## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| JOHN DUROCHER, DARIN HARRIS and ANTHONY MIRANDO, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, RIDDELL, INC., ALL AMERICAN SPORTS CORPORATION d/b/a RIDDELL/ALL AMERICAN, RIDDELL SPORTS GROUP, INC., EASTON-BELL SPORTS, INC., EASTON-BELL SPORTS, LLC, EB SPORTS CORPORATION, RBG HOLDINGS CORPORATION, and KRANOS CORPORATION d/b/a SCHUTT SPORTS,<br><br>Defendants. | No. 1:13-cv-01570-SEB-DML<br><br>FIRST AMENDED CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs John DuRocher, Darin Harris, and Anthony Mirando (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by counsel, bring this class action complaint against Defendants National Collegiate Athletic Association ("NCAA"), Riddell, Inc., All American Sports Corporation d/b/a Riddell/All American, Riddell Sports Group, Inc., Easton-Bell Sports, Inc., Easton-Bell Sports, LLC, EB Sports Corporation, RBG Holdings Corporation (collectively "Riddell Defendants") and Kranos Corporation d/b/a Schutt Sports (hereinafter "Schutt Sports") and allege the following upon information, belief and investigation of counsel:

## NATURE OF ACTION

1.      This action seeks to recover damages for injuries sustained by the Plaintiffs as a direct and proximate result of the intentional and tortious conduct of the Defendants in connection with the failure to take effective action to protect players and/or inform players of the true risks associated with concussions, brain injury, and brain trauma.

2.      Football is unquestionably a tough, aggressive, physically demanding sport. Injuries are common.  As such, it is vital to the safety of the players that the NCAA act reasonably, through research, studies, and other means, to identify the risks of serious injury associated with playing collegiate football; to keep the teams and players informed of the risks that they identify; and to take reasonable steps based upon their findings to protect their players.

3.      The rash of head injuries has been noted in a wide variety of news articles and television segments, and was addressed recently by the NCAA in an announcement that it would clamp down on illegal blows to the head.  But, as previously alluded to, this spate of head injuries is not a new problem at all.  For decades, collegiate football players have been plagued by the devastating effects of concussions.

4.      The NCAA's constitution states that college athletics shall be conducted in a manner designed to protect the physical and educational well-being of college athletes. Article 2.2 of the NCAA Constitution specifically addresses the "Principle of Student-Athlete Well-Being," and provides in pertinent part:

> **2.2 The Principle of Student-Athlete Well-Being**
> Intercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well being of student-athletes. (Revised: 11/21/05.)
>
>      ***
>
> **2.2.3 Health and Safety**
> It is the responsibility of each member institution to protect the health of,

and provide a safe environment for, each of its participating student-athletes. (Adopted: 1/10/95.)

5.     Article 2, §2.8.2 of the NCAA's constitution further states that the NCAA "shall assist the institution in its efforts to achieve full compliance with all rules and regulations...." This responsibility is reiterated on the NCAA's website, which places leadership responsibility on health and safety issues with the NCAA.

6.     Furthermore, in its annually published Sports Medicine Handbook, the NCAA explicitly states that "student-athletes rightfully assume that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risks of injury from athletics participation."

7.     The NCAA has breached its duty to protect college football players in the face of long-standing and overwhelming evidence regarding the need to do so.  The NCAA has ignored this duty and profited immensely from its inaction and denial, all to the detriment of the players.

8.     The NCAA has failed to educate its student-athletes of the long term, life-altering risks and consequences of head impacts in football. They have failed to establish known protocols to prevent, mitigate, monitor, diagnose and treat brain injuries. As knowledge of the adverse consequences of head impacts in football has grown, the NCAA has never gone back to its former college football players to offer education or needed medical monitoring.  In the face of their overwhelming and superior knowledge of these risks, as compared to that of the athletes, the NCAA's conduct constitutes negligence and reckless endangerment.

9.     Specifically, the NCAA has failed to address and/or correct the coaching of tackling, checking or playing methodologies that cause head injuries; the NCAA, Riddell and Schutt Sports have failed to educate coaches, trainers and student-athletes as to the symptoms indicating possible concussions; the NCAA has failed to implement system-wide "return to play"

3

guidelines for student-athletes who have sustained concussions; the NCAA has failed to implement system-wide guidelines for the screening and detection of head injuries; the NCAA has failed to implement legislation addressing the treatment and eligibility of student-athletes who have sustained multiple concussions in the course of play; and the NCAA, Riddell and Schutt Sports have failed to implement a support system for student-athletes who, after sustaining concussions, are left unable to either play their sport or even lead a normal life.

10.    The NCAA's conduct is particularly egregious in light of the fact that its policies and procedures – or lack thereof – leave former college football players like Plaintiffs and members of the below-defined Class inadequately protected from sustaining, monitoring and recovering brain injuries at a particularly early and vulnerable point in their lives. Unlike professional athletes, who at least have resources to pay for medical care necessitated by head injuries caused during their professional careers, collegiate football players typically range in age from 18 - 23 and are just beginning their adult lives. For such NCAA student-athletes, including Plaintiffs and the putative Class, these injuries can have long-term, debilitating effects, ranging from an inability to finish their education, to loss of memory, to depression, and early-onset dementia.

11.    As such, Plaintiffs seek medical monitoring and financial recovery for the long-term and chronic injuries, financial losses, expenses and other losses suffered by the Plaintiffs and members of the Class as a result of the NCAA, Riddell and Schutt Sports' carelessness, negligence, and concealment of information.

## JURISDICTION AND VENUE

12.    This Court has original diversity jurisdiction over this action under 28 U.S.C. § 1332(a) and (d) in that this is a class action in which the amount in controversy exceeds the sum

of $5,000,000, exclusive of interest and costs, and in which numerous members of the proposed class are citizens of a state other than the Defendants.

13.     This Court has personal jurisdiction over the Defendants because the Defendants conduct substantial business in the District.  Moreover, a substantial part of the events or omissions giving rise to the claims asserted here occurred in this District.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (c), and (d) because a substantial part of the events or omissions giving rise to the claims asserted here occurred in this District, and the NCAA resides, is found, has agents, or conducts substantial business in this District (and did so during the Class Period.)

## PARTIES

15.     Plaintiff John DuRocher is a natural person and a citizen of the State of Washington. Mr. DuRocher was a student at the University of Oregon and University of Washington and played college football from 2003 – 2006. He played as quarterback.  During his collegiate football career he experienced repeated traumatic head impacts.  For example, in a game against Stanford University, Mr. DuRocher sustained a hit that left him lightheaded and dizzy, was removed from the game and subsequently diagnosed with a concussion.  Mr. DuRocher believes that he suffered other similar head impacts in his college football career, but cannot recall them with specificity. After graduation, Mr. DuRocher has experienced frequent severe headaches.  Mr. DuRocher is at increased risk of latent brain injuries caused by repeated head impacts in his college football career.  As a result of the injuries sustained during his collegiate football career, Mr. DuRocher is in need of medical monitoring. Mr. DuRocher has also incurred out-of-pocket costs and continues to pay for ongoing medical treatment directly related to the repeated traumatic head impacts.

16.     Plaintiff Darin Harris is a natural person and a citizen of the State of Washington. Mr. Harris was a student at the University of Washington and played college football from 2004 – 2008. He played as strong safety and was on the special teams unit.  While attending University of Washington, Mr. Harris was named the defensive most valuable player on several occasions and was on full academic scholarship.

17.     During his college career he experienced repeated traumatic head impacts. For example, Mr. Harris recalls an impact to the head in a game against the University of Oregon, during the 2007 season, in which he was blindsided and experienced lightheadedness and dizziness.  He recalls returning to play the next time the defense took the field.  In the Fall of 2008, Mr. Harris recalls suffering another severe impact to the head in a game against Brigham Young University, was subsequently removed from the game and later diagnosed with a concussion.   Mr. Harris believes that he suffered other similar head impacts in his college football career, but he cannot recall them with specificity. After graduation, Mr. Harris has experienced frequent severe headaches, memory loss, an inability to concentrate or focus, anxiety and depression.  Mr. Harris is at increased risk of latent brain injuries caused by repeated head impacts in his college football career.  As a result of the injuries sustained during his collegiate football career, Mr. Harris is in need of medical monitoring.  Mr. Harris has also incurred out-of-pocket costs and continues to pay for ongoing medical treatment directly related to the repeated traumatic head impacts.

18.     Plaintiff Anthony Mirando is a natural person and a citizen of the State of Ohio.  Mr. Mirando was a student at Kent State University and played college football from 2006 – 2010. He played as outside linebacker. While attending Kent State University, Mr. Mirando was named academic ALL-MAC defensive player and was on full academic scholarship.

