# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | |
|---|---|
| JOHN DUROCHER and DARIN HARRIS, individually and on behalf of all others similarly situated, | No. 1:13-cv-01570-SEB-DML |
| Plaintiffs, | SECOND AMENDED CLASS ACTION COMPLAINT |
| vs. | JURY TRIAL DEMANDED |
| RIDDELL, INC., ALL AMERICAN SPORTS CORPORATION d/b/a RIDDELL/ALL AMERICAN, RIDDELL SPORTS GROUP, INC., EASTON-BELL SPORTS, INC., EASTON-BELL SPORTS, LLC, EB SPORTS CORPORATION, and RBG HOLDINGS CORPORATION, | |
| Defendants. | |

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs John DuRocher and Darin Harris (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by counsel, bring this class action complaint against Defendants Riddell, Inc., All American Sports Corporation d/b/a Riddell/All American, Riddell Sports Group, Inc., Easton-Bell Sports, Inc., Easton-Bell Sports, LLC, EB Sports Corporation, and RBG Holdings Corporation (collectively "Defendants"), and allege the following upon information, belief, and investigation of counsel:

## NATURE OF ACTION

1.     This is a class action seeking to recover medical monitoring and damages for injuries and losses sustained by the Plaintiffs as a direct and proximate result of Defendants' negligent conduct in failing to take effective action to protect collegiate football players and/or inform players of the true risks and hidden dangers associated with concussions, brain injury,

and repetitive brain trauma.

2.     Defendants are in the business of designing, manufacturing, selling, and distributing athletic equipment, including football helmets and protective gear to colleges and universities around the United States. Defendants hold themselves out as leaders and innovators in the athletic equipment industry and as being committed to protecting athletes through the designing and manufacturing of protective helmets for all football players.[1]

3.     Football is unquestionably a tough, aggressive, physically demanding sport. Injuries are common. As such, it is vital to the safety of football players that the Defendants act reasonably, through research, studies, and other means, to help identify the risks of serious injury associated with playing collegiate football; to keep the teams and players that use their helmets informed of the risks that they identify; to take reasonable steps based upon their findings to protect and educate players who rely on their helmets to protect them; to design their products to adequately perform their intended protective function; and to adequately and meaningfully warn of the protective function's limitations regarding concussions, brain injury, and repetitive brain trauma.

4.     The rash of football-related head injuries has been noted in a wide variety of news articles and television segments, and was addressed recently by the National Collegiate Athletic Association ("NCAA") in an announcement that it would clamp down on illegal blows to the head. But, as previously alluded to, this spate of head injuries is not a new problem at all. For decades, collegiate football players have been plagued by the devastating and long-term effects of concussions.

5.     The Defendants have breached their duty to educate, protect, and adequately warn

---

[1] *See, e.g.,* www.Riddell.com and Riddell Fact Sheet.

college football players in the face of long-standing and overwhelming evidence regarding the dangerous risks posed by head trauma. The Defendants have ignored this duty and profited immensely from their inaction, all to the detriment of the players.

6.      The Defendants have failed to educate their helmet users of the long term, life-altering risks and consequences of head impacts suffered from playing football. They have failed to establish known protocols to prevent, mitigate, monitor, diagnose, and treat brain injuries. As knowledge of the adverse consequences of head impacts in football has grown, the Defendants have never gone back to former college football players to offer education or needed medical monitoring. In the face of their overwhelming and superior knowledge of these risks, as compared to that of the athletes, the Defendants' conduct constitutes negligence and reckless endangerment.

7.      Specifically, the Defendants have failed to assist in proper education of coaches, trainers, and football players regarding the risks associated with repetitive impacts to the head, including the symptoms indicating possible concussions. The Defendants have also failed to properly warn, instruct, and/or counsel players that the use of a helmet is not an absolute safeguard against the risk of sustaining a concussion. The Defendants have failed to implement a support system for college football players who, after sustaining concussions, are left unable to either play their sport or even lead a normal life.

8.      The Defendants' failure to educate and/or properly warn their helmet users leave former college football players like Plaintiffs and members of the below-defined Class and subclasses inadequately protected from understanding, sustaining, monitoring, and recovering from brain injuries at a particularly early and vulnerable point in their lives. Collegiate football players typically range in age from 18 to 23 and are just beginning their adult lives. For Plaintiffs

and the putative Class and subclasses, these injuries can have devastating long-term, debilitating effects, including an inability to finish their education, mild, moderate, and severe cognitive impairments including memory loss, loss of executive functioning, inability to focus, emotional stability, depression, early-onset dementia, and long term neurological problems.

9.      As a result, Plaintiffs seek medical monitoring and financial recovery for the long-term and chronic injuries, financial losses, expenses, and other damages suffered by the Plaintiffs and members of the Class and subclasses as a result of the Defendants' carelessness, negligence, concealment of information, and reckless endangerment.

## JURISDICTION AND VENUE

10.     This Court has original diversity jurisdiction over this action under 28 U.S.C. § 1332(a) and (d) because this is a class action in which the amount in controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which numerous members of the proposed Class and subclasses are citizens of a state other than the home states of the Defendants.

11.     This Court has personal jurisdiction over the Defendants because the Defendants conduct substantial business in the District. Moreover, a substantial part of the events or omissions giving rise to the claims asserted here occurred in this District.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (c), and (d) because a substantial part of the events or omissions giving rise to the claims asserted here occurred in this District, and the Defendants reside, are found, have agents, or conduct substantial business in this District (and did so during the Class Period).

## PARTIES

13.     Plaintiff John DuRocher is a natural person and a citizen of the State of Washington. Mr. DuRocher was a student at the University of Oregon and University of Washington and played

4

college football from 2003 – 2006. He played as quarterback. During his collegiate football career, he experienced repeated traumatic head impacts.  For example, in a game against Stanford University, Mr. DuRocher sustained a hit that left him lightheaded and dizzy. Mr. Durocher was removed from the game and subsequently diagnosed with a concussion.  Mr. DuRocher believes that he suffered other similar head impacts in his college football career, but cannot recall them with specificity.  After graduation, Mr. DuRocher has experienced frequent severe headaches.

14.  Mr. DuRocher is at increased risk of latent brain injuries caused by repeated head impacts in his college football career. As a result of the injuries sustained during his collegiate football career, Mr. DuRocher is in need of medical monitoring. Mr. DuRocher has also incurred out-of-pocket costs and continues to pay for ongoing medical treatment directly related to the repeated traumatic head impacts. Upon information and belief, Mr. DuRocher wore helmets manufactured and sold by the Defendants during his collegiate football career.

15.  Plaintiff Darin Harris is a natural person and a citizen of the State of Washington. Mr. Harris was a student at the University of Washington and played college football from 2004 – 2008. He played as a strong safety and was on the special teams unit. While attending University of Washington, Mr. Harris was named the defensive most valuable player on several occasions and was on full academic scholarship.

16.  During his college career, Mr. Harris experienced repeated traumatic head impacts. For example, Mr. Harris recalls an impact to his head in a game against the University of Oregon, during the 2007 season, in which he was blindsided and experienced lightheadedness and dizziness. He recalls returning to play the next time the defense took the field. In the fall of 2008, Mr. Harris recalls suffering another severe impact to the head in a game against Brigham Young University.  He was subsequently removed from the game and later diagnosed with a

concussion.  Mr. Harris believes that he suffered other similar head impacts in his college football career, but he cannot recall them with specificity. After graduation, Mr. Harris has experienced frequent severe headaches, memory loss, an inability to concentrate or focus, anxiety, and depression.

17.     Mr. Harris is at increased risk of latent brain injuries caused by repeated head impacts in his college football career. As a result of the injuries sustained during his collegiate football career, Mr. Harris is in need of medical monitoring. Mr. Harris has also incurred out-of-pocket costs and continues to pay for ongoing medical treatment directly related to the repeated traumatic head impacts. Upon information and belief, Mr. Harris wore helmets manufactured and sold by the Defendants during his collegiate football career.

18.     Defendant Riddell, Inc. is a corporation organized and existing under the laws of the State of Illinois and whose principal place of business is in the State of Illinois. Riddell, Inc. is engaged in the business of designing, manufacturing, selling, and distributing football equipment, including helmets, to colleges and universities in the United States. Riddell, Inc. is a wholly owned subsidiary of Riddell Sports Group, Inc.

19.     Defendant All American Sports Corporation, doing business as Riddell/All American, is a corporation organized and existing under the laws of the State of Delaware and is engaged in the business of designing, manufacturing, selling, and distributing football equipment, including helmets, to colleges and universities in the United States. All American Sports Corporation is a separate, wholly owned subsidiary of Riddell Sports Group, Inc.

20.     Defendant Riddell Sports Group, Inc. is a Delaware Corporation with its principal place of business in Irving, Texas and is engaged in the business of designing, manufacturing, selling, and distributing football equipment, including helmets, to colleges and universities in the

United States. Riddell Sports Group, Inc. is a wholly owned subsidiary of Easton-Bell Sports, Inc.

21.     Defendant Easton-Bell Sports, Inc. is a Delaware Corporation with a principal place of business at 7855 Haskell Avenue, Suite 200, Van Nuys, California 91406 and is a parent corporation of Riddell Sports Group Inc. Easton-Bell Sports, Inc. designs, develops, and markets branded athletic equipment and accessories, including marketing and licensing products under the Riddell brand.

22.     Defendant Easton-Bell Sports, LLC is the parent corporation of Easton-Bell Sports, Inc. and is incorporated in Delaware, with a principal place of business at 152 West 57th Street, New York, New York 10019.