19.     During his collegiate football career he experienced repeated traumatic head impacts. Mr. Mirando recalls playing in several games whereby he sustained hits that left him lightheaded, dizzy and nauseated.  On two occasions, he recalls returning to play in the very same game he suffered a severe head impact and was subsequently diagnosed with a concussion by the team physician.  Mr. Mirando believes that he suffered other similar head impacts in his college football career, but cannot recall them with specificity.  After graduation, Mr. Mirando has experienced frequent severe headaches, blurred vision, difficulty concentrating and memory loss. Mr. Mirando is at increased risk of latent brain injuries caused by repeated head impacts in his college football career.  As a result of the injuries sustained during his collegiate football career, Mr. Mirando is in need of medical monitoring.  Mr. Mirando has also incurred out-of-pocket costs and continues to pay for ongoing medical treatment directly related to the repeated traumatic head impacts.

20.     Defendant National Collegiate Athletic Association ("NCAA") is an unincorporated association that acts as the governing body of college sports.  Its principal office is located in Indianapolis, Indiana. According to its website, the NCAA oversees 88 championships in 23 sports. There are more than 400,000 student-athletes competing in three divisions at over 1,000 colleges and universities *i.e.* member schools within the NCAA.  Through various licensing programs, the NCAA takes in, on average, over $750 million in revenues each year.

21.     Defendant Riddell, Inc. is a corporation organized and existing under the laws of the State of Illinois and whose principal place of business is in the State of Illinois. Riddell is engaged in the business of designing, manufacturing, selling and distributing football equipment, including helmets, to the NCAA and its member schools.

7

22.     Defendant All American Sports Corporation, doing business as Riddell/All American, is a corporation organized and existing under the laws of the State of Delaware and is engaged in the business of designing, manufacturing, selling and distributing football equipment, including helmets, to the NCAA and its member schools.

23.     Defendant Riddell Sports Group, Inc. is a Delaware corporation with its principal place of business at 6255 N. State Highway, #300, Irving, Texas 76038.

24.     Defendant Easton-Bell Sports, Inc. is a Delaware Corporation with a principal place of business at 7855 Haskell Avenue, Suite 200, Van Nuys, California 91406 and is a parent corporation of Riddell Sports Group Inc. Easton-Bell Sports, Inc. designs, develops, and markets branded athletic equipment and accessories, including marketing and licensing products under the Riddell brand.

25.     Defendant Easton-Bell Sports, LLC is the parent corporation of Easton-Bell Sports, Inc. and is incorporated in Delaware, with a principal place of business at 152 West 57th Street, New York, New York 10019.

26.     Defendant EB Sports Corporation is a Delaware corporation with its principal place of business at 7855 Haskell Avenue, Van Nuys, California 91406.

27.     Defendant RBG Holdings Corporation is a Delaware corporation with its principal place of business at 7855 Haskell Avenue, Suite 350, Van Nuys, California 91406.

28.     Defendants Riddell, Inc., Riddell Sports Group Inc., All American Sports Corporation, Easton-Bell Sports, Inc., EB Sports Corporation, Easton-Bell Sports, LLC, and RBG Holdings Corporation, shall hereinafter be referred to collectively as the "Riddell Defendants."

29.     Defendant Kranos Corporation, doing business as Schutt Sports (hereinafter

"Schutt Sports"), is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Litchfield, Illinois.  Schutt Sports is engaged in the business of designing, manufacturing, selling and distributing football equipment, including helmets, to the NCAA and its member schools.

30.     The factual allegations against the Riddell Defendants and Schutt Sports for purposes of this Complaint are set forth in separate paragraphs.

## FACTUAL ALLEGATIONS

### A.     *The NCAA Breached its Duty to Protect NCAA Football Players*

31.     Historians report that the very existence of the NCAA evolved from the actions of President Teddy Roosevelt, who at the end of the 1905 college football season summoned the Presidents of Harvard, Yale and Princeton to the White House to call for reform of the game to prevent brutality and unsportsmanlike conduct. In 1905, 18 youths had died playing football and there were strong calls to ban the game. Roosevelt's plea to the three university presidents created momentum for health and safety reform of college football that led to the formation of the Intercollegiate Athletic Association for the United States in 1906, which assumed the name NCAA in 1910.  Historians report that this specific concern for the safety of college football players led to the creation of the NCAA.  From the turn of the 20th century to the present, the NCAA has assumed a duty to NCAA athletes to protect their health and safety.  These duties were confirmed over the decade and are reflected in the NCAA's constitution.

32.     The NCAA has failed to educate its student-athletes of the long term, life-altering risks and consequences of head impacts in football. They have failed to establish known protocols to prevent, mitigate, monitor, diagnose and treat brain injuries. As knowledge of the adverse consequences of head impacts in football has grown, the NCAA has never gone back to

its former college football players to offer education or needed medical monitoring. In the face of their overwhelming and superior knowledge of these risks, as compared to that of the athletes, the NCAA's conduct constitutes negligence and reckless endangerment.

### B.    A Primer on Head Injuries, Concussions, and Neurological Damage

33.    Medical science has known for many decades that repetitive and violent jarring of the head or impact to the head can cause Mild Trauma Brain Injury ("MTBI") with a heightened risk of long term, chronic neuro-cognitive sequela.

34.    For example, Dr. Bennet Omalu, a renowned neuropathologist at the University of California, summarized the history of knowledge of "Head and Other Injuries in Youth, High School, College, and Professional Football," in his testimony before the U.S. Congress as follows:

> We have known about concussions and the effects of concussions in football for over a century. Every blow to the head is dangerous. Repeated concussions and sub-concussions both have the capacity to cause permanent brain damage. During practice and during games, a single player can sustain close to one thousand or more hits to the head in only one season without any documented or reported incapacitating concussion. Such repeated blows over several years, no doubt, can result in permanent impairment of brain functioning especially in a child.

35.    The American Association of Neurological Surgeons (the "AANS") has defined a concussion as "a clinical syndrome characterized by an immediate and transient alteration in brain function, including an alteration of mental status and level of consciousness, resulting from mechanical force or trauma." The AANS defines traumatic brain injury ("TBI") as:

> a blow or jolt to the head, or a penetrating head injury that disrupts the normal function of the brain.   TBI can result when the head suddenly and violently hits an object, or when an object pierces the skull and enters brain tissue.  Symptoms of a TBI can be mild, moderate or severe, depending on the extent of damage to the brain.  Mild cases may result in a brief change in mental state or consciousness, while severe cases may result in extended periods of unconsciousness, coma or even death.

36.     The NCAA, Riddell Defendants and Schutt Sports have known or should have known for many years that MTBI generally occurs when the head either accelerates rapidly and then is stopped, or is rotated rapidly. The results frequently include, among other things, confusion, blurred vision, memory loss, nausea, and sometimes unconsciousness.

37.     The NCAA, Riddell Defendants and Schutt Sports have known or should have known for many years that medical evidence has shown that symptoms of MTBI can appear hours or days after the injury, indicating that the injured party has not healed from the initial blow.

38.     The NCAA, Riddell Defendants and Schutt Sports have known or should have known for many years that once a person suffers an MTBI, he is up to four times more likely to sustain a second one.  Additionally, after suffering even a single sub-concussive or concussive blow, a lesser blow may cause MTBI, and the injured person requires more time to recover.

39.     The NCAA, Riddell Defendants and Schutt Sports have known or should have known for many years that collegiate football players and their families were unaware of the serious risk posed to the players' long-term cognitive health, caused by repeated head impacts while playing football.

40.     The NCAA, Riddell Defendants and Schutt Sports have known or should have known for many years that clinical and neuropathological studies by some of the nation's foremost experts demonstrate that multiple head injuries or concussions sustained during a football player's career can cause severe cognitive problems such as depression and early-onset dementia.

41.     The NCAA, Riddell Defendants and Schutt Sports have known or should have known for many years that published peer reviewed scientific studies have shown that repeated

traumatic head impacts (including sub-concussive blows and concussions) cause ongoing and latent brain injury. These injuries have been documented and associated with sports-related head impacts in both football and boxing.

42.     The NCAA, Riddell Defendants and Schutt Sports have known or should have known for many years that neuropathology studies, brain imaging tests, and neuropsychological tests on many former football players have established that football players who sustain repetitive head impacts while playing the game have suffered and continue to suffer brain injuries that result in any one or more of the following conditions: early-onset of Alzheimer's Disease, dementia, depression, deficits in cognitive functioning, reduced processing speed, attention, and reasoning, loss of memory, sleeplessness, mood swings, personality changes, and the debilitating and latent disease known as Chronic Traumatic Encephalopathy ("CTE").  CTE is also associated with an increased risk of suicide.