23.     Defendant EB Sports Corporation is a Delaware corporation with its principal place of business at 7855 Haskell Avenue, Van Nuys, California 91406. EB Sports Corporation is a wholly owned subsidiary of Easton-Bell Sports, LLC.

24.     Defendant RBG Holdings Corporation is a Delaware corporation with its principal place of business at 7855 Haskell Avenue, Suite 350, Van Nuys, California 91406. RBG Holdings Corporation is a wholly owned subsidiary of EB Sports Corporation.

25.     Defendants Riddell, Inc., Riddell Sports Group Inc., All American Sports Corporation, Easton-Bell Sports, Inc., EB Sports Corporation, Easton-Bell Sports, LLC, and RBG Holdings Corporation, shall hereinafter be referred to collectively as the "Defendants."

## FACTUAL ALLEGATIONS

*A.*     ***A Primer on Head Injuries, Concussions, and Neurological Damage***

      *1.*     ***What is a Concussion?***

26.     Concussion or mild traumatic brain injury ("MTBI") has been defined as "a

complex pathophysiological process affecting the brain, induced by traumatic biomechanical forces." In simple terms, a concussion is an injury to the brain that may result in temporary or permanent loss of normal brain function.

27.     The milder indications of a concussion include headaches, lack of concentration, problems with memory and judgment, lack of coordination, and difficulty with balance. The more significant effects can include Chronic Traumatic Encephalopathy ("CTE") and Second Impact Syndrome.

28.     CTE is a progressive neurodegenerative disease caused by repetitive trauma to the brain that eventually leads to dementia and other neurological disorders. Second Impact Syndrome is a condition in which the brain swells rapidly after the injured person suffers a second concussion before being able to properly heal from the first, causing substantial injury or death.

29.     Medical science has known for many decades that repetitive and violent jarring of the head or impact to the head can cause MTBI with a heightened risk of long term, chronic neuro-cognitive sequela.

30.     For example, Dr. Bennet Omalu, a renowned neuropathologist at the University of California, summarized the history of knowledge of "Head and Other Injuries in Youth, High School, College, and Professional Football," in his testimony before the U.S. Congress as follows:

> We have known about concussions and the effects of concussions in football for over a century. Every blow to the head is dangerous. Repeated concussions and sub-concussions both have the capacity to cause permanent brain damage. During practice and during games, a single player can sustain close to one thousand or more hits to the head in only one season without any documented or reported incapacitating concussion. Such repeated blows over several years, no doubt, can result in permanent impairment of brain functioning especially in a child.

31.     The American Association of Neurological Surgeons (the "AANS") has defined a concussion as "a clinical syndrome characterized by an immediate and transient alteration in brain function, including an alteration of mental status and level of consciousness, resulting from mechanical force or trauma." The AANS defines traumatic brain injury ("TBI") as:

> a blow or jolt to the head, or a penetrating head injury that disrupts the normal function of the brain. TBI can result when the head suddenly and violently hits an object, or when an object pierces the skull and enters brain tissue. Symptoms of a TBI can be mild, moderate or severe, depending on the extent of damage to the brain. Mild cases may result in a brief change in mental state or consciousness, while severe cases may result in extended periods of unconsciousness, coma or even death.

32.     The Centers for Disease Control and Prevention ("CDC") and NCAA identifies the following symptoms as being associated with concussions:



### 2.      How Concussions Occur in Sports

33.      The brain has three main parts – the cerebrum controls higher mental functions, such as thought, memory, and language; the cerebellum controls balance and coordination; and the brainstem controls bodily function such as breathing, heart rate, and blood pressure.

34.      A number of structures surround the brain to keep it safe. It is encased in the skull to protect it from outside sources; it has supporting tissues to help stabilize it; and, it is covered on all sides by three membranes and a layer of fluid.  For this reason, it is often said that the

brain "floats" inside the skull.

35.     As a result, injuries to the brain occur when the head suddenly stops moving, but the brain, which was traveling at the same speed as the head, continues to move and strikes the inside of the skull, transferring part of the force to the brain.

36.     Concussions occur when linear and rotational accelerations are impacted to the brain from either direct impacts to the head or indirect impacts that whiplash the head. During the course of a college football season, studies have shown athletes receiving more than 1,000 impacts greater than 10 G force which is slightly more than a fighter pilot receives doing maximal maneuvers. The majority of football related hits to the head exceed 20 G force.

37.     While helmets, and to a lesser extent protective headgear, are effective in eliminating skull fractures and dramatically reducing linear forces, they are ineffective in reducing the rotational forces that result in a concussion.

38.     Published peer-reviewed scientific studies have shown that concussive and sub-concussive head impacts while playing football are linked to significant risk of permanent brain injury. This head trauma, which includes multiple concussions, triggers progressive degeneration of the brain tissue. The brain degeneration is associated with memory loss, confusion, impaired judgment, paranoia, impulse control problems, aggression, depression, and eventually, progressive dementia.

> ### 3.     Testing for Concussion-Related Injuries: Medical Evidence Regarding the Need for Medical Monitoring and the Availability of Specific Medical Tests and Protocols for the Early Detection of Latent Brain Injury

39.     Numerous published peer-reviewed scientific studies have shown that repeated traumatic head impacts (including sub-concussive blows and concussions) cause ongoing and latent brain injury.  This form of brain injury has been well documented as a result of various

causes, including sports-related head impacts in football.

40.     Neuropathology studies, brain imaging tests, and neuropsychological tests on many former football players have established that football players who have sustained repetitive head impacts while playing the game have suffered and continue to suffer brain injuries that result in any one or more of the following conditions: early onset of Alzheimer's Disease, ALS, dementia, depression, deficits in cognitive functioning, reduced processing speed, attention, and reasoning, loss of memory, sleeplessness, mood swings, personality changes, and CTE.

41.     Repeated traumatic head impacts suffered by former football players have a microscopic and latent effect on the brain. These impacts twist, shear, and stretch neuronal cells such that multiple forms of damage take place, including the release of small amounts of chemicals within the brain, such as the Tau protein.  Among other things, the gradual buildup of Tau protein—sometimes over decades—causes CTE, which is the same phenomenon as boxer's encephalopathy (or punch drunk syndrome), which was studied and reported in the Martland study in 1928. The Martland study was the first to link sub-concussive blows and "mild concussions" to degenerative brain disease.  CTE is also associated with an increased risk of suicide, dementia, and a progressive cognitive decline and dysfunction.

42.     Accordingly, the repeated traumatic head impacts suffered by former college football players exposed them to a subtle and repetitive change within the brain on the cellular level including increased levels of the Tau protein which is known to increase the risk of brain injury.

43.     Plaintiffs and members of the Class and subclasses were exposed to a significant number of sub-concussive blows and concussions as a result of their collegiate football careers. The general public does not experience this type of brain trauma.

44.     Historically, the public has also dismissed repeated sub-concussive blows and

strikes and concussions as "dings" and having one's "bell rung," and only those medical and academic institutions or entities affiliated with the sports, like sports equipment manufacturers, have facts that would assist members of the Class and subclasses in being able to obtain adequate brain injury diagnosis, management, and treatment to facilitate recovery and rehabilitation.

45.     The Defendants' inaction regarding the risks of chronic sub-concussive blows and concussions in football has increased the risks for members of the Class and subclasses to brain injury and its sequelae including cognitive, mental health, and neurological disorders during the years following their collegiate football careers.

46.     Management of concussions requires a gradual, multistep process involving baseline testing and neurocognitive examination.

47.     For sports, such as football, in which repeated blows to the head are unavoidable, proper concussion education, assessment and management is paramount for preventing and mitigating long-term consequences.

48.     Medical monitoring for latent brain injury identifies deficits that are amenable to treatment through medical, cognitive, psychological, and behavioral counseling (for the patient and his spouse and family), as well as through pharmaceutical treatment, lifestyle modifications, and other therapeutic interventions.

49.     Serial testing of cognitive functioning for early signs or symptoms of neurologic dysfunction, and serial brain imaging for signs of injury or disease, is medically necessary to assure early diagnosis and effective treatment of brain injury.

50.     Medical monitoring for latent brain injury is highly specialized and different from the medical care that is normally recommended to other men of a similar age, in the absence of a history of chronic repeated sub-concussive impacts and concussions.

51.     Well-established and specialized medical monitoring procedures exist to provide early diagnosis of brain injury which greatly enhances successful treatment, rehabilitation, and prevention or mitigation of cognitive, psychological, and behavioral deficits.

52.     Such procedures include serial brain imaging studies and neuropsychological evaluations targeted to identifying the deficits associated with chronic and repeated sub-concussive blows and concussions experienced by former collegiate football players like Plaintiffs and members of the Class and subclasses.

53.     Medical monitoring for latent brain injury can provide for early diagnosis, leading to benefits in treatment, management, rehabilitation, and prevention or mitigation of damage.

**B.      The Defendants Knew the Dangers and Risks Associated with Repetitive Head Impacts and Concussions.**

54.     Concussions, and their debilitating effects, continue to receive increasing attention. This increased awareness is partly due to the recent and overwhelming publicity and media attention on concussions in professional sports, such as the NFL and NHL, and the long-term effects of such brain injuries.

55.     More than 300,000 concussions occur every year and participation in sports is a common cause of these injuries. American football is the leading cause of sports-related concussions in the United States. These injuries are difficult to detect, with athletes often underreporting their injuries, minimizing their importance, or not recognizing that an injury has occurred. At the collegiate level, concussions are more common in certain sports, such as football, ice hockey, and soccer.