43.     The NCAA, Riddell Defendants and Schutt Sports have known or should have known for many years that CTE is found in athletes, including football players and boxers, with a history of repetitive head trauma. Conclusive studies have shown that this condition is prevalent in retired professional football players who have a history of head injury. The changes in the brain caused by repetitive trauma are thought to begin when the brain is subjected to that repetitive trauma, but symptoms may not appear until months, years, or even decades after the last traumatic impact or the end of active athletic involvement.

44.     Published peer-reviewed scientific studies have shown that concussive and sub-concussive head impacts while playing football are linked to significant risk of permanent brain injury.   This head trauma, which includes multiple concussions, triggers progressive degeneration of the brain tissue.   The brain degeneration is associated with memory loss,

confusion, impaired judgment, paranoia, impulse control problems, aggression, depression, and eventually, progressive dementia.

### C.    *The NCAA was and is in a Superior Position of Knowledge, Authority and Owed a Duty to its Players*

45.    Since the early 1970s, the high incidence of concussions among student-athletes in many different sports, including football, hockey and soccer, has been well known to the NCAA.  Further, based on studies that the NCAA *itself* paid for (as explained in detail below), the NCAA has been aware that a history of multiple concussions has been associated with greater risk of future brain defects in student-athletes, including symptoms of post-traumatic brain injury such as headaches, dizziness, loss of memory, impulse control problems, and CTE.

46.    From its inception, the NCAA had a duty to protect football players from health and safety risks. The NCAA held itself out as acting in the players' best interests.  Players and their families have relied on the NCAA to disclose relevant risk information and protect their health and safety.

47.    The NCAA's accumulated knowledge about head injuries to football players, and the associated health risks therefrom, was at all times superior to that available to the former college football players.

48.    In the early 2000s, the NCAA specifically became aware of the correlation between concussions and depression, dementia, and early on-set Alzheimer's disease. Despite this knowledge, the NCAA failed to act reasonably by developing appropriate means to identify at-risk players and guidelines or rules regarding return to play criteria. The NCAA's inaction increased the risk of long-term injury and illness in student-athletes, especially college football players.

**D.      The NCAA Knew the Dangers and Risks Associated with Repetitive Head Impacts and Concussions**

49.      In the early 1980s, the Department of Neurosurgery at the University of Virginia published studies on patients who sustained MTBI and observed long-term damage in the form of unexpected cognitive impairment. The studies were published in neurological journals and treatises within the United States.

50.      For example, in 1982, the University of Virginia and other institutions conducted studies on college football teams that showed that football players who suffered MTBI suffered pathological short-term and long-term damage. With respect to concussions, the same studies showed that a person who sustained one concussion was more likely to sustain a second, particularly if that person was not properly treated and removed from activity so that the concussion symptoms were allowed to resolve.

51.      The same studies showed that two or more concussions close in time could have serious short-term and long-term consequences in both football players and other victims of brain trauma.

52.      In 1986, Dr. Robert Cantu of the American College of Sports Medicine published Concussion Grading Guidelines, which he later updated in 2001.

53.      By 1991, three distinct medical professionals/entities—Dr. Robert Cantu of the American College of Sports Medicine, the American Academy of Neurology, and the Colorado Medical Society—developed return-to-play criteria for football players suspected of having sustained head injuries.

54.      The NCAA implemented an injury surveillance system in 1982.  In 1994, Randall W. Dick, Assistant Director of Sports Science for the NCAA, authored an article entitled "*A Summary of Head and Neck Injuries in Collegiate Athletics Using the NCAA Injury Surveillance*

14

*System*" published by the American Society for Testing and Materials. The article identified concussions as the most prevalent type of head injury and noted that evaluation of concussions may be a first step to the prevention of severe injuries. The author cautioned that "[m]edical personnel should be educated on the diagnosis and treatment of such injuries in all sports and rules protecting the head and neck should be enforced." In spite of this admonition, the NCAA did not proceed to educate its active football players on the long term risks of concussions, nor provide necessary medical monitoring. Furthermore, the NCAA never reached out to its former football players to educate them or provide necessary medical monitoring.

55. In 1996, the NCAA Sports Science Safety Subcommittee on Competitive Safeguards and Medical Aspects of Sports discussed the concussion data in football and other sports and recognized the football helmet would not prevent concussions. No further steps were taken to educate present or former NCAA football players regarding the risks of concussions, or to provide needed medical monitoring.

56. In 1999, the National Center for Catastrophic Sport Injury Research at the University of North Carolina conducted a study involving eighteen thousand (18,000) collegiate and high school football players. The research showed that once a player suffered one concussion, he was three times more likely to sustain a second in the same season.

57. In 2000, a study presented at the American Academy of Neurology's 52nd Annual Meeting and authored by Dr. Barry Jordan, Director of the Brain Injury Program at Burke Rehabilitation Hospital in White Plains, New York, and Dr. Julian Bailes, surveyed 1,094 former NFL players between the ages of 27 and 86 and found that: (a) more than 60% had suffered at least one concussion in their careers, with 26% of the players having three or more and 15% having five or more; (b) 51% had been knocked unconscious more than once; (c) 73% of those

injured said they were not required to sit on the sidelines after their head trauma; (d) 49% of the former players had numbness or tingling; 28% had neck or cervical spine arthritis; 31% had difficulty with memory; 16% were unable to dress themselves; 11% were unable to feed themselves; and (e) eight suffered from Alzheimer's disease.

58.     A 2001 report by Dr. Frederick Mueller that was published in the Journal of Athletic Training reported that a football-related fatality has occurred every year from 1945 through 1999, except for 1990.  Head-related deaths accounted for 69% of football fatalities, cervical spinal injuries for 16.3%, and other injuries for 14.7%.  High school football produced the greatest number of football head-related deaths. From 1984 through 1999, sixty-nine football head-related injuries resulted in permanent disability.

59.     In 2002, a prominent study published in the Archives of Clinical Neuropsychology entitled *Enduring Effects of Concussion in Youth Athletes* documented that there were enduring effects in youth who have experienced a history of two or more concussions.[1] These include decreased overall neuropsychological functioning, as well as decreased mental speed.

60.     In 2003, the University of North Carolina, Chapel Hill, published a study, funded in part by the NCAA, which concluded that NCAA football players required an average of five to seven days after concussion for their cognitive functioning to return to normal.[2] The study concluded that *athletes required a full seven days after a concussion before completely regaining their pre-concussion abilities*.

61.     Despite this knowledge, the NCAA continues to allow college football players to

---

[1]      Moser, *et al.*, Archives of Clinical Neuropsychology, 17 (2002) 91-100.
[2]      McCrea, *et al.*, *Acute Effects and Recovery Time Following Concussions in Collegiate Football Players, The NCAA Concussion Study*, JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, Vol. 290, No. 19, November 19, 2003, at 2561.

return to play the very next calendar day after sustaining a concussion. In practice, this means that a student athlete can be back on the field less than 24 hours after sustaining a serious brain injury – thereby placing the student-athlete in serious medical jeopardy.

62.     In another 2003 UNC-Chapel Hill study, again partially funded by the NCAA, the effects of multiple concussions sustained by a single athlete were examined.[3]  The study found that NCAA football players who had a history of concussions are at an increased risk of sustaining additional future concussions, and that those student-athletes who had three previous concussions were at a three-fold greater risk of future concussions.  The study recommended that athletes with a high cumulative history of concussions should receive more information about the increased risk of repeat concussions before deciding whether to continue to play football.

63.     The study also concluded that the use of standardized assessment tools would assist medical staff in better determining how long student-athletes should rest before returning to play.  Despite this knowledge, the NCAA has failed to implement any guidelines or rules pertaining to repeat concussions and failed to implement an educational program for athletes with a history of concussions who profess a desire to continue playing football.

64.     In 2005, UNC-Chapel Hill published a study that found a clear link between previous head injuries and the likelihood of developing mild cognitive impairment (MCI) and early-onset Alzheimer's disease.[4] In fact, the study found that players with three or more reported concussions were five times more likely to develop MCI, three times more likely to develop significant memory problems, and possessed an overall higher likelihood of developing

---

[3]     Guskiewicz, *et al.*, *Cumulative Effects Associated With Recurrent Concussion in Collegiate Football Players, The NCAA Concussion Study*, THE JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, Vol. 290, No. 19, November 19, 2003, at 2549.
[4]     Guskiewicz, *et al*., *Association between recurrent concussions and late-life cognitive impairment in retired professional football players*, NEUROSURGERY, Vol. 50, October 2005, at 719.

early on-set Alzheimer's disease. The NCAA did not even acknowledge the study, let alone act

on it or even alert its student-athletes of these known risks.

65.     Two years later, the NCAA ignored yet another UNC-Chapel Hill study, which

found that recurrent concussions were linked to a heightened risk of depression in former

football players.[5]  The results of that study showed that former football players who sustained

three or more concussions were three times more likely to be diagnosed with depression. Those

with two or more concussions were one and one-half times more likely to be diagnosed with

depression.