56.     In the early 1980s, the Department of Neurosurgery at the University of Virginia published studies on patients who sustained MTBI and observed long-term damage in the form

of unexpected cognitive impairment. The studies were published in neurological journals and treatises within the United States.

57.    In 1982, the University of Virginia and other institutions conducted studies on college football teams that showed that football players who suffered MTBI suffered pathological short-term and long-term damage. With respect to concussions, the same studies showed that a person who sustained one concussion was more likely to sustain a second, particularly if that person was not properly treated and removed from activity so that the concussion symptoms were allowed to resolve.

58.    The same studies showed that two or more concussions close in time could have serious short-term and long-term consequences in both football players and other victims of brain trauma.

59.    In 1986, Dr. Robert Cantu of the American College of Sports Medicine published "Concussion Grading Guidelines," which he later updated in 2001.

60.    In 1982, the NCAA implemented an injury surveillance system. In 1994, Randall W. Dick, Assistant Director of Sports Science for the NCAA, authored an article entitled, "*A Summary of Head and Neck Injuries in Collegiate Athletics Using the NCAA Injury Surveillance System*" published by the American Society for Testing and Materials. The article identified concussions as the most prevalent type of head injury and noted that evaluation of concussions may be a first step to the prevention of severe injuries. The author cautioned that "[m]edical personnel should be educated on the diagnosis and treatment of such injuries in all sports and rules protecting the head and neck should be enforced."

61.    By 1991, three distinct medical professionals/entities—Dr. Robert Cantu of the American College of Sports Medicine, the American Academy of Neurology, and the Colorado

Medical Society—developed return-to-play criteria for football players suspected of having sustained head injuries.

62.     In 1994, the NFL agreed to fund a committee to study the issue of head injury in the NFL. The NFL formed the Mild Traumatic Brain Injury Committee (the "MTBI Committee") to study the effects of concussions and sub-concussive injury on NFL players.

63.     In 1996, the NCAA Sports Science Safety Subcommittee on Competitive Safeguards and Medical Aspects of Sports discussed the concussion data in football and other sports and recognized the football helmet would not prevent concussions.

64.     In 1999, the National Center for Catastrophic Sport Injury Research at the University of North Carolina conducted a study involving eighteen thousand (18,000) collegiate and high school football players. The research showed that once a player suffered one concussion, he was three times more likely to sustain a second in the same season.

65.     In 2000, a study presented at the American Academy of Neurology's 52nd Annual Meeting and authored by Dr. Barry Jordan, Director of the Brain Injury Program at Burke Rehabilitation Hospital in White Plains, New York, and Dr. Julian Bailes, surveyed 1,094 former NFL players between the ages of 27 and 86 and found that: (a) more than 60% had suffered at least one concussion in their careers, with 26% of the players having three or more and 15% having five or more; (b) 51% had been knocked unconscious more than once; (c) 73% of those injured said they were not required to sit on the sidelines after their head trauma; (d) 49% of the former players had numbness or tingling; 28% had neck or cervical spine arthritis; 31% had difficulty with memory; 16% were unable to dress themselves; 11% were unable to feed themselves; and (e) 8 suffered from Alzheimer's disease.

66.     A 2001 report by Dr. Frederick Mueller that was published in the Journal of

Athletic Training reported that a football-related fatality has occurred every year from 1945 through 1999, except for 1990. Head injury-related deaths account for 69% of football fatalities, cervical spinal injuries for 16.3%, and other injuries for 14.7%. High school football produced the greatest number of football head-related deaths. From 1984 through 1999, 69 football head-related injuries resulted in permanent disability.

67.     In 2002, a prominent study published in the Archives of Clinical Neuropsychology entitled *Enduring Effects of Concussion in Youth Athletes* documented that there were enduring effects in youths who have experienced a history of 2 or more concussions.[2] These include decreased overall neuropsychological functioning, as well as decreased mental speed.

68.     In 2003, the University of North Carolina, Chapel Hill published a study which concluded that NCAA football players required an average of five to seven days after concussion for their cognitive functioning to return to normal.[3] The study concluded that *athletes required a full seven days after a concussion before completely regaining their pre-concussion abilities*.

69.     In another 2003 UNC-Chapel Hill study, the effects of multiple concussions sustained by a single athlete were examined.[4] The study found that NCAA football players who had a history of concussions are at an increased risk of sustaining additional future concussions, and that those student-athletes who had three previous concussions were at a three-fold greater risk of future concussions. The study recommended that athletes with a high cumulative history

---

[2] Moser, *et al*., Archives of Clinical Neuropsychology, 17 (2002) 91-100.
[3] McCrea, *et al*., *Acute Effects and Recovery Time Following Concussions in Collegiate Football Players, The NCAA Concussion Study*, JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, Vol. 290, No. 19, November 19, 2003, at 2561.
[4] Guskiewicz, *et al.*, *Cumulative Effects Associated With Recurrent Concussion in Collegiate Football Players, The NCAA Concussion Study*, THE JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, Vol. 290, No. 19, November 19, 2003, at 2549.

of concussions should receive more information about the increased risk of repeat concussions before deciding whether to continue to play football.

70.    In 2005, UNC-Chapel Hill published a study that found a clear link between previous head injuries and the likelihood of developing mild cognitive impairment (MCI) and early-onset Alzheimer's disease.[5] In fact, the study found that players with three or more reported concussions were five times more likely to develop MCI, three times more likely to develop significant memory problems, and possessed an overall higher likelihood of developing early on-set Alzheimer's disease.

71.    In 2005, the NCAA "injury surveillance system" documented a high rate of concussions in football and other sports. Specifically, head injuries accounted for 11% of practice and 5% of game injuries with concussions ranked third highest in both practice and competition.

72.    Over the course of 2004 through 2009, data from the NCAA's injury surveillance system reflected an estimated 29,000 concussions in NCAA sports. In addition, the statistics showed that over 16,000 of these occurred in football. No further steps were taken either to educate present or former college football players regarding the risks of concussions, or to provide needed medical monitoring.

73.    Furthermore, the University of North Carolina's Center for the Study of Retired Athletes published survey-based papers in 2005 through 2007 that found a strong correlation between depression, dementia, and other cognitive impairment in NFL players and the number of concussions those players had received.

---

5 Guskiewicz, et al., *Association between recurrent concussions and late-life cognitive impairment in retired professional football players*, NEUROSURGERY, Vol. 50, October 2005, at 719.

74.     In 2008, the University of Michigan's Institute for Social Research conducted a study on the health of retired players, with over 1,000 former NFL players taking part. The results of the study, which were released in 2009, reported that "Alzheimer's disease or similar memory-related diseases appear to have been diagnosed in the league's former players vastly more often than in the national population – including a rate of 19 times the normal rate for men ages 30 through 49."

75.     In June 2010, scientific evidence linked multiple concussions to yet another degenerative brain disease—Amyotrophic Lateral Sclerosis ("ALS"), commonly referred to as "Lou Gehrig's Disease."

76.     As yet another example, the chart on the following page, which is excerpted from an article in the 2010 New England Journal of Medicine entitled *Traumatic Brain Injury— Football, Warfare, and Long-Term Effects*, shows that even mild "traumatic brain injury" ("TBI") can have lasting consequences that are manifest later in the football player's life.



Spectrum of Pathologic Features and Outcomes of Traumatic Brain Injury (TBI).
In the left inset, Bielschowsky silver stain shows intraneuronal and extracellular neurofibrillary tangles in temporal cortex from a retired boxer with dementia pugilistica.[1] The right inset shows diffuse Aβ plaque deposits in temporal cortex from a subject who sustained severe TBI.[2]

77.     In sum, the Defendants have known for decades that MTBI experienced in football can and does lead to long-term brain injury in football players, including, but not limited to, memory loss, dementia, depression, and CTE and its related symptoms.

**C.** ***The Role of Protective Equipment in Preventing Sport-Related Concussions***

78.     The Centers for Disease Control and Prevention ("CDC") estimates that 100,000 mild traumatic head injuries occur in football every year. The importance of understanding and preventing these head injuries is increasing because athletes have been getting bigger, faster, and stronger, resulting in more violent collisions, which are more likely to cause concussions.

79.     The mechanisms underlying these concussions, as well as methods of prevention, have been investigated both in the laboratory and in the field. Over the years, equipment changes have been proposed in an attempt to help prevent concussions, including modifications of helmets and mouth guards. This equipment has been critical for injury prevention; helmets have been shown to protect against skull fracture, severe TBI, and death.

80.     Protective headgear and helmets decrease the potential for severe TBI after a collision by reducing the acceleration of the head on impact, thereby decreasing the brain-skull collision and the sudden deceleration-induced axonal injury. The energy-absorbing material within a helmet accomplishes this by compressing to absorb force during the collision and slowly restoring to its original shape. This compression and restoration prolongs the duration of the collision and reduces the total momentum transferred to the head.

81.     There are variations in helmet design based on the demands and constraints of each sport. Although helmets and headgear in most sports are good at mediating the high-impact collisions responsible for severe TBI, the question remains as to what extent the helmets and headgear of each sport are able to respond to the lower-impact collisions responsible for concussion.