66.     In 2004, the NCAA "injury surveillance system" documented a high rate of

concussions in football and other sports. No action was taken by the NCAA to respond to this

data in terms of educating former players or providing needed medical monitoring.

67.     The National Athletics Trainers Association ("NATA") published concussion

management guidelines in 2004 repeating the need for return to play protections and symptom

monitoring as earlier medical recommendations had outlined.

68.     The University of North Carolina's Center for the Study of Retired Athletes

published survey-based papers in 2005 through 2007 that found a strong correlation between

depression, dementia, and other cognitive impairment in NFL players and the number of

concussions those players had received.

69.     In 2008, the University of Michigan's Institute for Social Research conducted a

study on the health of retired players, with over 1,000 former NFL players taking part.  The

results of the study, which were released in 2009, reported that "Alzheimer's disease or similar

memory-related diseases appear to have been diagnosed in the league's former players vastly

---

[5]      Guskiewicz, *et al.*, *Recurrent concussions and risk of depression in retired professional football players,*
MED. SCI. SPORTS EXERC., Vol. 39, June 2007, at 903.

more often than in the national population – including a rate of 19 times the normal rate for men ages 30 through 49."

70.     In June 2010, scientific evidence linked multiple concussions to yet another degenerative brain disease—Amyotrophic Lateral Sclerosis ("ALS"), commonly referred to as "Lou Gehrig's Disease."

71.     As yet another example, the chart on the following page, which is excerpted from an article in the 2010 New England Journal of Medicine entitled Traumatic Brain Injury—Football, Warfare, and Long-Term Effects, shows that even mild "traumatic brain injury" ("TBI") can have lasting consequences that are manifest later in the football player's life.



Spectrum of Pathologic Features and Outcomes of Traumatic Brain Injury (TBI).
In the left inset, Bielschowsky silver stain shows intraneuronal and extracellular neurofibrillary tangles in temporal cortex from a retired boxer with dementia pugilistica.[1] The right inset shows diffuse Aβ plaque deposits in temporal cortex from a subject who sustained severe TBI.[2]

72.    In sum, the NCAA has known for decades that MTBI experienced in football can and does lead to long-term brain injury in football players, including, but not limited to, memory loss, dementia, depression, and CTE and its related symptoms.

73.    Not until 2010 did the NCAA take action by adopting a concussion management

policy that delegated the concussion problem to its member schools.  This public relations maneuver, in the face of decades of knowledge coupled with inaction, was too little and too late to correct the inadequacies of its past conduct and its detrimental impact on former collegiate players.

   **E.      Scientific and Medical Evidence Regarding the Need for Medical Monitoring and the Availability of Specific Medical Tests and Protocols for the Early Detection of Latent Brain Injury**

74.      As stated *supra*, published peer-reviewed scientific studies have shown that repeated traumatic head impacts (including sub-concussive blows and concussions) cause ongoing and latent brain injury.  Such brain injury has been documented as a result of various causes, including sports-related head impacts in both football and boxing.

75.      Neuropathology studies, brain imaging tests, and neuropsychological tests on many former football players have established that football players who sustain repetitive head impacts while playing the game have suffered and continue to suffer brain injuries that result in any one or more of the following conditions: early onset of Alzheimer's Disease, dementia, depression, deficits in cognitive functioning, reduced processing speed, attention, and reasoning, loss of memory, sleeplessness, mood swings, personality changes, and CTE.

76.      Repeated traumatic head impacts suffered by former football players have a microscopic and latent effect on the brain.   These impacts twist, shear, and stretch neuronal cells such that multiple forms of damage take place, including the release of small amounts of chemicals within the brain, such as the Tau protein.  Among other things, the gradual build up of Tau protein—sometimes over decades—causes CTE, which is the same phenomenon as boxer's encephalopathy (or punch drunk syndrome), which was studied and reported in the Martland study in 1928.  CTE is also associated with an increased risk of suicide, dementia, and a progressive

cognitive decline and dysfunction.

77.     Accordingly, the repeated traumatic head impacts suffered by former NCAA football players exposed them to a subtle and repetitive change within the brain on the cellular level including increased levels of the Tau protein which is known to increase the risk of brain injury.

78.     Plaintiffs and members of the Class were exposed to a significant number of sub-concussive blows and concussions as a result of their college football careers.  The general public does not experience this type of brain trauma.

79.     Historically, the NCAA has dismissed repeated sub-concussive blows and concussions as "dings" and having one's "bell rung," and concealed facts that would assist the members of the Class in being able to obtain adequate brain injury diagnosis, management, and treatment to facilitate recovery and rehabilitation.

80.     The NCAA's inaction and denial as to the risks of chronic sub-concussive blows and concussions has increased the risks for members of the Class to brain injury and its sequela including cognitive, mental health, and neurological disorders during the years following their collegiate football careers.

81.     Management of concussions requires a gradual, multistep process involving baseline testing and neurocognitive examination.

82.     For sports, such as football, in which repeated blows to the head are unavoidable, proper concussion assessment and management is paramount for preventing and mitigating long-term consequences.

83.     Medical monitoring for latent brain injury identifies deficits that are amenable to treatment through medical, cognitive, psychological and behavioral counseling (for the patient and his spouse and family), as well as through pharmaceutical treatment, lifestyle modifications,

and other therapeutic interventions.

84.      Serial testing of cognitive functioning for early signs or symptoms of neurologic dysfunction, and serial brain imaging for signs of injury or disease, is medically necessary to assure early diagnosis and effective treatment of brain injury.

85.      Medical monitoring for latent brain injury is highly specialized and different from the medical care that is normally recommended to other men of a similar age, in the absence of a history of chronic repeated sub-concussive impacts and concussions.

86.      Well-established and specialized medical monitoring procedures exist to provide early diagnosis of brain injury which greatly enhances successful treatment, rehabilitation, and prevention or mitigation of cognitive, psychological, and behavioral deficits.

87.      Such procedures include serial brain imaging studies and neuropsychological evaluations targeted on identifying the deficits associated with chronic and repeated sub-concussive blows and concussions experienced by members of the Class.

88.      Medical monitoring for latent brain injury is reasonably necessary to provide for early diagnosis, leading to benefits in treatment, management, rehabilitation, and prevention or mitigation of damage.

F.      *The NCAA Fraudulently Concealed Information on the Long-Term Effects of Repeated Head Impacts in Football*

89.      Despite its awareness of these dangerous practices and the increased risk of head injury to the players, during the 1970s, 1980s, 1990s and 2000s, the NCAA turned a blind eye to the players being coached and trained to use all portions of their helmet to block, tackle, butt, spear, ram and/or injure opposing players by hitting with their helmeted heads, and instead elevated its financial self-interest above the physical safety of its student-athletes.

90.      As noted above, the NCAA knew of the head trauma risks of football players for

23

several decades, yet took no action to educate its football players of these risks.  Similarly they took no action to provide medical monitoring to prevent, mitigate, monitor, diagnose, or treat these injuries.

91.     In August 2010, the NCAA implemented a concussions management plan ("CMP"); however, this plan failed to provide the necessary education and disclosure of head trauma risks, and needed medical monitoring, to former players.

92.     Prior to passage of the NCAA CMP, Plaintiffs and members of the Class were unaware that the conduct of the NCAA may have caused them to be at an increased risk for developing chronic brain injury symptoms, including, but not limited to, dementia and/or Alzheimer's disease.

93.     Plaintiffs and members of the Class did not have a reasonable basis to know or believe that the aforementioned harm was caused by the concealment, neglect and/or misconduct of the NCAA.

94.     Over the past four decades, the NCAA has actively concealed any correlation between on-field concussions, its return-to-play policies and the chronic mental illnesses and maladies suffered by former college football players, including Plaintiffs and the Class.

95.     Even today, by failing to implement appropriate policies to prevent, manage, mitigate and remedy head injuries and concussions sustained by its student-athletes, the NCAA continues to ignore and actively conceal the repeated warnings and patterns of injury of which the NCAA has actual knowledge.

96.     Although the debilitating effects of concussions and other head injuries have already manifested for many former college football players, there are many others who have sustained such injuries as a direct result of the NCAA's failures and inactivity described above,

but whose symptoms have only partially manifested or not yet manifested at all.

97.     The NCAA has failed to establish a proper and adequate methodology to monitor and detect when players suffer concussive or sub-concussive injury in practice or game play. This has increased the risk of injury that will materialize in the future.

98.     As a result, Plaintiffs and members of the Class require medical monitoring to detect the manifestation of post-injury symptoms.

99.     The NCAA was under a continuing duty to disclose the true character, quality, and nature of the after effects of head injuries. Because of the NCAA's deceitful and fraudulent concealment of the true character, quality, and nature of these injuries, the NCAA is estopped from relying on any statute of limitations defense.