82.     Early helmets consisted of nothing more than leather padding but later designs began including metal, rubber, and plastics to provide additional protections. However, even

these basic helmets were not required for college play until 1939 and were not mandated until 1940 for athletes in the NFL. The evolution of the football helmet is depicted below:



The Evolution of the Helmet

83.     Despite these innovations in helmet design, the incidence of head injuries continued to increase, prompting the formation of the National Operating Committee on Standards for Athletic Equipment ("NOCSAE") in 1969 to initiate research efforts for head protection and to implement the first football helmet safety standards in 1973.

84.     The goal of NOCSAE has been to improve athletic equipment, and to reduce injuries through creating standards for athletic equipment. Efforts include the development of performance standards for football helmets as well as research to better understand the mechanism and tolerance of head and neck injuries and the design and structure of football helmets.

85.     The NOCSAE organization is comprised of representatives from a number of national representative organizations that have an interest in athletic equipment and which

include manufacturers, reconditioners, athletic trainers, coaches, equipment managers, sports medicine doctors, and consumer organizations. NOCSAE's annual budget is funded mostly by equipment manufacturers whose products bear the NOCSAE seal of approval. The largest share of the funding comes from licensing fees for including the NOCSAE logo on their football helmets.

86.     The NOCSAE helmet safety standards are voluntary test standards that have been developed to reduce head injuries by establishing requirements for impact attenuation for football helmets and face masks and have been adopted by various regulatory bodies for sports, including the NCAA.

87.     In order to obtain the NOCSAE certification seal, helmets are tested on a pass/fail standard based on their ability to reduce impact forces to the head as measured by a Severity Index (SI) value. The current testing standard involves mounting a football helmet on a synthetic head model and dropping it a total of 16 times onto a firm rubber pad, including two each from a height of 60 inches onto six locations at ambient temperatures. Two 60-inch drops onto the side are also conducted immediately after exposure of the helmet to 120 degrees Farenheit for four hours.

88.     To pass the drop test, helmets must score less than 1200 SI at all impacts. The NOCSAE standard was developed to reduce the incidence of traumatic brain injuries, like skull fractures and cervical spine injuries; however, these test methods were not explicitly developed with the goal of reducing mild traumatic brain injuries and/or concussions. The NOCSAE standard SI threshold is well in excess of the values associated with concussions, and all varsity helmets in use today vastly outperform the 1200 SI threshold.

89.     The NOCSAE does not possess a surveillance force to ensure compliance with the

standards. NOCSAE receives no oversight from any independent agency, such as the Consumer Product Safety Commission or the Occupational Safety and Health Administration, and the standards are voluntary and are available for adoption by any equipment manufacturer, user group, or athletic regulatory body. Manufacturers test their own helmets to ensure they meet NOCSAE helmet safety standards. However, if a manufacturer affixes the NOCSAE seal to its helmets, it accepts the responsibility that all of those helmets meet the appropriate NOCSAE standards.

90.     At present, a helmet certified to a NOCSAE standard does provide a substantial level of protection for serious head injuries, including concussions, but the NOCSAE concedes that its helmet standard is not a concussion standard, and no helmet can prevent all concussions, even those certified to the NOCSAE standard.

### 1.     *Modern Helmet Designs*

91.     Modern football helmets' basic design elements include the use of hard plastic exteriors housing materials of various stiffness to absorb the force of collision ("the shell") and an inflating system meant to ensure proper fit ("the liner"). The anatomy of a traditional football helmet and current NOCSAE testing methods are depicted below:



Graham Roberts and Frank O'Connell/The New York Times   |   Send Feedback

Sources: Dr. Blaine Hoshizaki, Neurotrauma Impact Science Lab, University of Ottawa; Adams USA; National Operating Committee on Standards for Athletic Equipment

92.    The object of the shell is to provide a smooth hard outer surface, which resists penetration and serves to distribute an impact load over a large area. The shell will reduce the force transmitted to the liner and the head if it can effectively spread a localized impact load over a large segment of the shell. Today, most football helmets are constructed with a polycarbonate shell.

93.    In addition, modern football helmets include a shock absorbing liner. The shock absorbing liner in a helmet is positioned on the inside of the shell and designed to "manage" the force transmitted through the shell. As the second line of defense, the liner provides protection by compression under load. Its function is to absorb the force so that little, if any, load is transmitted to the player's head and spine. The energy of the impact is absorbed as the material compresses and how well a liner is designed to absorb energy is dependent upon its physical

dimensions and characteristics of the liner. The correct choice of shock absorbing liner is one that manages predictable levels of force in foreseeable accidents by deforming in a controlled fashion. The liner, as it is compressed, absorbs the impact force over time.

94.    The newer energy-absorbing materials within a helmet can reduce acceleration of the head on impact by compressing to absorb force during the collision; however, not all helmets are designed equally in their ability to reduce this acceleration resulting from impact. The characteristics or properties of the padding or cushioning used in helmet design are an important component of the liner.  Materials such as thermoplastic polyurethane ("TPU") have been shown to help reduce head impact acceleration by absorbing energy more effectively throughout a wider range of temperatures thus reducing force on the brain and risk of injury.[6]

95.    The ultimate goal of a helmet is to mitigate the risk and severity of head injuries and improve the level of safety during play. To better protect against brain injuries and concussions, a well-designed helmet must therefore both absorb energy from the impact, leaving less energy for the skull and brain, and also cushion the impact to minimize the magnitude of deceleration. Other advances include increases in the size and coverage of the helmet which provide more space for better liner materials such as thermoplastic urethane liners or thermoplastic shock absorbers filled with air such as those depicted below:

---

[6] *G. Gimbel, et al., A Comparison between Vinyl Nitrile Foam and New Air Chamber Technology on Attenuating Impact Energy for Ice Hockey Helmets*, INTERNATIONAL JOURNAL OF SPORTS SCIENCE AND ENGINEERING, Vol. 02, No. 3, pp. 154-161, July 2008.



96.     Even though recent engineering advances made by helmet manufacturers have undoubtedly improved the performance of the football helmet, industry experts acknowledge that helmets communicate a level of protection that they do not provide, in part because of lax industry standards and practices. Moreover, this recent change in design focus has been a response to increased awareness and publicity over concussion concerns; however, helmet manufacturers have long been aware of the risks and injuries associated with concussions.

### D.    *The Concussion Crisis Grows While Defendants Continue to Profit*

97.     Despite years of science and medicine linking the risk of long-term brain injury to repeat concussions, it was not until the early 2000's that Defendants began to evaluate the effectiveness of different helmet designs in minimizing the risk of concussions.

98.     In 1996, the NFL's Committee on MBTI engaged the firm Biokinetics to improve understanding of the biomechanics of concussions. The NFL's MBTI Committee and Biokinetics studied concussions in the NFL over a five-year period, and by 2000 had focused on 12 on-field collisions, nine of which resulted in concussions. The firm received partial funding from Riddell in 1998 for the study commissioned by the NFL.

99.     The Defendants subsequently retained Biokinetics to develop a test to evaluate

how helmets responded to "potentially concussive" hits. Helmet manufacturers and researchers later used this test when evaluating helmet designs and conducting head injury research.  The Defendants used the underlying Biokinetics data to develop a new helmet design.

100.    In 2002, the Defendants released the Revolution helmet, a helmet specifically manufactured and designed to "reduce the incidence of concussions" and marketed it as "a first-of-its-kind helmet."

101.    Following the release of the Revolution helmet, Defendants funded research at the University of Pittsburgh Medical Center (hereinafter the "UPMC study") to study the new helmet. The findings of the study were published in the February 2006 issue of the scientific journal Neurosurgery.[7]  Based on the UPMC study funded by a grant from Defendants and co-authored by Riddell's senior vice president for research and development, Thad Ide, Defendants began to market the Revolution helmet as reducing concussions by 31% — a figure criticized as an exaggeration by leading experts on head injuries and some members of Congress.

102.    The authors of the UPMC study not only disputed the 31% figure but notified the Defendants that "this data should not be used as a marketing ploy or marketing tactic from a scientific paper that was done not for those purposes." One of the authors, Dr. Joseph Maroon later responded that the study actually stated that an athlete wearing the Revolution helmet was associated with "approximately a 31 percent decreased relative risk and 2.3 percent decreased absolute risk for sustaining a concussion in the study."  By focusing solely on the larger number, which referred to a relative decrease in risk, and without acknowledging the study's limitations, Defendants exaggerated any benefits.

_____

[7] *M. Collins, et al, Examining Concussion Rates and Return to Play in High School Football Players Wearing Newer Helmet Technology: A Three-Year Prospective Cohort Study*, NEUROSURGERY, Vol. 58 , No. 2, February 2006.

103.    In addition, Dr. Robert Cantu, a neurosurgeon and leader in the field of sports-related concussion research, wrote a comment published in Journal of Neurosurgery that the study contained a "serious, if not fatal methodological flaw." The study was flawed in that it compared the performance of the new Riddell Revolution helmet with players wearing used and reconditioned helmets of unknown age and condition. Dr. Cantu further stated it was "impossible to compare the two" and to be "cautious in drawing any conclusions from this type of study."

104.    Nevertheless, the 31% concussion reduction claim was the centerpiece of the Defendants marketing campaign, which fueled sales of the Revolution helmet model. Defendants' launched a media campaign featuring the concussion reduction claim that, according to its "Riddell Revolution UPMC Media Campaign Highlights" video news release, created "over 60 million media impressions, nearly 150 television placements, over 100 newspaper clips, over 250 on-line placements, [and] 6 live sports radio interviews."[8]

---

[8]    *Concussion and Marketing of Sports Equipment: Hearing Before the House Comm. on Commerce, Science, and Transportation,* 112th Cong. 112-324 (October 19, 2011) (Statement of Tom Udall, U.S. Senator); *See also* www.riddell.com/pressreleases_upmcstudy

1. Image from Easton Bell website, available at
*http://www.eastonbellsports.com/brands/riddell*, accessed Oct. 19, 2011.