## ALLEGATIONS AGAINST THE RIDDELL DEFENDANTS

100.     The Riddell Defendants have operated as a business through designing, developing, manufacturing, selling, and distributing football equipment, including helmets, in one form or another, since 1922.

101.     As early as the 1930s, players began using helmets during football games. These early helmets were constructed from pieces of cobbled leather.

102.     In the early 1940s, John T. Riddell, who later formed John T. Riddell Incorporated, invented the first plastic suspension helmet. In 1949, plastic helmets became legalized.

103.     Throughout the latter half of the 20th century and continuing to present day, the Riddell Defendants have designed, developed, manufactured, sold, and distributed equipment used in the NCAA and its member schools, including equipment used by Plaintiffs and members of the Class, including, but not limited to, the following:

(a)     In the 1950s, the Riddell Defendants manufactured a face-mask component for its helmets, which was eventually patented.

(b)     In 1962, the Riddell Defendants used a "U" shaped nose protector with a shell (known as the TK2) molded out of polycarbonate. The Riddell Defendants also designed an open/closed cell foam and composite liner system for this model to increase the efficiency of the webbed suspension.

(c)     In 1963, the Riddell Defendants developed the TAK-29 helmet, which was the first to use air inflation for fitting the helmet snug to the head. The TAK-29 shell, like the TK2, displayed the protective polycarbonate plastic, in addition to including tough shock and cut-resistant face-mask attachment straps.

(d)     In 1969, recognizing that head protection was a key factor in helmet design requiring durable head protection, the Riddell Defendants constructed a micro-fit helmet model with injection molding technology to create a one-piece shell to improve the structural integrity of the entire helmet.

(e)     In 1973, the Riddell Defendants developed, designed, manufactured, sold, and/or distributed an air cushion helmet whose interior system consisted of individual vinyl air cushions with layers of fitting and energy absorbing foam. When a blow was struck, the air in the cushion was expelled through a single vent, greatly reducing the initial impact. With the exhausting of the air cushion, the compressed fitting foam was further compressed, reducing impact.

(f)     In 1977, the Riddell Defendants developed, designed, manufactured, sold, and/or distributed a stainless steel face-mask which offered greater bend resistance that prevented helmet breakage at the drill holes.

(g)     In 1981, the Riddell Defendants developed, designed, manufactured, sold, and/or distributed an Air Cushion Engineered helmet.

(h)     In 1982, the Riddell Defendants developed, designed, manufactured, sold, and/or distributed a M155 helmet model with a combination of foam and liquid-filled cells used for padding. On impact, the liquid would be throttled from one cell to the next, resulting in energy attenuation. The M155 helmet model included one-piece injection-molded face-masks which were mar and rust-resistant, in addition to polyurethane face mask straps and universal jaw pads.

(i)     In 2002, the Riddell Defendants developed, designed, manufactured, sold, and/or distributed the Riddell Revolution helmet designed with the intent of reducing the risk of concussion.

(j)     In 2003, the Riddell Defendants developed, designed, manufactured, sold, and/or distributed a real-time, Head Impact Telemetry System (HITS) to monitor and record significant incidences of head impact sustained during a football game or practice. The system measured the location, magnitude, duration, and direction of head acceleration and transmitted that information wirelessly to the sideline.

(k)     In 2006, the Riddell Defendants provided a research grant to the University of Pittsburgh Medical Center for head injury research. The

study compared rates of high school athletes who wore the Riddell
Revolution helmet with those who wore traditional helmets.

(l)     In 2007, the Riddell Defendants developed, designed, manufactured, sold,
and/or distributed an individual helmet system, Revolution IQ HitsTM,
allowing players to monitor the number and severity of impacts received
during games and practices. On-board electronics record every impact,
allowing players to upload and evaluate each occurrence on their home
computers.

(m)     In 2011, the Riddell Defendants developed, designed, manufactured, sold,
and/or distributed the 360 helmet which uses energy-managing materials
and a face mask attachment system to disperse the energy of frontal
impacts. According to Riddell, it developed this helmet using over 1.4
million impacts collected through Riddell's HITS technology.

104.    Since 1929, the Riddell Defendants have marketed themselves as "the premier
designer and developer of protective sports equipment."  According to its website, Riddell is also
the Official Helmet of the National Football League and the recognized leader in helmet
technology and innovation for *athletes at all levels of football.*  Upon information and belief,
Plaintiffs and members of the Class wore Riddell helmets at times while playing and/or
practicing during their NCAA football careers.

105.    The Riddell Defendants at all times mentioned herein were engaged in the
business of selling, manufacturing, designing, testing, engineering, marketing, modifying,
assembling, inspecting, distributing, and controlling the helmets and other similar equipment for
use by Plaintiffs and members of the Class and within the NCAA and its member schools.

106.   Plaintiffs and members of the Class did not know the long-term effects of concussions and relied on the NCAA and Riddell Defendants to protect them.

### A.   The Riddell Defendants' Duty to Protect Against the Long-Term Risk of Concussions

107.   Despite years of science and medicine linking the risk of long term brain injury from repeat concussions, it was not until the release of the Revolution Helmet wherein a notification reminding players to "sit out" if they suffer a concussion was placed on the Revolution helmet.

108.   Around the same time period, the Riddell Defendants developed the HITS system to monitor the severity and incident of impacts that a player receives.

109.   Based on a 2003 University of Pittsburgh Medical Center ("UPMC") study funded by a grant from the Riddell Defendants, the Riddell Defendants began to market the Revolution helmet as reducing concussions by 31%.

110.   However, both the HITS system and the Revolution helmet, both created by the Riddell Defendants and their employees have been criticized by experts for their inaccurate marketing as being safer in reducing the risk of concussion.

111.   A study published in the Journal of Neurosurgery showed that the study by UPMC was flawed in that it discounted low impact hits and in turn proved that the Revolution did not reduce the risk of concussions.

112.   Even to this day the Riddell Defendants do not acknowledge a link between repeat concussions and later life cognitive problems.

113.   In fact, the Riddell Defendants have never warned any Plaintiff or former college football player of the long-term health effects of concussions.

## ALLEGATIONS AGAINST SCHUTT SPORTS

114.    Defendant Schutt Sports has operated as a business through designing, developing, manufacturing, selling, and distributing sports equipment since 1935.

115.    In 1987, Defendant Schutt Sports began designing, developing, manufacturing, selling and distributing football and baseball helmets.

116.    Throughout the 1990's and continuing to present day, Schutt Sports has designed, developed, manufactured, sold, and distributed equipment used in the NCAA and its member schools, including equipment used by Plaintiffs and members of the Class, including, but not limited to, the following:

(a)     In 1987, Schutt Sports acquired, marketed, manufactured, sold, and/or distributed the "AiR®" football helmet.

(b)     In 1999, Schutt Sports introduced the game's first titanium football faceguard.

(c)     In 2001, Schutt Sports developed, designed, manufactured, sold, and/or distributed the "Air Advantage®" football helmet.

(d)     In 2003, Schutt Sports developed, designed, manufactured, sold, and/or distributed the "DNA Pro®" football helmet, the world's first helmet with (TPU) Thermoplastic Urethane Cushioning.  Schutt Sports marketed the TPU Cushioning as the first major advancement from traditional foam padding in helmets in 30 years. The helmet design was touted as being superior to traditional foam padding in game-like conditions with better impact absorption, better heat management and better hygienics.

(e)     In 2007, Schutt Sports developed, designed, manufactured, sold, and/or distributed the "AiR XP™" football helmet; the first traditional shell helmet with TPU Cushioning.

(f)     In 2008, Schutt Sports developed, designed, manufactured, sold, and/or distributed the "ION4D™" football helmet, the heir apparent to the DNA Pro – a large standoff helmet that features TPU Cushioning. The ION4D™ also featured the Energy Wedge Faceguard – a shock absorber for the helmet and the first major advancement in faceguard design in decades.

(g)     In 2010, Schutt Sports developed new helmet technology by introducing the quarter turn release system and TPU Jaw Pads.

117.    Defendant Schutt Sports has continuously marketed itself as the "world's leading maker of football helmets and faceguards."  According to its website, Schutt Sports' ION 4D, AiR XP, and DNA™ line of helmets all feature "breakthrough technology providing *maximum protection* to athletes" of all ages and "three out of four professional football players take the field wearing Schutt® gear."  Schutt's helmets are "the world's only football helmets to feature TPU Cushioning – the same material used by the US military for helmets for fighter pilots and paratroopers."  Upon information and belief, Plaintiffs and members of the Class wore Schutt Sports' helmets at times while playing and/or practicing during their NCAA football careers.