105. In a recent patent infringement case between Riddell and Schutt Sports, Inc., Riddell's senior vice president for research and development, Thad Ide, testified, "Riddell's sole basis for the 31% reduction in concussion claim was the UPMC study by Dr. Collins."[9] "There are no other bases for the specific 31 percent reduction claim."[10]

106. In 2011, a Congressional hearing was held on the topic of "Concussions and the Marketing of Sports Equipment," which cited yet another example of Defendants' misleading advertising taken from its website that failed to disclose Riddell's role in funding and writing the UPMC study:

> ''An extensive long-term study by the University of Pittsburgh Medical Center was published in the February 2006 issue of Neurosurgery. The results were impressive: Players wearing the Riddell Revolution football helmet were 31 percent less likely to suffer a concussion than athletes who wore traditional or standard football helmets. For athletes who had never suffered a previous concussion, wearing the Riddell Revolution decreased

---

[9]     *See Riddell, Inc. v. Schutt Sports, Inc.,* C.A. 3:08-cv-0071 (W.D. Wis. 2010), Deposition Testimony of Thad Ides, (Ides Dep. 221:24–222:8.)
[10]     *Id.* (Ides Dep. 222:17–18.)

their relative risk of concussion by 31 percent. . . .\* \* NEUROSURGERY, FEBRUARY 2006, VOL. 58, NO. 2''[11]

107.    Even more alarming was Defendants use of the 31% anti-concussion claim to sell helmets that were not actually tested in the UPMC study.  Thad Ide further testified in the patent infringement case that "even though the Revolution Speed was not part of the UPMC study, Riddell purposefully included the name Revolution before Speed in order to call to mind the UPMC study because Riddell "wanted to link the design parameters, testing techniques, concussion-reduction technology for the whole Revolution . . . family of helmets."[12]  Within the Revolution family of helmets is the IQ Hits, the Speed, IQ, Revolution itself, Revolution youth, Revolution IQ youth, and Revolution Speed youth.[13]  The UPMC study tested the Riddell Revolution helmet, but not the Revolution Speed, the Revolution IQ, the Revolution IQ Hits, and the Revolution Youth.[14]

108.    In addition, Riddell's online store and website advertised the following statements:

> Based on the same technology that made the varsity Riddell Revolution helmet possible—we offer in a Youth version—the Riddell Revolution Youth. . . . After an extensive long-term study by the University of Pittsburgh Medical Center was published in the February 2006 issue of Neurosurgery. The results were impressive: research shows a 31 percent reduction in the risk of concussion in players wearing a Riddell Revolution football helmet when compared to traditional helmets.\* \* NEUROSURGERY, FEBRUARY 2006, VOL. 58, NO. 2''[15]

109.     As a result of Defendants' misleading 31% anti-concussion marketing campaign,

---

[11]     *Concussion and Marketing of Sports Equipment: Hearing Before the House Comm. on Commerce, Science, and Transportation,* 112th Cong. 112-324 (October 19, 2011) (Statement of Tom Udall, U.S. Senator); *See also* http://www.eastonbellsports.com/brands/riddell
[12]     *See Riddell, Inc. v. Schutt Sports, Inc.,* C.A. 3:08-cv-0071 (W.D. Wis. 2010), Deposition Testimony of Thad Ides, (Ides Dep. 235:8–19.)
[13]     *Id.* (Ides Dep. 235:20–236:6.)
[14]     *Id.* (Ides Dep. 236:7–19.)
[15]     *See supra*, n.11.

sales increased across all helmet product lines. Annual sales tripled from 47,466 units in 2002 to 142,949 units in 2009, which inevitably included many helmets that were marketed as reducing the risk of concussion even though they were not actually tested in the UPMC study.

110. In 2007, NOCSAE's technical director, Dave Halstead, told the New York Times in a story titled "Studies for Competing Design Called Into Question'' that `` . . . the [Riddell] Revolution is a good helmet. . . . But I have problems with that particular [2006 Neurosurgery] study. The helmet is not shown to do what they say it does.'' Public statements from the UPMC study authors and other helmet safety experts have overwhelming called into question whether there is competent and reliable scientific evidence to substantiate Defendants' marketing claim.

111. Additionally, court documents made public during a Colorado lawsuit against the Defendants revealed that Biokinetics, the Canadian-based biomechanics firm hired by the NFL and later by Riddell, sent Defendants a report in 2000 showing that no football helmet, no matter how revolutionary, could prevent concussions.

112. As Revolution helmet sales continued to soar, the Defendants' anti-concussion claims caught the attention of Senator Tom Udall (D-MN) who sent a letter to the Federal Trade Commission requesting an investigation into what he called "misleading safety claims and deceptive practices in the helmet industry." Senator Udall was quoted as saying "several helmet manufacturers advertise helmets as built with "concussion reduction technology" or "designed with the intent to reduce concussions." These helmets are also marketed as meeting the National Operating Committee on Standards for Athletic Equipment (NOCSAE) voluntary industry standard for football helmets. However, this football helmet standard does not specifically address concussion risks."

113. On January 4, 2010, the Chief Executive Officer of Riddell, Dan Arment, spoke

before members of the House Judiciary Committee at hearing on "Legal Issues Relating to Football Head Injuries." In his testimony, he stated:

> ''We have independent, peer-reviewed, published research in the medical journal Neurosurgery, February of 2006, showing that the Revolution [helmet] reduces the risks of concussions by 31 percent when compared to traditional helmets. . . . Today, over one million high school, college, and professional players have made the switch from traditional helmets to the Revolution family of helmets.''[16]

114.    In light of statements like those above and marketing from several helmet manufacturers that their products could reduce the incidence of concussion, Mike Oliver, NOCSAE executive director issued the following warning: "any device or supplement promoted as being able to prevent, diagnose or cure a concussion must be supported by scientific data and peer-reviewed research. Currently, there is no definitive scientific research linking mouth guards, headgear or other specialty products to a reduction in concussion risk or severity. For companies to suggest otherwise misleads athletes, parents and coaches into a dangerous false sense of protection against concussion."

115.    Recent studies have drawn similar conclusions. For example, the Cleveland Clinic found that modern football helmets are no better at protecting against concussions than vintage "leatherhead" football helmets. The Cleveland Clinic researchers note that:

> helmet safety standards – as measured by the Gadd Severity Index – are based solely on the risk of severe skull fracture and catastrophic brain injury, not concussion risk. So, while modern helmets may prevent severe head injuries, this study found that they frequently did not provide superior protection in typical on-field impacts . . . . The findings suggest that helmet testing should focus on both low- and high-energy impacts, not solely on potentially catastrophic high-energy impacts. This is especially true of youth football helmets, which are currently scaled-down versions

---

[16] *Legal Issues Relationg to Football Head Injuries: Hearing Before the House Comm. on the Judiciary,* 111th Cong. (October 28, 2009 and January 4, 2010) (Statement of Dan Arment, CEO of Riddell).

of adult helmets. The lack of adequate knowledge surrounding adult helmet protectivity at low-energy impacts, as well as the current absence of any youth-specific helmet testing standards, may have serious brain health implications for the 3 million youths participating in tackle football in the United States each year.[17]

116.    Defendants have long since been aware that their Riddell football helmets cannot actually reduce the frequency of concussions; however, Defendants have continuously marketed their helmets as having "concussion reduction technology" thus promoting a false sense of security to football players, equipment managers, colleges, and the public.

117.    Defendants have also continued to utilize substandard liner materials such as vinyl nitrile foam that are less effective at reducing head impact acceleration by absorbing energy. Vinyl nitrile foam padding used in Defendants' helmets degrades over time and provides less protection against lower-level impacts that result in concussions. Newer materials such as thermoplastic polyurethane have been shown to be more effective at energy absorption throughout a wider range of temperatures and without notable degradation in performance, thereby reducing force on the brain and risk of injury.

118.    Despite Defendants' superior knowledge about the risks associated with concussions and repetitive head impacts, Defendants have never warned any Plaintiff or former college football player of the long-term health effects of concussions.

   **E.    *The Defendants Assumed a Leadership Responsibility for Educating Their Helmet Users and Promoting Safety in Collegiate Sports but Failed to Provide Adequate Warnings and Prudent Concussion Management Tools.***

---

[17] *A. Bartsch, et al., Impact Test Comparisons of 20th and 21st Century American Football Helmets*, THE JOURNAL OF NEUROSURGERY, Vol. 116, No. 222-233, January 2012.

119.    The Defendants have operated as a business through designing, developing, manufacturing, selling, and distributing football equipment, including helmets, in one form or another, since 1922.

120.    In the early 1940s, John T. Riddell, who later formed John T. Riddell Incorporated, invented the first plastic suspension helmet.

121.    Throughout the latter half of the 20th century and continuing to present day, the Defendants have designed, developed, manufactured, sold, and distributed equipment used in colleges, including equipment used by Plaintiffs and members of the Class and subclasses, including, but not limited to, the following:

    (a)    In 1939, Riddell invented the plastic web-suspension helmet, which was used by soldiers in World War II.

    (b)    In 1962, Riddell designed an open/closed cell foam and composite liner system to increase the efficiency of the webbed suspension.