118.    Defendant Schutt Sports at all times mentioned herein was engaged in the business of selling, manufacturing, designing, testing, engineering, marketing, modifying, assembling, inspecting, distributing, and controlling the helmets and other similar equipment for use by Plaintiffs and members of the Class and within the NCAA and its member schools.

119.    Plaintiffs and members of the Class did not know the long-term effects of concussions and relied on the NCAA and Schutt Sports to protect them.

A.     *Schutt Sports Duty to Protect Against the Long-Term Risk of Concussions*

120.    Despite years of science and medicine linking the risk of long term brain injury from repeat concussions, it was not until recently Schutt Sports began to acknowledge that helmets systems could not prevent concussions and/or eliminate the risk of serious head or neck injuries while playing football.

121.    In 2011, U.S. Senator Tom Udall, wrote a letter to FTC chairman Jon Leibowitz requesting that the FTC investigate the misleading safety claims and deceptive practices related to the sale of new helmets and the reconditioning of used football helmets as meeting industry

safety standards.

122.    Senator Udall was quoted as saying "several helmet manufacturers advertise helmets as built with "concussion reduction technology" or "designed with the intent to reduce concussions."  These helmets are also marketed as meeting the National Operating Committee on Standards for Athletic Equipment (NOCSAE) voluntary industry standard for football helmets. However, this football helmet standard does not specifically address concussion risks."

123.    Senator Udall's letter also cited the example of a Schutt Sports online video advertisement that supposedly demonstrated the protection of their new helmet designs compared to other helmets by dropping a bowling ball onto a watermelon wrapped in Schutt padding and repeating the same test with other foam padding.

124.    In 2010, Schutt Sports issued a press release representing Schutt as the "Helmet of Choice for College Football's Best Programs." DJ MacLean, Director of Sports Marketing for Schutt Sports indicated that the branding program was a top priority for the company and the program was aimed at conferences like the Pac-10, Big Ten, Big East, Mountain West and SEC.

125.    Defendant Schutt Sports has continuously marketed its products to the NCAA, its member schools and college football players but it was not until recently and as a result of the FTC investigation that Schutt Sports agreed to stop making anti-concussion claims about their helmets.

126.    Even to this day Defendant Schutt Sports does not acknowledge a link between repeat concussions and later life cognitive problems.

127.    In fact, Defendant Schutt Sports has never warned any Plaintiff or former college football player of the long-term health effects of concussions.

## CLASS ACTION ALLEGATIONS

128.   Plaintiffs bring this action on behalf of themselves and, under Fed. R. Civ. P.

23(a), (b)(2) and (b)(3), as representatives of a National Class defined as follows:

> All former NCAA football players, and spouses of players, who sustained
> a concussion(s) or suffered concussion-like symptoms while playing
> football in a NCAA football game, and who have developed or will
> develop mental or physical problems as a result of the concussion(s)
> suffered and have incurred or will incur medical expenses from such
> injuries (the "Class").

Excluded from the National Class are the NCAA and its subsidiaries and affiliates; all former

NCAA football players who played professional football in the National Football League; all

persons who make a timely election to be excluded from the Class; governmental entities; and

the judge to whom this case is assigned and any immediate family members thereof.

129.   Certification of Plaintiffs' claims for class-wide treatment is appropriate because

Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as

would be used to prove those elements in individual actions alleging the same claims.

130.   The members of the Class are so numerous and geographically dispersed that

joinder is impracticable.  Plaintiffs believe that the Class includes hundreds if not thousands of

persons who have developed or will develop mental or physical problems as a result of the

sustaining traumatic brain injuries, concussions or concussion-like symptoms while playing in a

college football game, and that the locations of such persons is geographically dispersed

throughout the country.  Although the exact number and locations of such persons is unknown to

Plaintiffs at this time, records in the possession of the NCAA will contain information on the

identities and locations of such parties.

131.   Numerous questions of law and fact are common to all the members of the Class

because the Class Members all played under the same rules and practices; all played with the

same equipment; and they all suffered traumatic brain injuries, concussions or concussion-like symptoms while playing under these rules and practices.  Such common questions include:

     a.    whether the Defendants had a duty to provide warnings to players about the injuries associated with repeated brain trauma, concussions and concussion like symptoms;

     b.    whether the Defendants willfully and wantonly concealed evidence related to the injuries associated with repeated brain trauma, concussions and concussion like symptoms; and

     c.    whether the Defendants had a duty to enact rules that protect players from the dangers of sustaining one or more traumatic brain injuries, concussions or concussion-like symptoms in a football game.

132.    Plaintiffs' claims are typical of the claims of the members of the Class and the claims of the Named Plaintiffs originate from the same practices on the part of the Defendants. For example, Plaintiffs John DuRocher, Darin Harris and Anthony Mirando are each persons who sustained one or more traumatic brain injuries, concussions, or suffered concussion like symptoms, while playing in a collegiate football game and have developed mental or physical problems as a result of the traumatic brain injuries, concussions or concussion-like symptoms. As a result, Plaintiffs have sustained damages as a result of the Defendants wrongful conduct described herein.

133.    Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiffs are coincident with, and not antagonistic to, those of the other Class Members.

134.    Plaintiffs are represented by counsel with experience in the prosecution of class

action litigation, and with particular experience with class action litigation involving medical injuries.

135.   Class action treatment is also appropriate because the common questions of law and fact identified above predominate over questions affecting only individual members.

136.   Class action treatment is also the superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender, and will prevent inconsistent rulings or decisions.

137.   Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### COUNT I

**NEGLIGENCE**
**(Against the NCAA)**

138.   Plaintiffs repeat and re-allege each of the allegations contained in the foregoing paragraphs.

139.   The NCAA has historically assumed a duty to protect the health and safety of its football players.  By taking such steps to protect the health and safety of its players, a relation of trust and confidence between the NCAA and its players existed, which gave rise to a duty upon the NCAA not to conceal material information from its players, and to act to protect the health and safety of its players.

140.   The NCAA had superior knowledge of such material information concerning the increased risks of repeated traumatic head impacts to its players, such material information was

not readily available to the Plaintiffs or Class Members, and the NCAA knew or should have known that the Plaintiffs and Class Members were acting and playing based upon mistaken beliefs created by the NCAA's concealment, inaction, and denial.

141.   At all relevant times, the NCAA had a duty toward Plaintiffs and the members of Class to supervise, regulate, monitor and provide reasonable and appropriate rules to minimize the risk of injury to the players.

142.   The NCAA players, including the Plaintiffs and members of the Class, did reasonably and justifiably rely upon the NCAA to protect their health and safety.

143.   The NCAA acted carelessly and negligently in its position as the regulatory body for collegiate football teams and its student-athletes, including the Plaintiffs and members of the Class.  The NCAA knew or should have known that its actions or its inaction in light of the rate and extent of concussions reported and made known to the NCAA would cause harm to players in both the short- and long-term.

144.   The NCAA was careless and negligent by breaching the duty of due care it assumed for the benefit of the Plaintiffs and members of the Class, both generally and in the following particular respects:

      a.      Failing to educate college football players concerning symptoms that may indicate a concussion has occurred;

      b.      Failing to warn of the risk of unreasonable harm resulting from repeated concussions;

      c.      Failing to disclose the special risks of long-term complications from repeated concussions and return to play;

      d.      Failing to disclose the role of repeated concussions in causing chronic life-long cognitive decline;

      e.      Failing to promulgate rules and regulations to adequately address the dangers of repeated concussions and a return-to-play policy to minimize

long-term chronic cognitive problems;

f.     Misrepresenting pertinent facts that players needed to be aware of to make determinations of the safety of return to play;

g.     Concealing pertinent facts;

h.     Failing to adopt rules and reasonably enforce those rules to minimize the risk of college football players suffering debilitating concussions; and

i.     Other acts of negligence or carelessness that may materialize during the pendency of this action.

145.    The Plaintiffs and members of the Class have each sustained past medical expenses and will in all likelihood incur future medically-related costs associated with the harm suffered and injuries and disability referenced above.

146.    The Plaintiffs and members of the Class have in the past experienced, and they may in the future suffer, from an assortment of problems associated with the harm and injuries described including, but not limited to, headaches, dizziness, loss of memory, depression, impulsivity to anger, cognitive dysfunction, employment impairment, limitations in physical activities, embarrassment, and loss of the pleasures of life, among other things.

147.    As a result of the foregoing, Plaintiffs and members of the Class have suffered damages and will in the future suffer damages caused by the misconduct of the NCAA.

148.    The Plaintiffs and members of the Class are entitled to damages in an amount to be determined at trial, and injunctive relief requiring the NCAA, among other things, to adopt corrective measures regarding: the coaching of tackling methodologies that cause head injuries; the implementation of system-wide "return to play" guidelines for college football players who have sustained concussions; the implementation of system-wide guidelines for the screening and detection of head injuries; and the implementation of legislation addressing the treatment and eligibility of student-athletes who have sustained multiple concussions in the course of play.