    (c)    In 1963, Riddell developed the TAK-29 helmet, which was the first to use air inflation for fitting the helmet snug to the head. The TAK-29 shell displayed the protective polycarbonate plastic, in addition to including tough shock and cut-resistant facemask attachment straps.

    (d)    In 1969, recognizing that head protection was a key factor in helmet design requiring durable head protection, Riddell constructed a micro-fit helmet model with injection molding technology to create a one-piece shell to improve the structural integrity of the entire helmet.

    (e)    In 1973, Riddell developed, designed, manufactured, sold, and/or distributed an air cushion helmet whose interior system consisted of

individual vinyl air cushions with layers of fitting and energy absorbing foam.

(f)     In 1981, Riddell developed, designed, manufactured, sold, and/or distributed an Air Cushion Engineered helmet.

(g)     In 1982, Riddell developed, designed, manufactured, sold, and/or distributed a M155 helmet model with a combination of foam and liquid-filled cells used for padding. On impact, the liquid would be throttled from one cell to the next, resulting in energy attenuation.

(h)     In 1993, Riddell developed, designed, manufactured, sold, and/or distributed the VSR-4 helmet, which featured the first air-fitted liner system.

(i)     In 2002, Riddell developed, designed, manufactured, sold, and/or distributed the Riddell Revolution helmet designed with the intent of reducing the risk of concussion.

(j)     In 2003, Riddell developed, designed, manufactured, sold, and/or distributed the Head Impact Telemetry System (HITS) to monitor and record significant incidences of head impact sustained during a football game or practice.

(k)     In 2006, Riddell provided a research grant to the University of Pittsburgh Medical Center for head injury research. The study compared rates of high school athletes who wore the Riddell Revolution helmet with those who wore traditional helmets.

(l)     In 2011, Riddell developed, designed, manufactured, sold, and/or

36

distributed the Riddell 360 helmet.

122.    Since 1929, the Defendants have marketed themselves as "the premier designer and developer of protective sports equipment."  According to its website, Riddell is also the "Official Helmet of the National Football League" and the "recognized leader in helmet technology and innovation for ***athletes at all levels of football."*** Upon information and belief, Plaintiffs and members of the Class and subclasses wore Riddell helmets at times while playing and/or practicing during their collegiate football careers.

123.    The Defendants at all times mentioned herein were engaged in the business of selling, manufacturing, designing, testing, engineering, marketing, modifying, assembling, inspecting, distributing, and controlling the helmets and other similar equipment for use by Plaintiffs and members of the Class and subclasses and within their respective colleges.

124.    In 1989, Riddell partnered with the NFL and became League's official helmet. The NFL formed the Committee on MTBI in 1994 in response to a growing number of concussions and one of the committee's goals was to improve understanding of the biomechanics of concussions, and to use that information to engineer a concussion-resistant helmet. Riddell worked closely with the NFL to conduct research and share data on helmet design and safety.

125.    During Congressional Hearings, Riddell's president Dan Arment stated, "for more than 70 years Riddell has passionately been at the forefront of providing state-of-the-art helmet technology," and "as a market leader, we have always felt we have an obligation, not just as a business but in the public interest, to collaborate where possible and maintain the highest standard of innovation and research that has continued to stand the test of time, scrutiny and independent research…"[18]

---

[18] *Legal Issues Relating to Football Head Injuries: Hearing Before the House Comm. on the*

126.    Concussions are the most common head injuries experienced in playing college football; many are unreported and hence undiagnosed. Contrary to Defendants' statements, the helmet warnings on Riddell helmets mentioned nothing about concussions throughout the 1980s and 1990s. Prior to 2002, the warning stated:

> "Do not use this helmet to butt, ram or spear an opposing player. This is in violation of the football rules and such use can result in severe head or neck injuries, paralysis or death to you and possible injury to your opponent. No helmet can prevent all head or neck injuries a player might receive while participating in football."

127.    In fact, it was not until Defendants' introduced the Riddell Revolution in 2002 that inadequate concussion warning started to appear on helmets.

128.    Over the years, Defendants have continuously represented themselves as market leaders who have formed significant partnerships with a number of organizations including USA Football, American Youth Football, the NFL, the NFL Players Association, NCAA, and National Athletic Trainers' Association to promote player education.

129.    Recently, Riddell also partnered with USA Football and became the official helmet and equipment partner for its 2009 Junior National Football Team. USA Football is the sport's national governing body on youth and amateur levels and conducts more than 100 annual football training events nationwide offering education for coaches and game officials, skill development for players, and resources for youth football league administrators.

130.    In 2012, USA Football announced its "Protection Tour" and teamed up with Defendants again to help educate parents and players in youth sports and in May 2012, Defendants announced that every new Riddell football helmet shipped to retailers and customers

---

*Judiciary,* 111th Cong. (October 28, 2009 and January 4, 2010) (Statement of Dan Arment, CEO of Riddell)

will include a hangtag offering concussion education that includes information from the Centers for Disease Control and Prevention Heads Up program.  Defendants' concussion education hangtag was touted as being "the first of its kind among sports helmet manufacturers."  The new helmet hangtags are attached to each helmet through an ear hole and provide customers with baseline knowledge of concussions and direct them on where to obtain more information.

131.    The Defendants' voluntary actions and authority throughout its history show that for over 70 years, Riddell shouldered for itself the common law duty to make the game of football safer for the players through advancements in helmet technology and to keep the players informed of safety information.  By voluntarily undertaking to study and report on the issue of concussions and helmet safety in football, the Defendants' assumed a duty to exercise reasonable care in their work and their public statements about a helmet's ability to effectively reduce the risk of concussion.

132.    Plaintiffs and members of the Class and subclasses did not know the long-term effects of concussions and relied on the Defendants to protect them.

133.    The Defendants' belated willingness to adequately warn college football players and acknowledge the dangers and risks associated with concussions have done little to correct or even address the inadequacies of their past conduct and failure to warn and educate former college football players on concussion awareness and management.

134.    The Defendants have failed to educate their helmet users of the long-term, life-altering risks and consequences of head impacts in football. They have failed to establish known protocols to prevent, mitigate, monitor, diagnose, and treat brain injuries.

135.    As knowledge of the adverse consequences of head impacts in football has grown, the Defendants have never gone back to former college football players to offer education or

needed medical monitoring. In the face of their overwhelming and superior knowledge of these risks, as compared to that of the athletes, the Defendants' conduct constitutes negligence and reckless endangerment.

>   ### F.   The Defendants Were and Are in a Superior Position of Knowledge and Authority and Owed a Duty to Their Helmet Users.

136.   As stated above, the high incidence of concussions among college football players has been well known to the Defendants. The Defendants had a duty to adequately inform and warn football players of the risks associated with concussions. Players and their families have relied on the Defendants to disclose relevant risk information and protect their health and safety through instruction, counseling, and proper use of their products.

137.   The Defendants accumulated knowledge about head injuries to football players and the associated health risks therefrom was at all times superior to that available to former college football players.

138.   The Defendants have known or should have known for many years that MTBI generally occurs when the head either accelerates rapidly and then is stopped, or is rotated rapidly. The results frequently include, among other things, confusion, blurred vision, memory loss, nausea, and sometimes unconsciousness.

139.   The Defendants have known or should have known for many years that medical evidence has shown that symptoms of MTBI can appear hours or days after the injury, indicating that the injured party has not healed from the initial blow.

140.   The Defendants have known or should have known for many years that once a person suffers an MTBI, he is up to four times more likely to sustain a second one. Additionally, after suffering even a single sub-concussive or concussive blow, a lesser blow may cause MTBI, and the injured person requires more time to recover.

141.    The Defendants have known or should have known for many years that collegiate football players and their families were unaware of the serious risk posed to the players' long-term cognitive health, caused by repeated head impacts while playing football.

142.    The Defendants have known or should have known for many years that clinical and neuropathological studies by some of the nation's foremost experts demonstrate that multiple head injuries or concussions sustained during a football player's career can cause severe cognitive problems such as depression and early-onset dementia.

143.    The Defendants have known or should have known for many years that published peer reviewed scientific studies have shown that repeated traumatic head impacts (including sub-concussive blows and concussions) cause ongoing and latent brain injury. These injuries have been documented and associated with sports-related head impacts in both football and boxing.

144.    The Defendants have known or should have known for many years that neuropathology studies, brain imaging tests, and neuropsychological tests on many former football players have established that football players who sustain repetitive head impacts while playing the game have suffered and continue to suffer brain injuries that result in any one or more of the following conditions: early-onset of Alzheimer's Disease, dementia, depression, deficits in cognitive functioning, reduced processing speed, attention, and reasoning, loss of memory, sleeplessness, mood swings, personality changes, and the debilitating and latent disease known as Chronic Traumatic Encephalopathy ("CTE"). CTE is also associated with an increased risk of suicide.

145.    The Defendants have known or should have known for many years that CTE is found in athletes, including football players and boxers, with a history of repetitive head trauma. Conclusive studies have shown that this condition is prevalent in retired professional football

41

players who have a history of head injury. The changes in the brain caused by repetitive trauma are thought to begin when the brain is subjected to that repetitive trauma, but symptoms may not appear until months, years, or even decades after the last traumatic impact or the end of active athletic involvement.

146.    The Defendants have known or should have known the helmet standards set forth by NOCSAE are not designed to rate protection against concussions.

147.    The Defendants have known or should have known that helmets are effective in eliminating skull fractures and reducing linear forces but they are ineffective in reducing the rotational forces that result in a concussion.