149.    In addition, Plaintiffs have no adequate remedy at law in that monetary damages alone cannot compensate them for the risk of long-term physical and economic losses due to concussions and sub-concussive injuries.  Plaintiffs and members of the Class were recklessly endangered during and subsequent to their playing careers, and are entitled to injunctive relief, as allowed by law, from all Defendants in the form of a Court-supervised comprehensive medical monitoring fund for Plaintiffs and the Class, which would facilitate the early diagnosis and adequate treatment of brain injury for Plaintiffs and members of the Class.

## COUNT II

### FRAUDULENT CONCEALMENT
### (Against the NCAA)

150.    Plaintiffs repeat and re-allege each of the allegations contained in the foregoing paragraphs.

151.    The NCAA concealed facts and information which were material.  As more fully described above, since the early 1970s, the high incidence of concussions among student-athletes in many different sports, especially football, has been well known to the NCAA.  Further, based on studies for which the NCAA *itself* paid, the NCAA has been aware that a history of multiple concussions has been associated with greater risk of future brain defects in student-athletes, including symptoms of post-traumatic brain injury such as headaches, dizziness, loss of memory, impulse control problems, and Chronic Traumatic Encephalopathy. Moreover, in the early 2000s, the NCAA specifically became aware of the correlation between concussions and depression, dementia, and early on-set Alzheimer's disease.

152.    Through concealment of material facts, the NCAA intended to induce a false belief, under circumstances creating a duty to speak.  The NCAA specifically intended to induce a false belief in its student-athletes that they should continue to play and should not be prevented

from playing their respective sports even after a concussion or several concussions that should have required time to heal.

153.    Plaintiffs could not have discovered the truth through reasonable inspection or inquiry, or were prevented from doing so. Plaintiffs were under the care and treatment of the NCAA and school trainers and doctors, and justifiably relied on their silence as representing that the facts did not exist.

154.    The concealed information was such that Plaintiffs would have acted differently if they had been aware of the material facts.  Plaintiffs would not have continued to play, or would have taken additional time to allow their brain injuries to heal before returning to play.  Despite the NCAA's knowledge, the NCAA failed to act reasonably by developing appropriate means to identify at-risk players and guidelines or rules regarding return to play criteria.  The NCAA's inaction increased the risk of long-term injury and illness in student-athletes, especially football players.

155.    As a direct and proximate result of the NCAA's conduct, Plaintiffs and members of the Class have suffered harm described above, and/or will suffer future injuries and damages that have not yet fully manifested.

## COUNT III

### UNJUST ENRICHMENT
### (Against the NCAA)

156.    Plaintiffs repeat and re-allege each of the allegations contained in the foregoing paragraphs.

157.    The NCAA and its members enjoy enormous revenues from college sports, including by way of example in football, a 15-year deal between the Southeast Conference (SEC) and ESPN estimated in value at $2.25 billion (Smith & Ourand, 2008), the $2.8 billion

expected to be generated over the next 25 years by the Big Ten Network (Ourand & Smith, 2008), and the newly inked Pac 12 TV deal that will generate $3 billion over the next 12 years (Ubben, 2011). Individual campus deals, such as the Longhorn Network developed between the University of Texas and ESPN, has a projected income profile of $300 million over the span of next 20 years (Haurwitz, 2011). In 2010, the NCAA entered into an exclusive television and media rights contract with CBS and Turner Broadcasting and over the 14-year term, the NCAA is expected to receive $10.8 billion.

158.    It is unjust to allow the NCAA and its members to earn revenues and retain the benefits of athletes' services while refusing to pay medical expenses of sports-related injuries whose treatment is required post college career.

## COUNT IV

### MEDICAL MONITORING
### (Against the NCAA, Riddell Defendants and Schutt Sports)

159.    Plaintiffs repeat and re-allege each of the allegations contained in the foregoing paragraphs.

160.    Plaintiffs seek to certify a National Medical Monitoring Class.

161.    During their respective NCAA careers, Plaintiffs and the members of the Class experienced repeated traumatic head impacts, including sub-concussive blows and concussions, with greater frequency and severity than the general population of men of a similar age.

162.    The repeated traumatic head impact injuries, including sub-concussive blows and concussions, experienced by Plaintiffs and members of the Class during their respective NCAA football careers are known and proven to be hazardous because they increase the risks of developing neurodegenerative disorders and diseases, including but not limited to CTE, MCI, Alzheimer's disease and other similar cognitive-impairing conditions.

163.    The NCAA was fully aware of—yet concealed the dangers of exposing players, including Plaintiffs and members of the Class, to—increased risks of repeated traumatic head impacts and developing neurodegenerative disorders and diseases.  The NCAA had a duty to protect the health and safety of NCAA football players.  The NCAA failed to educate its student-athletes regarding the risks of repeated head trauma in football, and failed to require actions to prevent, mitigate, monitor, diagnose, and treat brain injuries. By such negligent conduct, the NCAA breached its duties of care to the Plaintiffs and members of the Class, and caused the increased risks to the former NCAA football players giving rise to the need for medical monitoring.

164.    The Riddell Defendants and Schutt Sports were fully aware of yet failed to adequately warn, protect and educate college football players, including Plaintiffs and members of Class, to the dangers and increased risks of repeated traumatic head impacts and development of neurodegenerative disorders and diseases. The Riddell Defendants and Schutt Sports had a duty to provide necessary and adequate safety and instructional materials and warnings of the risk and means available to reduce and/or minimize the risk of concussive brain injuries while playing football using their helmets. By such negligent conduct, the Riddell Defendants and Schutt Sports breached their duties of care to the Plaintiffs and members of the Class, and caused the increased risks to the former NCAA football players giving rise to the need for medical monitoring.

165.    As a proximate result of all Defendants' negligent conduct, Plaintiffs and members of the Class have experienced increased risks of the sequela of repeated traumatic head impacts, including developing serious latent neurodegenerative disorders and diseases, including but not limited to CTE, MCI, Alzheimer's disease or similar cognitive-impairing conditions.

166.    Monitoring procedures exist that comport with contemporary scientific principles and make possible early detection of the cognitive impairments and conditions that Plaintiffs and members of the Class are at increased risks of developing.  Such monitoring, which includes but is not limited to baseline exams, diagnostic exams, and behavioral and pharmaceutical interventions, will prevent or mitigate the injuries, and enable treatment of the adverse consequences of the latent neurodegenerative disorders and diseases associated with the repeated traumatic head impacts described herein.

167.    The monitoring procedures set forth above are fundamentally different from and more extensive than the normally prescribed medical treatment and/or diagnostic procedures for adult males.

168.    As set forth above, the monitoring procedures are reasonably necessary according to contemporary scientific principles, to enable Plaintiffs and members of the Class to obtain early detection and diagnosis of the cognitive impairments and conditions that they are at increased risks of developing as a result of the Defendants' tortious conduct described herein.

169.    By monitoring and testing former (and current) NCAA football players who are believed to have suffered a concussion or sub-concussion while playing or practicing, the risk of each such player suffering long-term injuries, disease and losses as described above will be significantly reduced.

170.    Plaintiffs and members of the Class therefore seek an injunction creating a Court-supervised comprehensive medical monitoring fund for Plaintiffs and members of the Class, which would facilitate the early diagnosis and adequate treatment in the event that a neurodegenerative disorder or disease is diagnosed in Plaintiffs or members of the Class.

171.    Accordingly, the Defendants should be required to establish a medical monitoring

program that includes, among other things:

     a.     Establishing a trust fund, in an amount to be determined, to pay for the medical monitoring of all past, current and future NCAA football players, as frequently and appropriately as necessary;

     b.     Notifying all Class Members in writing that they may require frequent medical monitoring; and

     c.     Providing information to treating team physicians to aid them in detecting concussion or sub-concussions and to assist them in determining when the student-athlete is subjected to an increased risk of harm.

172.    Plaintiffs and members of the Class have no adequate remedy at law in that monetary damages alone cannot compensate them for the increased risks of long-term physical and economic losses associated with brain injury. Without a Court-supervised comprehensive medical monitoring fund as described herein, the Plaintiffs and members of the Class will continue to face increased risks of injury and disability, without proper diagnosis and opportunity for rehabilitation.

## COUNT V

### LOSS OF CONSORTIUM
**(Against the NCAA, Riddell Defendants and Schutt Sports)**

173.    Plaintiffs repeat and re-allege each of the allegations contained in the foregoing paragraphs.

174.    The actions of the Defendants as described above have caused and will continue in the future to cause the spouses of those who played college football in the NCAA to be deprived of the services, society, and companionship of their husbands.