148.    The Defendants have known or should have known that materials such as thermoplastic polyurethane ("TPU") are better at absorbing energy throughout a wider range of temperatures and provide better protection against head impacts when used throughout liner systems of football helmets.

149.    The Defendants have known or should have known that helmets designed with materials such as thermoplastic polyurethane provide a safer means of attenuating and absorbing energy thereby reducing forces and energy directed to a player's head and minimizing the risk of head injuries.

150.    The Defendants have known or should have known that there is no definitive scientific research to support claims that football helmets can prevent or reduce the frequency of concussions.

151.    In sum, the Defendants have known for decades that MTBI experienced in football can and does lead to long-term brain injury in football players, including, but not limited to, memory loss, dementia, depression, and CTE and its related symptoms.

152.     Not until recently did the Defendants take affirmative steps to acknowledge the concussion problem and begin to educate and/or inform their current helmet users about the true risks associated with concussions, brain injury and brain trauma. This public relations maneuver, in the face of decades of knowledge coupled with inaction, was too little and too late to correct the inadequacies of its past conduct and its detrimental impact on former college football players.

153.     The Defendants were under a continuing duty to disclose and warn of the true character, quality, and nature of the after-effects of head injuries. Because of the Defendants' deceitful and fraudulent concealment and failure to warn of the true character, quality, and nature of these injuries, the Defendants are estopped from relying on any statute of limitations defense.

## CLASS ACTION ALLEGATIONS

A.     *Plaintiffs' 23(a), (b)(2), and (b)(3) Class Allegations*

154.     Plaintiffs bring this action on behalf of themselves and, under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) as representatives of Class and subclasses defined as follows:

> All present or former members of a college football team in the United States, who, while wearing a helmet manufactured by Defendants, participated in a college football game or practice from November 15, 2000 through the present and, while playing in such a game or practice, experienced a head impact.

> **Riddell Subclass A:**

> All present or former members of a college football team at a school in Arizona, California, Colorado, District of Columbia, Florida, Guam, Illinois, Indiana, Maryland, Massachusetts, Missouri, Montana, Ohio, Oregon, Pennsylvania, Utah, Washington or West Virginia, who, while wearing a helmet manufactured by Defendants, participated in a college football game or practice from November 15, 2000 through the present and, while playing in such a game or practice, suffered a head impact.

> **Riddell Subclass B:**

> All present or former members of a college football team at a school in Alabama, Alaska, Arkansas Connecticut, Delaware,

Georgia, Hawaii, Idaho, Iowa, Kansas, Kentucky, Louisiana, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Northern Mariana Islands, Oklahoma, Oregon, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virgin Islands, Virginia, Washington, Wisconsin, or Wyoming, who, while wearing a helmet manufactured by Defendants, participated in a college football game or practice from November 15, 2000 through the present and, while playing in such a game or practice, suffered a head impact and subsequently suffered a concussion or one or more concussion-like symptoms, defined as: amnesia; confusion; headache; loss of consciousness; balance problems or dizziness; double or fuzzy vision; sensitivity to light or noise; nausea; feeling sluggish, foggy or groggy; feeling unusually irritable; concentration or memory problems; and slowed reaction time.

Excluded from this Class and subclasses are the Defendants and their subsidiaries and affiliates; all former college football players who played professional football in the National Football League; all persons who make a timely election to be excluded from the Class and subclasses; governmental entities; and any judicial officers or staff to whom this case is referred, and their immediate family members.

155.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

156.    **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of the Class and subclasses are so numerous and geographically dispersed that joinder is impracticable. Plaintiffs believe that the Class and subclasses include hundreds if not thousands of persons who have developed or will develop mental or physical problems as a result of the sustaining traumatic brain injuries, concussions or concussion-like symptoms while playing in a college football game or practice, and that the locations of such persons is geographically dispersed throughout the country. Although the exact number and locations of such persons is unknown to

Plaintiffs at this time, records in the possession of the Defendants will contain information on the identities and locations of such parties.

157.    **Commonality – Federal Rule of Civil Procedure 23(a)(2).** Numerous questions of law and fact are common to all the members of the Class and subclasses because the Class Members all played under the same rules and practices; all played with the same equipment; and they all suffered or were exposed to an increased risk of traumatic brain injuries, concussions or concussion-like symptoms while playing football and wearing helmets manufactured by Defendants. Such common questions include:

(a)    whether Defendants voluntarily undertook and/or otherwise had a duty to provide warnings to players about the injuries associated with repeated brain trauma, concussions and concussion-like symptoms;

(b)    whether Defendants failed to appropriately warn or otherwise inform players about their risks of concussions even while wearing Defendants' helmets;

(c)    whether Defendants had a duty to use liner materials with newer energy-absorbing capabilities within subject helmets to effectively reduce acceleration of the head on impact by compressing to absorb force during the collision; and

(d)    whether Defendants willfully and wantonly concealed evidence related to the injuries associated with repeated brain trauma, concussions and concussion like symptoms.

158.    **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of the claims of the members of the Class and subclasses and the claims of the Named

Plaintiffs originate from the same practices on the part of the Defendants. As a result, Plaintiffs have sustained damages as a result of the Defendants wrongful conduct described herein.

159.    **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs will fairly and adequately protect and represent the interests of the Class and subclasses. The interests of the Plaintiffs are coincident with, and not antagonistic to, those of the other Class Members. Plaintiffs are represented by counsel with experience in the prosecution of class action litigation, and with particular experience with class action litigation involving medical injuries.

160.    **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendants' negligent behavior, actions, and refusals to act are generally applicable to Plaintiffs and the members of the Class and subclasses, thereby making appropriate final injunctive relief and declaratory relief, in the form of Medical Monitoring, as described below.

161.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

162.    **Predominance – Federal Rule of Civil Procedure 23(b)(3).** Questions of law and fact are common to all the members of the Class and subclasses because the Class Members all played under the same rules and practices; all played with the same equipment; and they all suffered or were exposed to an increased risk of traumatic brain injuries, concussions or concussion-like symptoms while playing football and wearing helmets manufactured by Defendants. Such common and predominant questions include, but are not limited to:

> (a)    whether Defendants voluntarily undertook and/or otherwise had a duty to provide warnings to players about the injuries associated with repeated brain trauma, concussions and concussion-like symptoms;

(b)     whether Defendants failed to appropriately warn or otherwise inform players about their risks of concussions even while wearing Defendants' helmets;

(c)     whether Defendants had a duty to use liner materials with newer energy-absorbing capabilities within subject helmets to effectively reduce acceleration of the head on impact by compressing to absorb force during the collision; and

(d)     whether Defendants willfully and wantonly concealed evidence related to the injuries associated with repeated brain trauma, concussions and concussion like symptoms.

The common questions of law and fact identified above predominate over questions affecting only individual members.

163.    **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of hundreds of individual lawsuits would not be economically feasible for individual Class members and would cause a strain on judicial resources and increase the likelihood of varying outcomes, yet each Class member would be required to prove a common set of facts in order to recover.

## CLAIMS FOR RELIEF

### First Claim For Relief

### MEDICAL MONITORING

164.    Plaintiffs repeat and re-allege each of the allegations contained in the foregoing paragraphs.

165.    During their respective collegiate football careers, Plaintiffs and the members of the Class and subclasses were exposed to a higher risk of traumatic head impacts, including sub-concussive blows and concussions, when compared to the general population of men of a similar age.

165.    The traumatic head impacts, including both the sub-concussive blows and concussions, to which Plaintiffs and members of the Class and subclasses were exposed during their respective college football careers are known and proven to be hazardous because they increase the risk of developing neurodegenerative disorders and diseases, including but not limited to CTE, MTBI, MCI, Alzheimer's disease, and other similar cognitive-impairing conditions.

166.    The Defendants were fully aware of yet failed to adequately warn, protect and educate college football players, including Plaintiffs and members of the Class and subclasses, to the dangers and increased risks of repeated traumatic head impacts and development of neurodegenerative disorders and diseases. The Defendants had a duty to provide necessary and adequate safety and instructional materials and warnings of the risk and means available to reduce and/or minimize the risk of concussive brain injuries while playing football using their helmets. By such negligent conduct, the Defendants breached their duties of care to the Plaintiffs and members of the Class and subclasses, and caused the increased risks to the former college football players giving rise to the need for medical monitoring.

167.    As a proximate result of the Defendants' negligent conduct, Plaintiffs and members of the Class and subclasses have experienced increased risks of the sequela of repeated traumatic head impacts, including developing serious latent neurodegenerative disorders and

diseases, including but not limited to CTE, MCI, Alzheimer's disease, or similar cognitive-impairing conditions.

168.    Monitoring procedures exist that comport with contemporary scientific principles and make possible early detection of the cognitive impairments and conditions that Plaintiffs and members of the Class and subclasses are at increased risks of developing. Such monitoring, which includes but is not limited to baseline exams, diagnostic exams, and behavioral and pharmaceutical interventions, will prevent or mitigate the injuries, and enable treatment of the adverse consequences of the latent neurodegenerative disorders and diseases associated with the repeated traumatic head impacts described herein.

169.    The monitoring procedures set forth above are fundamentally different from and more extensive than the normally prescribed medical treatment and/or diagnostic procedures for adult males.

170.    As set forth above, the monitoring procedures are reasonably necessary according to contemporary scientific principles, to enable Plaintiffs and members of the Class and subclasses to obtain early detection and diagnosis of the cognitive impairments and conditions that they are at increased risks of developing as a result of the Defendants' tortious conduct described herein.