175.    The actions of the Defendants as described above have caused and will continue in the future to cause the spouses of those who played college football in the NCAA to both pay for and provide the medical treatment and care needed by their husbands.

176.    As a direct and proximate result of Defendants' tortuous conduct, the spouses of those who played college football in the NCAA have suffered and will continue to suffer economic loss, and have been and will continue to be deprived of the services and society of their husbands.

177.    As a direct and proximate result of Defendants' tortuous conduct, Plaintiffs and members of the Class are entitled to damages, as alleged herein or allowed by law.

**COUNT VI**

**STRICT LIABILITY FOR DESIGN DEFECT**
**(Against the Riddell Defendants and Schutt Sports)**

178.    Plaintiffs repeat and re-allege each of the allegations contained in the foregoing paragraphs.

179.    At the time the helmets were designed, manufactured, sold, and distributed by the Riddell Defendants and Schutt Sports, the helmets were defective in design, unreasonably dangerous, and unsafe for their intended purpose because they did not provide adequate protection against the foreseeable risk of concussive brain injury.  The design defect includes, but is not limited to the following:

    (a)    Negligently failing to design the subject helmet with a safe means of attenuating and absorbing the foreseeable forces of impact in order to minimize and/or reduce the forces and energy directed to the player's head;

    (b)    Negligently designing the subject helmet with a shock attenuating system which was not safely configured;

    (c)    Negligently failing to properly and adequately inspect and/or test the helmet model;

44

(d)   Failing to warn Plaintiffs that their helmets would not protect against the long-term health consequences of concussive brain injury; and

(e)   Other acts of negligence that may be discovered during the course of this matter.

180.   The defective design and unreasonably dangerous condition were a proximate and producing cause of the personal injuries suffered by the Plaintiffs and members of the Class and other damages, including but not limited to, economic damages and non-economic damages.

181.   At all times, the helmets were being used for the purpose for which they were intended.

182.   The Riddell Defendants and Schutt Sports are strictly liable for designing a defective and unreasonably dangerous product and for failing to warn which were proximate and producing causes of the personal injuries and other damages including, but not limited to, economic damage as alleged herein. A safer alternative design was economically and technologically feasible at the time the product left the control of the Riddell Defendants and Schutt Sports.

## COUNT VII

**STRICT LIABILITY FOR MANUFACTURING DEFECT**
**(Against the Riddell Defendants and Schutt Sports)**

183.   Plaintiffs repeat and re-allege each of the allegations contained in the foregoing paragraphs.

184.   At the time the helmets were designed, manufactured, sold and distributed by the Riddell Defendants and Schutt Sports, the helmets were defective in their manufacturing and unreasonably dangerous and unsafe for their intended purpose because they did not provide adequate protection against the foreseeable risk of concussive brain injury. The Riddell

Defendants and Schutt Sports' failure to design the helmets to design and manufacturing specifications resulted in, among other things, the following:

      (a)    Negligently failing to manufacture the subject helmet with a safe means of attenuating and absorbing the foreseeable forces of impact in order to minimize and/or reduce the forces and energy directed to the player's head;

      (b)    Negligently manufacturing the subject helmet with a shock attenuating system which was not safely configured;

      (c)    Negligently failing to properly and adequately inspect and/or test the helmet model;

      (d)    Failing to warn Plaintiffs that their helmets would not protect against the long-term health consequences of concussive brain injury; and

      (e)    Other acts of negligence that may be discovered during the course of this matter;

185.    The manufacturing defect was a proximate and producing cause of the personal injuries suffered by Plaintiffs and members of the Class and other damages, including but not limited to, economic damages and non-economic damages.

186.    The Riddell Defendants and Schutt Sports are strictly liable for manufacturing and placing in the stream of commerce a defective and unreasonably dangerous product which was a proximate and producing cause of the personal injuries and other damages, including but not limited to, economic damages and non-economic damages.  A safer alternative design was economically and technologically feasible at the time the product left the control of the Riddell Defendants and Schutt Sports.

## COUNT VIII

### FAILURE TO WARN
### (Against the Riddell Defendants and Schutt Sports)

187.    Plaintiffs repeat and re-allege each of the allegations contained in the foregoing paragraphs.

188.    The Riddell Defendants and Schutt Sports knew or should have known of the substantial dangers involved in the reasonably foreseeable use of their helmets.

189.    The Riddell Defendants and Schutt Sports failed to provide necessary and adequate safety and instructional materials and warnings of the risk and means available to reduce and/or minimize the risk of concussive brain injuries while playing football.

190.    The Riddell Defendants and Schutt Sports failed to provide necessary and adequate information, warnings, and/or instructional materials regarding the fact that other model helmets provided greater shock attenuation from blows to the head area.

191.    The Riddell Defendants and Schutt Sports failed to warn players of risk of long-term brain injury from repeated concussions so that they could make an informed decision on returning to play post concussion.

192.    The Riddell Defendants and Schutt Sports knew that these substantial dangers were not readily recognizable to an ordinary consumer or user and that such persons would use these products without inspection for defects.

193.    Plaintiffs and members of the Class neither knew, nor had reason to know of the existence of the aforementioned defects, or increased risks of harm.

194.    Plaintiffs and members of the Class were using the helmets in a reasonably foreseeable manner at all times.

195.    Plaintiffs' and Class members' damages were the legal and proximate result of the

actions of the Riddell Defendants and Schutt Sports who owed a duty to warn Plaintiffs of the risks of substantial harm associated with the foreseeable use of their products.

196.     The Riddell Defendants and Schutt Sports' failure to warn caused the Plaintiffs' and Class members' personal injuries.

## COUNT IX

### NEGLIGENCE
### (Against the Riddell Defendants and Schutt Sports)

197.     Plaintiffs repeat and re-allege each of the allegations contained in the foregoing paragraphs.

198.     The Riddell Defendants and Schutt Sports were negligent in their design, testing, assembly, manufacture, marketing, and engineering of the helmets as described herein.

199.     The Riddell Defendants and Schutt Sports owed a duty of care to the Plaintiffs and Class members in their design, testing, manufacture, assembly, marketing and sale of the helmets and all components and sub-assemblies of the helmets.

200.     The Riddell Defendants and Schutt Sports should have been well aware that repeated blows to the head can cause MTBI which can and does lead to long-term brain injury in college football players, including, but not limited to, memory loss, dementia, depression, and CTE and its related symptoms.

201.     The Riddell Defendants and Schutt Sports breached their duty of reasonable care by failing to provide necessary and adequate safety and instructional materials and warnings of the risk and means available to reduce and/or minimize the risk of concussive brain injuries while playing football using their helmets.

202.     As a result of the Riddell Defendants and Schutt Sports' breach of duty, Plaintiffs and members of the Class have suffered harm described above, and/or will suffer future injuries

and damages that have not yet fully manifested.

## JURY DEMAND

203. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all claims in this Complaint so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and members of the Class pray for judgment with respect to their Complaint as follows:

A. Certification of the proposed Class pursuant to Federal Rules of Civil Procedure Rule 23(a), (b)(2) and (b)(3);

B. Designation of Plaintiffs as representatives of the proposed Class and designation of Plaintiffs' counsel as Class counsel;

C. Grant an injunction and/or other equitable relief against the Defendants and in favor of Plaintiffs for the requested medical monitoring;

D. Award Plaintiffs and the Class compensatory damages, the amount of which is to be determined at trial;

E. Award Plaintiffs and the Class prejudgment interest on all damages;

F. Grant Plaintiffs and the Class equitable relief in the nature of disgorgement; restitution, and the creation of a constructive trust to remedy the NCAA's unjust enrichment;

G. Award Plaintiffs and the Class their costs and expenses in this litigation, including reasonable attorneys' fees and expert fees;

H. Award Plaintiffs and the Class all such other and further relief as may be just, equitable and proper under the circumstances.

Dated: October 9, 2013                     Respectfully submitted,

  /s/Irwin B. Levin
Irwin B. Levin
Richard E. Shevitz
Scott D. Gilchrist
Lynn A. Toops
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone:    (317) 636-6481
Facsimile:    (317) 636-2593

James R. Dugan, II, Esq.
David B. Franco, Esq.
Douglas R. Plymale, Esq.
Chad Primeaux, Esq.
THE DUGAN LAW FIRM, APLC
One Canal Place
365 Canal Street, Suite 1000
New Orleans, LA 70130
Telephone:    (504) 648-0180
Facsimile:    (504) 648-0181

Don Barrett, Esq.
Barrett Law Group, P.A.
404 Court Square North
Lexington, Mississippi 39095
Telephone:    (663) 834-9168

Douglas Gill, Esq.
Douglas H. Gill & Associates
602 7th Avenue South
Seattle, WA 98104
Tel: (253) 691-0197

***Attorneys for Plaintiffs and the Proposed Class***