171.    By monitoring and testing former (and current) college football players who are believed to have suffered a concussion or sub-concussion while playing or practicing, the risk of each such player suffering long-term injuries, disease and losses as described above will be significantly reduced.

172.    Plaintiffs and members of the Class and subclasses therefore seek an injunction creating a Court-supervised Defendant-funded comprehensive medical monitoring fund for

Plaintiffs and members of the Class and subclasses, which would facilitate the early diagnosis and adequate treatment in the event that a neurodegenerative disorder or disease is diagnosed in Plaintiffs or members of the Class and subclasses.

173.   Accordingly, the Defendants should be required to establish a medical monitoring program that includes, among other things:

      (a)     Establishing a trust fund, in an amount to be determined, to pay for the medical monitoring of all past and current college football players who wore, during a game, helmets manufactured by Defendants, as frequently and appropriately as necessary;

      (b)     Notifying all Class Members in writing that they may require frequent medical monitoring; and

      (c)     Providing information to treating team physicians to aid them in detecting concussion or sub-concussions and to assist them in determining when the student-athlete is subjected to an increased risk of harm.

174.   Plaintiffs and members of the Class and subclasses have no adequate remedy at law in that monetary damages alone cannot compensate them for the increased risks of long-term physical and economic losses associated with brain injury. Without a Court-supervised comprehensive medical monitoring fund as described herein, the Plaintiffs and members of the Class and subclasses will continue to face increased risks of injury and disability, without proper diagnosis and opportunity for rehabilitation.

## Second Claim For Relief

## NEGLIGENCE

175.   Plaintiffs and Class Members repeat and re-allege each of the allegations contained in the foregoing paragraphs.

176.    The Defendants were negligent in their design, testing, assembly, manufacture, marketing, and engineering of the helmets as described herein.

177.    The Defendants voluntarily undertook and/or otherwise owed a duty of care to the Plaintiffs and Class members in their design, testing, manufacture, assembly, marketing, and sale of the helmets and all components and sub-assemblies of the helmets.

178.    The Defendants should have been well aware that repeated blows to the head can cause MTBI, which can and does lead to long-term brain injury in college football players, including, but not limited to, memory loss, dementia, depression, and CTE and its related symptoms.

179.    The Defendants breached their duty of reasonable care by failing to provide necessary and adequate safety and instructional materials and warnings of the risk and means available to reduce and/or minimize the risk of concussive brain injuries while playing football using their helmets.

180.    The Defendants failed to provide necessary and adequate information, warnings, and/or instructional materials regarding the fact that other model helmets provided greater shock attenuation from blows to the head area.

181.    Although the Defendants possessed special knowledge of the potential risks and substantial dangers to users of their football helmets, the Defendants negligently and carelessly failed to adequately warn or instruct users of the potential risks and dangerous and defective conditions of their above-described football helmets including but not limited to helmets with a safer means of attenuating and absorbing the foreseeable forces of impact in order to minimize and/or reduce the forces and energy directed to the player's head.

182.    As a result of the Defendants' breach of duty, Plaintiffs and members of the Class and subclasses have suffered harm described above, and/or will suffer future injuries and damages that have not yet fully manifested.

183.    There is no adequate remedy at law that could compensate Plaintiffs and members of the Class and subclasses for the risk of long-term physical and economic losses due to concussions and sub-concussive injuries. Plaintiffs and Class Members are therefore entitled to a Court-approved medical monitoring program.

184.    Furthermore, because class members did not know, nor could they have discovered through the exercise of reasonable diligence, Defendants' breach and misrepresentations and their own increased exposure to traumatic brain injuries as a result thereof, any applicable statute of limitations is tolled by the Defendants' misconduct and concealment of information.

**Third Claim for Relief**

**STRICT LIABILITY FOR DESIGN DEFECT**

185.    Plaintiffs and Class Members repeat and re-allege each of the allegations contained in the foregoing paragraphs.

186.    At the time the helmets were designed, manufactured, sold, and distributed by the Defendants, the helmets were defective in design, unreasonably dangerous, and unsafe for their intended purpose because they did not provide adequate protection against the foreseeable risk of concussive brain injury. The design defect includes, but is not limited to the following:

(a)    Negligently failing to design the subject helmet with a safe means of attenuating and absorbing the foreseeable forces of impact in order to

52

minimize and/or reduce the forces and energy directed to the player's head;

(b)   Negligently designing the subject helmet with a shock attenuating system which was not safely configured;

(c)   Negligently failing to properly and adequately inspect and/or test the helmet model;

(d)   Failing to warn Plaintiffs that their helmets would not protect against the long-term health consequences of concussive brain injury; and

(e)   Other acts of negligence that may be discovered during the course of this matter.

187.   The defective design and unreasonably dangerous condition were a proximate and producing cause of the personal injuries suffered by the Plaintiffs and members of the Class and subclasses and other damages, including but not limited to, economic damages and non-economic damages.

188.   At all times, the helmets were being used for the purpose for which they were intended.

189.   The Defendants are strictly liable for designing a defective and unreasonably dangerous product and for failing to warn which were proximate and producing causes of the personal injuries and other damages including, but not limited to, economic damage as alleged herein. A safer alternative design was economically and technologically feasible at the time the product left the control of the Defendants.

**Fourth Claim for Relief**

**STRICT LIABILITY FOR MANUFACTURING DEFECT**

190.     Plaintiffs and Class Members repeat and re-allege each of the allegations contained in the foregoing paragraphs.

191.     At the time the helmets were designed, manufactured, sold and distributed by the Defendants, the helmets were defective in their manufacturing and unreasonably dangerous and unsafe for their intended purpose because they did not provide adequate protection against the foreseeable risk of concussive brain injury. The Defendants' failure to design the helmets to design and manufacturing specifications resulted in, among other things, the following:

(a)     Negligently failing to manufacture the subject helmet with a safe means of attenuating and absorbing the foreseeable forces of impact in order to minimize and/or reduce the forces and energy directed to the player's head;

(b)     Negligently manufacturing the subject helmet with a shock attenuating system which was not safely configured;

(c)     Negligently failing to properly and adequately inspect and/or test the helmet model;

(d)     Failing to warn Plaintiffs that their helmets would not protect against the long-term health consequences of concussive brain injury; and

(e)     Other acts of negligence that may be discovered during the course of this matter.

192.     The manufacturing defect was a proximate and producing cause of the personal injuries suffered by Plaintiffs and members of the Class and subclasses and other damages, including but not limited to, economic damages and non-economic damages.

193.    The Defendants are strictly liable for manufacturing and placing in the stream of commerce a defective and unreasonably dangerous product which was a proximate and producing cause of the personal injuries and other damages, including but not limited to, economic damages and non-economic damages. A safer alternative design was economically and technologically feasible at the time the product left the control of the Defendants.

## JURY DEMAND

194.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all claims in this Complaint so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and members of the Class and subclasses pray for judgment with respect to their Complaint as follows:

A.    Certification of the proposed Class and Subclasses, and/or any other necessary and appropriate Subclasses pursuant to Federal Rules of Civil Procedure Rule 23(a) and (b)(2) and (b)(3);

B.    Designation of Plaintiffs as representatives of the proposed Class and appropriate Subclasses and appointment of the undersigned counsel as Class counsel;

C.    Grant of an injunction, declaration, or other appropriate order to provide, for the benefit of the Class and Subclass, a Court-supervised Defendant-funded medical monitoring program that pays for or reimburses the costs of monitoring to detect, prevent, ameliorate, and or/mitigate the effects of concussions, traumatic brain injuries and/or concussion-like symptoms;

D.    Award Plaintiffs and the Class and Subclasses their damages, costs and expenses in this litigation, including reasonable attorneys' fees and expert fees; and

E.    Award Plaintiffs and the Class and Subclasses all such other and further relief as may be just, equitable, and proper under the circumstances.

Dated:  March 14, 2014              Respectfully submitted,

                               *s/ Irwin B. Levin*
Irwin B. Levin
Richard E. Shevitz
Scott D. Gilchrist
Lynn A. Toops
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
Facsimile: (317) 636-2593

James R. Dugan, II
David B. Franco
Douglas R. Plymale
Chad Primeaux
THE DUGAN LAW FIRM, APLC
One Canal Place
365 Canal Street, Suite 1000
New Orleans, LA 70130
Telephone: (504) 648-0180
Facsimile: (504) 648-0181

Don Barrett
Brian K. Herrington
BARRETT LAW GROUP, P.A.
404 Court Square North
Lexington, Mississippi 39095
Tel:  (663) 834-9168

Elizabeth J. Cabraser
LIEFF CABRASER HEIMANN & BERNSTEIN
275 Battery Street, 29th Floor
San Francisco, CA 94111
Tel: (415) 956-100

Wendy R. Fleishman
LIEFF CABRASER HEIMANN & BERNSTEIN
250 Hudson Street, 8th Floor
New York, NY 10013
Tel: (212) 355-9500

Douglas Gill
DOUGLAS H. GILL & ASSOCIATES
602 7th Avenue South

56

Seattle, WA 98104
Tel: (253) 691-0197

***Attorneys for Plaintiffs and the Proposed Class
and Subclasses***

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2014, a copy of the foregoing was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the court's electronic filing system. Parties may access this filing through the court's system.

*s/ Irwin B. Levin*
Irwin B. Levin

COHEN & MALAD, LLP
One Indiana Square, Suite 1400
(317) 636-6481
(317-636-2593 Fax