UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JOHN DUROCHER individually and on behalf of all others similarly situated, DARIN HARRIS individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> RIDDELL, INC., ALL AMERICAN SPORTS CORPORATION doing business as RIDDELL/ALL AMERICAN, RIDDELL SPORTS GROUP, INC., EASTON-BELL SPORTS, INC., EASTON-BELL SPORTS, LLC, EB SPORTS CORPORATION, RBG HOLDINGS CORPORATION, KRANOS CORPORATION doing business as Schutt Sports, <br><br> Defendants. | 1:13-cv-01570-SEB-DML |

**ORDER ON DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT [DKT. NO. 76]**

## I.    Introduction.

Defendants, collectively referred to as Riddell, move to dismiss Plaintiffs John DuRocher and Darin Harris's Second Amended Complaint (SAC) in its entirety.  Plaintiffs assert four claims for relief in their SAC:  (1) Medical Monitoring; (2) Negligence; (3) Strict Liability for Design Defect; and (4) Strict Liability for Manufacturing Defect.

[SAC ¶¶ 164-94.]  For the following reasons, Defendants' Motion to Dismiss [Dkt. No. 76] is GRANTED IN PART and DENIED IN PART.

## II.  Background and Procedural History.

Defendants provide a thorough summary of the facts as alleged in the SAC and Plaintiffs do not contest the facts as described by the Defendants.  We take those facts as controlling in ruling on the motion to dismiss.

### A.  DuRocher's and Harris's Head Injuries.

Plaintiffs John Durocher and Darin Harris are former University of Washington football players.  [SAC ¶¶ 13-17.]  Both Plaintiffs allege that they suffered concussions and repeated head impacts while playing college football and wearing helmets manufactured by Riddle.  [*Id.* ¶¶ 13-17.]

Mr. DuRocher was a student at the University of Oregon as well as the University of Washington.  [*Id.* ¶ 13.]  Mr. DuRocher played college football as a quarterback from 2003-2006, during the course of which he experienced repeated traumatic head impacts.  [*Id.*]  As Plaintiffs explain, during one game Mr. DuRocher sustained a hit that left him immediately lightheaded and dizzy.  [*Id.*]  He was removed from the game and diagnosed with a concussion.  [*Id.*]  Following his graduation, Mr. DuRocher has experienced frequent, severe headaches.  [*Id.*]

Mr. Harris played college football at the University of Washington from 2004 to 2008 in the position of strong safety and with the special teams unit.  [*Id.* ¶ 15.]  Mr. Harris alleges that he experienced "repeated traumatic head impacts" during his college football career.  [*Id.* ¶ 16.]  During a football game in 2007, he sustained an impact injury to his

head in which he was "blindsided and experienced lightheadedness and dizziness." [*Id.*] He recalls returning to play when the defense next took the field. Mr. Harris recalls incurring another "severe impact to the head" in a 2008 football game, after which he was diagnosed with a concussion. [*Id.*] Following the conclusion of his football career, Mr. Harris has experienced "frequent severe headaches, memory loss, an inability to concentrate or focus, anxiety, and depression." [*Id.*]

Both Messrs. DuRocher and Harris allege that they have suffered "other similar head impacts" while playing football in college, but neither can recall the incidents with specificity. [*Id.* ¶¶ 13, 16.] They both also allege that "[u]pon information and belief," they each "wore Riddle helmets while playing and/or practicing during their collegiate football careers." [*Id.* ¶¶ 122, 14, 17.]

### B. The Dangers of Head Injuries and Development of Helmet Standards.

Plaintiffs allege that the medical community and more recently the general public have for some time recognized the risks of repeated concussions and head impacts, including a "heightened risk of long[-]term, chronic neuro-cognitive sequela" as a result of those impacts. [*Id.* ¶ 29.] According to Plaintiffs, the medical community has "known about concussions and the effects of concussions in football for over a century." [*Id.* ¶ 30.]

Plaintiffs cite various scientific studies documenting that repeated traumatic head impacts cause ongoing microscopic and latent brain injury, which can cause an early onset of Alzheimer's Disease, ALS, dementia, depression, deficits in cognitive functioning, reduced processing speed, attention, and reasoning, loss of memory, sleeplessness, mood swings, personality changes, and chronic traumatic encephalopathy. [*Id.* ¶¶ 39, 40.] This

information, they assert, has been widely and publicly available since the 1980s, within research groups, universities, and other organizations who published their findings on concussions and head impacts between the 1980s and the 2000s. [*Id.* ¶¶ 56-76.] During the early 1990s, the sports-medicine community developed "return-to-play criteria for football players suspected of having sustained head injuries." [*Id.* ¶ 61.] In 1996, the National Collegiate Athletic Association ("NCAA") also studied concussions, including through its Sports Science Safety Subcommittee on Competitive Safeguards and Medical Aspects of Sports, having recognized that "the football helmet would not prevent concussions." [*Id.* ¶ 63.]

In 1969, stakeholders in helmet safety – including "manufacturers, reconditioners, athletic trainers, coaches, equipment managers, sports medicine doctors, and consumer organizations" – formed the National Operating Committee on Standards for Athletic Equipment (NOCSAE). [*Id.* ¶¶ 83–85.] DuRocher and Harris explain: "The goal of NOCSAE has been to improve athletic equipment, and to reduce injuries through creating standards for athletic equipment." [*Id.* ¶ 84.] NOCSAE's efforts include "the development of performance standards for football helmets as well as research to better understand the mechanism and tolerance of head and neck injuries and the design and structure of football helmets." [*Id.*]

Since 1973, NOCSAE has issued football-helmet safety standards "that have been developed to reduce head injuries by establishing requirements for impact attenuation for football helmets and face masks and have been adopted by various regulatory bodies for sports, including the NCAA." [*Id.* ¶ 86.] DuRocher and Harris acknowledge that a helmet

certified to the NOCSAE standard provides "a substantial level of protection for serious head injuries, including concussions," and that no helmet – not even one that meets or exceeds the NOCSAE standard – can prevent all concussions. [*Id.* ¶ 90.]

For decades, Riddell has designed, manufactured, and sold football helmets, including selling helmets directly "to colleges and universities around the United States." [*Id.* ¶¶ 2, 121.] Since the 1940s, Riddell has introduced numerous advancements in football-helmet design, including air inflation to fit the helmet snugly, padding that uses foam and liquid-filled cells to absorb impact forces, and an "air-fitted liner system." [*Id.* ¶ 121.] These advancements are in addition to several different design iterations and other safety technologies that were available when DuRocher and Harris played college football. [*Id.* ¶ 121(h)–(j).]

Before 2001, Riddell provided warnings on its helmets that read:

> Do not use this helmet to butt, ram or spear an opposing player. This is in violation of the football rules and such use can result in severe head or neck injuries, paralysis or death to you and possible injury to your opponent. No helmet can prevent all head or neck injuries a player might receive while playing football.

[*Id.* ¶ 126.] Beginning in 2002, Riddell introduced a revised warning, to which DuRocher and Harris specifically refer (and thereby incorporate into the SAC by reference)[1], which reads as follows:

---

[1] Matters outside the pleadings can be considered if they are referred to in the complaint and central to plaintiff's claim. *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002).

NO HELMET CAN PREVENT SERIOUS HEAD OR NECK INJURIES A PLAYER MIGHT RECEIVE WHILE PARTICIPATING IN FOOTBALL. Do not use this helmet to butt, ram or spear an opposing player. This is in violation of the football rules and such use can result in severe head or neck injuries, paralysis or death to you and possible injury to your opponent. Contact in football may result in CONCUSSION-BRAIN INJURY which no helmet can prevent. Symptoms include: loss of consciousness or memory, dizziness, headache, nausea or confusion. If you have symptoms, immediately stop playing and report them to your coach, trainer and parents. Do not return to a game or practice until all symptoms are gone and you have received MEDICAL CLEARANCE. Ignoring this warning may lead to another and more serious or fatal brain injury.

[*See id.* ¶ 127; *see also* Decl. of P. Cereghini ¶ 2, Ex. 1.]

In addition to the 2002 warning, DuRocher and Harris describe different efforts at different times by Riddell and others to increase concussion awareness, such as Riddell's partnering in 2012 with USA Football, which included for the first time providing with each helmet "a hangtag offering concussion education that includes information from the Centers for Disease Control and Prevention Heads Up program." [*Id.* ¶ 130.]

Plaintiffs allege Defendants failed to warn Plaintiffs and other players that their helmets did not protect against the risks of latent long-term brain injury from repeated head impacts. [*Id.* ¶ 118.] Plaintiffs also allege that Defendants marketed their products in a way that misled "athletes, parents and coaches into a dangerous false sense of protection." [*Id.* ¶ 114.] According to Plaintiffs, "[a] helmet certified to the standards of the NOCSAE does provide a substantial level of protection for serious head injuries, including

concussions, but the NOCSAE concedes that its helmet standard is not a concussion standard, and no helmet can prevent all concussions, even those certified to the NOCSAE standard." [*Id.* at 90.]

### C.    Plaintiffs' SAC.

On October 1, 2013, Plaintiffs filed their original Complaint [Dkt. No. 1] and have now amended it twice. [Dkt. Nos. 9, 71.] The operative complaint is the Second Amended Complaint filed on March 14, 2014, which sets out four claims against Defendants: medical monitoring, common-law negligence, and two strict liability claims, one for design defects and one for manufacturing defects. [Dkt. No. 71.]

## III.    Applicable Law and Standard.

### A.    Choice of Law.

We first address the issue of what law governs Plaintiffs' claims. Defendants argue that Washington state law applies based on Indiana's *lex loci delicti* (the place of the wrong) rule for determining choice of law. [Dkt. No. 77 at 9-11.] *Lex loci delicti* requires the court to apply the substantive law of the state where the last event necessary to make the defendant potentially liable took place. *Klein v. DePuy, Inc.*, 506 F.3d 533, 555 (7th Cir. 2007). Plaintiffs' alleged injuries occurred in the state of Washington and a reasonable relationship exists between Plaintiffs' claims and the state of Washington. *See Harter v. Iowa Grain Co.*, 220 F.3d 544, 559 n.13 (7th Cir. 2000). Plaintiffs do not directly respond to Defendants' choice of law analysis, but rely on various Washington statutes and laws in support of their claims. We hold that the substantive law of the State of Washington is applicable here.

## B.     Motion to Dismiss Standard.

The Federal Rules of Civil Procedure authorize dismissal of claims for "failure to state a claim upon which relief may be granted." Fed. R. Civ. P. 12(b)(6). In determining the sufficiency of a claim, the court considers all allegations in the complaint to be true and draws such reasonable inferences as required in the plaintiff's favor. *Jacobs,* 215 F.3d at 765. Federal Rule of Civil Procedure 8(a) applies, with several enumerated exceptions, to all civil claims, and it establishes a liberal pleading regime in which a plaintiff must provide only a "short and plain statement of the claim showing that [he] is entitled to relief," Fed. R. Civ. P. 8(a)(2); this reflects the modern policy judgment that claims should be "determined on their merits rather than through missteps in pleading." *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 779 (7th Cir. 2007) (citing 2 James W. Moore, et al., *Moore's Federal Practice* § 8.04 (3d ed. 2006)). A pleading satisfies the core requirement of fairness to the defendant so long as it provides "enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1083 (7th Cir. 2008).

In its decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the United States Supreme Court introduced a more stringent formulation of the pleading requirements under Rule 8. In addition to providing fair notice to a defendant, the Court clarified that a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Plausibility requires more than labels and conclusions, and a "formulaic recitation of the elements of a cause of action will not

do." *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007) (quoting *Twombly,* 550 U.S. at 555). Instead, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Id.* The plausibility of a complaint depends upon the context in which the allegations are situated, and turns on more than the pleadings' level of factual specificity; the same factually sparse pleading could be fantastic and unrealistic in one setting and entirely plausible in another. *See In re Pressure Sensitive Labelstock Antitrust Litig.*, 566 F. Supp. 2d 363, 370 (M.D. Pa. 2008). "[A]t some point the factual detail in a complaint may be so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8." *Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 667 (7th Cir. 2007).

Although *Twombly* and *Iqbal* represent a new gloss on the standards governing the sufficiency of pleadings, they do not overturn the fundamental principle of liberality embodied in Rule 8. As this Court has noted, "notice pleading is still all that is required, and 'a plaintiff still must provide only enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests, and, through his allegations, show that it is plausible, rather than merely speculative, that he is entitled to relief.'" *United States v. City of Evansville*, No. 3:09-cv-128-WTL-WGH, 2011 WL 52467, at *1 (S.D. Ind. Jan. 8, 2011) (quoting *Tamayo*, 526 F.3d at 1083). On a motion to dismiss, "the plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint." *Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994). "Courts view motions to dismiss for failure to state a claim with disfavor because such motions undermine the policy of deciding causes of action on their merits."

*Biomet, Inc. Health Ben. Plan v. Black*, 51 F. Supp. 2d 942, 945 (N.D. Ind. 1999) (citing

*Action Repair, Inc. v. American Broad. Co., Inc.*, 776 F.2d 143 (7th Cir.1985)).

## IV.    Plaintiffs' Claims.

### A.    Medical Monitoring – First Claim for Relief.

Plaintiffs' First Claim for Relief seeks an injunction requiring Defendants, among

other things, to establish a medical monitoring program financed by a trust fund established

to pay for medical monitoring of all past and current college football players who wore,

during a game, helmets manufactured by Defendants.  [SAC ¶¶ 164-74.]  Defendants move

to dismiss this claim because "Washington does not and 'has never recognized a standalone

claim for medical monitoring.'"  [Dkt. No. 77 at 23 (citing *Korttner v. Starbucks Corp.*,

No. C09-0216-RAJ, 2009 WL 7382290, at *7 (W.D. Wash. Aug. 14, 2009) (citing *Duncan*

*v. Northwest Airlines, Inc.*, 203 F.R.D. 601, 606 (W.D. Wash. 2001) ("[T]here is no

compelling reason for this Court to create, as urged by plaintiff, a new separate tort of

medical monitoring.")).]

Plaintiffs provided no response to Defendants' request that we dismiss this claim

for medical monitoring with prejudice.  [*See generally* Dkt. No. 83.]  Plaintiffs do note that

"Washington allows for medical monitoring as a remedy to a negligence claim" [Dkt. No.

101 at 7], implicitly acknowledging that no standalone medical monitoring claim exists as

such under Washington law.  Plaintiffs are deemed to have waived their claim when they

fail to present legal arguments in response to defendant's motion to dismiss.  *Lekas v.*

*Briley*, 405 F.3d 602, 614-15 (7th Cir. 2005) ("'Our system of justice is adversarial and our

judges are busy people.  If they are given plausible reasons for dismissing a complaint, they

are not going to do the plaintiff's research and try to discover whether there might be something to say against the defendants' reasoning.'"). Because the State of Washington does not recognize a standalone claim for medical monitoring[2] and Plaintiffs have offered no objection to Riddle's Motion, we GRANT Defendants' Motion to Dismiss with respect to Plaintiffs' First Claim for Relief: Medical Monitoring WITH PREJUDICE.

### B. Washington Common-Law Negligence Claim – Second Claim for Relief.

Defendants argue that Washington's Product Liability Act (WPLA) provides a "unified approach" that allows "only a single product liability cause of action," preempting common law claims for injuries caused by allegedly harmful products, even if the claim is couched as a negligence claim. *Manjares v. Taser Int'l, Inc.*, No. CV-12-3086-LRS, 2012 WL 5389688, at *3 (E.D. Wash. Nov. 2, 2012) (citing *Washington Water Power Co. v. Graybar Elec. Co.*, 774 P.2d 1199 (Wash. 1989); *Crittenden v. Fibreboard Corp.*, 794 P.2d 554 (Wash. 1990)). The WPLA defines a product liability claim as:

> any claim or action brought for harm caused by the manufacture, production, making, construction, fabrication, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging, storage or labeling of the relevant product. It includes, but is not limited to, any claim or action previously based on: Strict liability in tort; *negligence*; breach of express or implied warranty; breach of, or failure to, discharge a duty to warn or instruct, whether negligent or innocent; misrepresentation, concealment, or nondisclosure, whether negligent or innocent; or other claim or action previously based on any other substantive legal theory except fraud,

---

[2] Defendants raise the question that if Plaintiffs have received their requested medical monitoring relief from the impending NCAA settlement, why Plaintiffs would continue to pursue that same relief from these Defendants. [Dkt. Nos. 100 at 4-5, 102 at 4.] Although this issue may be relevant in a motion for summary judgment, the issue is not properly before the Court on Defendants' Motion to Dismiss.

> intentionally caused harm or a claim or action under the consumer protection
> act, chapter 19.86 RCW.

Wash. Rev. Code § 7.72.010(4) (emphasis added). Washington courts have held that "[t]he Washington product liability act (RCW 7.72) created a single cause of action for product-related harms, and supplants previously existing common law remedies, including common law actions for negligence." *See Washington State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 858 P.2d 1054, 1066 (Wash. 1993).

In their negligence claim (Third Claim for Relief), Plaintiffs assert that Defendants were "negligent in their design, testing, assembly, manufacture, marketing, and engineering of the helmets" at issue. [SAC ¶ 176.] This claim is repeated in the assertion that Defendants breached their duty to "provide necessary and adequate safety and instructional materials and warning of the risk" and "negligently and carelessly failed to adequately warn or instruct users of the potential risks and dangerous and defective conditions" of their football helmets." [*Id.* at ¶¶ 179, 181.] "As a result of the Defendants' breach of duty," Plaintiffs allege they suffered and/or will suffer harm. [*Id.* at ¶ 182.] Because Plaintiffs' negligence claim asserts that Defendants failed to properly design, test, market, manufacture, instruct, and warn of risks related to the helmets at issue, Plaintiffs' negligence claim falls squarely within the purview of the WPLA. *See Kirkland v. Emhart Glass S.A.*, 805 F. Supp. 2d 1072, 1076 (W.D. Wash. 2011) ("The WPLA is preemptive and its scope is broadly defined to include any claim or action brought for harm caused by the product.").

Plaintiffs' attempts to salvage their negligence claim focus on their requested remedy – medical monitoring.  [*See* Dkt. No. 83 at 5 ("But the negligence claim should not be dismissed because that claim is based on more than product liability.  Plaintiffs' negligence claim seeks to recover, among other things, medical monitoring . . . .").]  Plaintiffs cite *Duncan v. Northwest Airlines, Inc.*, 203 F.R.D. 601, 608-09 (W.D. Wash. 2001) to support their argument that "Washington permits Plaintiffs to pursue medical monitoring as a remedy to a negligence claim under Washington law."  [Dkt. No. 83 at 5.]  *Duncan*, however, is clearly distinguishable from this case.  Plaintiff in *Duncan* brought a claim for negligence related to defendant's *policy* that exposed employees to second-hand smoke.  *Id.* at 603.  *Duncan* did not involve any product that would implicate the WPLA and plaintiff did not assert a products liability claim.  The mere fact that Plaintiffs request medical monitoring as a damage for their negligence claim barred by the WPLA does not save that claim.  Accordingly, we GRANT Defendants' Motion to Dismiss Plaintiffs' separate negligence claim WITH PREJUDICE because it is subsumed in Plaintiffs' products liability claim.

### C.    Product Liability Claims – Second and Third Claims for Relief.

Plaintiffs' product liability claim takes two forms – strict liability for design defect and strict liability for manufacturing defect.  Washington's Product Liability Statute provides:  "A product manufacturer is subject to liability to a claimant if the claimant's harm was proximately caused by the negligence of the manufacturer in that the product was not reasonably safe as designed or not reasonably safe because adequate warnings or instructions were not provided."  Wash. Rev. Code § 7.72.030(1).  Plaintiffs claim that the

13

helmets designed, manufactured, sold, and distributed by the Defendants "were defective in design, unreasonably dangerous, and unsafe for their intended purpose because they did not provide adequate protection against the foreseeable risk of concussive brain injury." [SAC ¶ 186.] Plaintiffs' specific complaints against Defendants regarding the design of the helmets include:

> (a) Negligently failing to design the subject helmet with a safe means of attenuating and absorbing the foreseeable forces of impact in order to minimize and/or reduce the forces and energy directed to the player's head;

> (b) Negligently designing the subject helmet with a shock attenuating system which was not safely configured;

> (c) Negligently failing to properly and adequately inspect and/or test the helmet model;

> (d) Failing to warn Plaintiffs that their helmets would not protect against the long-term health consequences of concussive brain injury; and

> (e) Other acts of negligence that may be discovered during the course of this matter.

[SAC ¶ 186; *see* Wash. Rev. Code. § 7.72.030(1)(a) ("A product is not reasonably safe as designed, if, at the time of manufacture, the likelihood that the product would cause the claimant's harm or similar harms, and the seriousness of those harms, outweighed the burden on the manufacturer to design a product that would have prevented those harms and the adverse effect that an alternative design that was practical and feasible would have on the usefulness of the product . . . .").]

Similarly, Plaintiffs' Fourth Claim for Relief alleges that the helmets were "unreasonably dangerous and unsafe for their intended purpose because they did not

provide adequate protection against the foreseeable risk of concussive brain injury." [SAC

¶ 191.] Specifically, Plaintiffs frame their complaint against Defendants as follows:

> (a) Negligently failing to manufacture the subject helmet with a safe means of attenuating and absorbing the foreseeable forces of impact in order to minimize and/or reduce the forces and energy directed to the player's head;

> (b) Negligently manufacturing the subject helmet with a shock attenuating system which was not safely configured;

> (c) Negligently failing to properly and adequately inspect and/or test the helmet model;

> (d) Failing to warn Plaintiffs that their helmets would not protect against the long-term health consequences of concussive brain injury; and

> (e) Other acts of negligence that may be discovered during the course of this matter.

[*Id.* ¶ 191.] Obviously, both of these products liability claims are very similar.

As a preliminary matter, Defendants argue that Plaintiffs' products liability claims fail because the *helmets* at issue did not cause Plaintiffs' alleged injuries and a WPLA claim arises only when there is a likelihood that the *product* would cause Plaintiffs' harm. [*See, e.g.*, Dkt. No. 77 at 18-19 ("[T]he *helmets* did not cause DuRocher['s] and Harris's concussions or head injuries.").] Defendants' argument misses the point. The court in *Rawlings Sporting Goods Co., Inc. v. Daniels*, 619 S.W.2d 435, 439 (Tex. App. Ct. 1981) succinctly explains that products liability actions predicated on a product designed to protect the consumer from the risks of dangerous activity are well-founded. The court ruled:

> The danger to plaintiff was not inherent in the helmet, but in the use of the helmet. We think liability arises when a product is manufactured and marketed for protection of the consumer, the consumer buys the product, relying on it for his protection, while engaged in a generally dangerous

activity, the manufacturer fails to warn of known limitations in the protective abilities of its product with which the user is not equally familiar, and as a result, the consumer is injured while using the product.

The rationale supporting a duty to warn is clear. The consumer is encouraged to participate in dangerous activity because of his confidence in the protective ability of the product. The manufacturer on the other hand, has superior knowledge of the limitations of the product. Where it is foreseeable that a consumer will rely on the product, thus exposing himself to a risk he might have avoided had he known the limitations, there is a duty to warn. Here the failure to warn was negligence. A product that does not include a warning is dangerously defective.

*Id.* The fact that Defendants' product itself did not directly cause the injury (i.e., it was not Defendants' helmet that forced the impact to Plaintiffs' heads) does not immunize Defendants from suit for products liability based on the manufacture, design, or warnings on the helmets at issue.

Defendants interpose four challenges to Plaintiffs' product liability claims: (1) Plaintiffs have not set forth the requirements for a design defect claim; (2) Plaintiffs have not adequately alleged a claim that Defendants' warnings were defective; (3) Plaintiffs have not set forth a plausible manufacturing defect claim; and (4) Plaintiffs have not alleged a sufficient showing that the alleged defects proximately caused their injuries. We address each of these arguments in turn below.

### 1. Design Defect.

#### a) Identification of Helmet(s) Worn by Plaintiffs.

The threshold question with respect to Plaintiffs' products liability claim is whether Plaintiffs have sufficiently identified Defendants' product to satisfy the Rule 8 threshold. The elements of a product design defect claim under Washington law are: (1) the

identification of a manufacturer's product (2) that was not reasonably safe as designed, which (3) caused harm to the plaintiff. Wash. Rev. Code § 7.72.030(1); *Bruns v. PACCAR, Inc.*, 890 P.2d 469, 473-74 (Wash. App. Ct. 1995). Plaintiffs allege that Mr. DuRocher and Mr. Harris "wore helmets manufactured and sold by the Defendants during [their] collegiate football career[s]." [SAC ¶¶ 14, 17, 122.] Defendants contend that Plaintiffs' failure to identify the *particular* helmets they wore is a fatal flaw in their design defect claim. [Dkt. No. 77 at 13-15.] According to Defendants, because Plaintiffs have not identified the particular helmets they wore, they cannot (and do not) specify the particular design defect, nor do they propose a safer alternative design. [*Id.*] Plaintiffs rejoin that they sufficiently identified the type of product at issue when they simply allege "helmets." [Dkt. No. 83 at 6-8.]

Defendants cite two cases in support of their argument that Plaintiffs have failed to sufficiently identify the helmet at issue in pleading a design defect claim. Neither case persuades us that dismissal of Plaintiffs' design defect claim is appropriate. First, Defendants point to *Chappey v. Ineos USA LLC*, No. 2:08-cv-271, 2009 WL 790194 (N.D. Ind. Mar. 23, 2009), in which the court dismissed plaintiff's product liability claims. *Id.* at *1. Plaintiff in *Chappey* abandoned her claim by failing to respond to defendants' motion. *Id.* at *4. In her complaint, Ms. Chappey did not allege that defendant was a manufacturer or seller of any product and did not specifically identify any product. *Id.* at *5 (alleging that defendant "supplied or installed unsafe items, including a water heater/system, plumbing device or other similar item"). For these reasons, the court held that "her claim for product liability must be dismissed." *Id.*

17

These pleading deficiencies do not apply to the case before us. Here, Plaintiffs have responded to Defendants' motion to dismiss their products liability claim by asserting that Defendants are the manufacturer and seller of the helmets at issue. [SAC ¶ 2 ("Defendants are in the business of designing, manufacturing, selling, and distributing athletic equipment, including football helmets and protective gear to colleges and universities around the United States."), ¶ 14 ("Upon information and belief, Mr. DuRocher wore helmets manufactured and sold by the Defendants during his collegiate football career."), ¶ 17 ("Upon information and belief, Mr. Harris wore helmets manufactured and sold by the Defendants during his collegiate football career.").] *Chappey* is easily distinguishable from the facts of this case and is therefore not persuasive authority.

Defendants also reference *Mountain Club Owner's Association v. Graybar Electric Company, Inc.*, Civ. No. 2:13-1835 WBS KJN, 2014 WL 130767 (E.D. Cal. Jan. 14, 2014) to support a dismissal of Plaintiffs' claims. In *Mountain Club*, the court dismissed plaintiff's product liability claim without prejudice where plaintiff failed to identify a particular type of product or defect. *Id.* at *3. The *Mountain Club* plaintiff alleged in a three-and-a-half page complaint that "the cable that allegedly caused the fire is 'defective and unreasonably dangerous.'" *Id.* at *2. The court found that plaintiff's allegation "does not identify the particular type of cable or the alleged defect, let alone explain how the cable was defective or how that defect resulted in a fire on plaintiff's property." *Id.* Because the failure to identify the alleged defect was fatal to plaintiff's strict liability claim, the court dismissed the claim. *Id.*

Plaintiffs' allegations in the case at bar more closely resemble the factual predicate in *Mountain Club* than in *Chappey*. Like the general "cable" identified in *Mountain Club*, Plaintiffs here generally refer to Defendants' helmets as the product in dispute. However, Plaintiffs have fleshed out the details of their claim in contrast to the complaint in *Mountain Club*. Over the course of a 55-page, 194-paragraph SAC Plaintiffs lay out their claim that the helmets manufactured by Defendants were inadequately designed to protect Plaintiffs from concussions while used during collegiate football games and practices. Plaintiffs include details regarding the various helmet designs and protective features. Indeed, Plaintiffs include a chronology of the manufacturing dates of Defendants' helmets throughout the latter half of the 20th century. [SAC ¶ 121.] Although Plaintiffs do not specify the model of the helmets they wore, they have included enough particulars with regard to the defective helmet(s) and the harm allegedly caused by them.

Plaintiffs rely on *A.K.W. v. Easton-Bell Sports, Inc.*, 454 Fed. Appx. 244 (5th Cir. 2011), positing that they need not identify a specific helmet to survive a motion to dismiss. In *A.K.W.*, the helmet at issue had been lost before the litigation commenced. *Id.* at 246. Plaintiff testified that the helmet had displayed a Riddell sticker. Despite the lack of the actual helmet worn by plaintiff at the time of his injury, the parties were able to narrow the types of helmets that plaintiff likely wore to four. *Id.* at 247. Plaintiff's expert proffered an opinion based on each of the four possible model helmets, assuming they had been worn in perfect condition. *Id.* The court held that "[b]ecause the opinion is not based on the actual helmet there is no need for Appellant to have produced the actual helmet," reversing the entry of summary judgment in favor of defendants. *Id.* The Fifth Circuit's decision in

*A.K.W.* reviewed the trial court's grant of summary judgment, which followed the completion of discovery, whereas here, the parties before us have not moved past the initial pleading stage. Nonetheless, the courts' reasoning in *A.K.W.* suggests that identifying the exact helmet model is not a prerequisite to asserting a products liability claim.

Recently, the District of Delaware had occasion to consider the specificity required when identifying a product in a products liability case. *Hicks v. Boeing Co.*, Civil Action No. 13-393-SLR-SRF, 2014 WL 1284904 (D. Del. Mar. 21, 2014). In that case, the plaintiff asserted a personal injury action against Boeing, among others, alleging asbestos exposure. Defendant sought a dismissal of the complaint because plaintiff did not identify the specific Boeing product that was the subject of his claims. *Id.* at *2. The trial court was not persuaded by this argument, citing four district court cases from around the country where the product was sufficiently identified to put defendant on notice despite a lack of identification of the precise model at issue. *Id.* (citing *Coene v. 3M Co.*, No. 10-cv-6546-CJS, 2011 WL 3555788, at *3 (W.D.N.Y. Aug. 11, 2011) (holding that defendants "ought to know whether they sold" the general type of product at issue and additional information about the products could be developed during discovery); *Coleman v. Boston Scientific Corp.*, No. 1:10-cv-01968-OWN-SKO, 2011 WL 1523477, at *2-5 (E.D. Cal. Apr. 20, 2011) (denying a motion to dismiss where plaintiff identified surgical mesh, but not a specific product line or model number); *Winslow v. W.L. Gore & Assoc., Inc.*, No. Civ. A 10-116, 2011 WL 866184, at *2 (W.D. La. Jan. 21, 2011) (noting almost all the proof in a products liability case would be in the hands of the defendant or other entities); *Hemme v. Airbus, S.A.S.*, No. 09 C 7239, 2010 WL 1416468, at *3 (N.D. Ill. Apr. 1, 2010) (holding

that the generic word "wiring" was sufficient to identify the product at issue)).  Each of these cases illustrates that the minimal pleading requirements when it comes to identifying a product in a products liability action do not necessarily require the specific model at issue, particularly when Defendants are in a position to know their own products and, in fact, third parties may possess the crucial information to more precisely identify the product at issue.

The court in *Winslow* explains the low identification threshold in a products liability action in the wake of *Iqbal* and *Twombly*:

> While defendants are correct in their quoting of *Twombly* and *Iqbal,* it must be remembered that neither was a products liability suit. While the pronouncements in the cases are nonetheless applicable, this is a products liability case where almost all of the evidence is in the possession of defendant or other entities. Proof will necessarily be technical in nature and it is likely impossible for plaintiff to state more specific allegations regarding defects in manufacture and design without first having the benefit of discovery and of expert analysis, neither of which is required in order to file suit.

2011 WL 8166184, at *2.  Quoting *Twombly*, the court reiterated that the pleading standard "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements."  *Id*. at 3 (citing *Twombly*, 550 U.S. at 566).

We agree with this analysis.  Although some dispute persists as to whether all of Defendants' helmets contained the same design and technology, the time period at issue is

limited to a six-year period of time – 2003-2008.[3]  Plaintiffs have set forth basic identifying

information regarding the product at issue – helmets manufactured and sold by the

Defendants and worn by Plaintiffs at Washington University during a six-year time period.

We expect discovery to expand the parties' knowledge as to the model and type of helmet

worn by the Plaintiffs during their collegiate football career, or at least to narrow the

possibilities.  If not, Defendants likely will pursue summary judgment based on a lack of

product identification.   However, at the pleading stage, Plaintiffs have satisfied the

requirements of Federal Rule of Civil Procedure 8 and pertinent case law with the product

identification contained in the SAC.  We DENY Defendants' Motion to Dismiss based on

a lack of product identification.

### a)   Product Reasonably Safe As Designed.

Defendants seek dismissal based on Plaintiffs' failure to sufficiently allege that the

product was not reasonably safe as designed.   According to the WPLA, a claim for

defective design must include the following:

> A product is not reasonably safe as designed, if, at the time of manufacture,
> the likelihood that the product would cause the claimant's harm or similar
> harms, and the seriousness of those harms, outweighed the burden on the
> manufacturer to design a product that would have prevented those harms and

---

[3] Plaintiffs include a chronology of Defendants' helmet development and manufacture in the SAC at ¶ 121.  Defendants characterize this allegation as an acknowledgement by Plaintiffs that "Riddell manufactured many different designs of helmets with different technologies, different materials, and different abilities." [Dkt. No. 90 at 6 (citing SAC ¶ 121).]  Yet, Plaintiffs allege that Riddle designed, manufactured, and sold the VSR-4 helmet beginning in 1993 and the Riddle Revolution helmet beginning in 2002.  [SAC ¶ 121(h), (i).]  This allegation provides a strong indication that the universe of helmets used by Plaintiffs during their collegiate career can be significantly narrowed during discovery.

> the adverse effect that an alternative design that was practical and feasible would have on the usefulness of the product

Wash. Rev. Code § 7.72.030(1)(a); *Soproni v. Polygon Apartments Partners,* 971 P.2d 500, 502 (Wash. 1999) (citing *Falk v. Keene Corp.*, 782 P.2d 974 (Wash. 1989); Wash. Rev. Code § 7.72.030)). "This may be tested by either a risk utility or a consumer expectation standard." *Pagnotta v. Beall Trailers of Oregon, Inc.*, 991 P.2d 728, 732 (Wash. Ct. App. 2000) (citing *Soproni v. Polygon Apartment Partners*, 971 P.2d 500 (Wash. 1999)). Under the consumer expectation standard, plaintiffs must prove that the product "was more dangerous than the ordinary consumer would expect," which is judged against the reasonable expectations of the ordinary consumer. *Id.*

Plaintiffs assert that their complaint "easily satisfies the consumer expectation standard applied under the WPLA" – that the helmets were more dangerous than the ordinary consumer would expect. [Dkt. No. 83 at 9 (citing SAC ¶ 186).] Plaintiffs specifically allege that Riddle's marketing campaign boasted a reduction in concussions of 31% with the Riddle Revolution helmets, where that number was unsupported by the testing that had been performed. [Dkt. No. 83 at 9 (citing SAC ¶¶ 101-10).][4] According

---

[4] Defendants note that Plaintiffs rely heavily on the "Riddle Revolution UPMC Media Campaign" related to Defendants' 31% concussion reduction claim. [Dkt. No. 90 at 7.] This campaign could not have started until 2006, when the UPMC study was concluded. [*See* SAC at ¶ 101.] It is possible that Mr. Durocher never saw the 31% concussion reduction claim because he stopped playing collegiate football in 2006. [*Id.* at ¶ 13.] Mr. Harris ceased playing collegiate football in 2008. [*Id.* at ¶ 15.] Plaintiffs do not allege that either Mr. Durocher or Mr. Harris actually observed or read the 31% concussion reduction materials. But it is possible that they did. We reject Defendants' argument that because the campaign began "several years *after* the plaintiffs *began* their college football careers," this allegation should be dismissed based on a Rule 12(b)(6) motion. [Dkt. No. 90 at 7 (second emphasis added).]

to Plaintiffs, having alleged that the helmets were "unreasonably dangerous" and did not

perform to the reasonable expectation of consumers (i.e., decrease the risk for sustaining a

concussion), the consumer expectation test has been satisfied.

Plaintiffs also posit that the risk-utility test is satisfied by their allegations of specific

product defects in the Riddle helmets. [*Id.* (citing SAC ¶¶ 117, 186(b), 180, 181, 189)).][5]

Paragraph 117 of the SAC states that:

> Defendants have also continued to utilize substandard liner materials such as
> vinyl nitrile foam that are less effective at reducing head impact acceleration
> by absorbing energy. Vinyl nitrile foam padding used in Defendants' helmets
> degrades over time and provides less protection against lower-level impacts
> that result in concussions. Newer materials such as thermoplastic
> polyurethane have been shown to be more effective at energy absorption
> throughout a wider range of temperatures and without notable degradation in
> performance, thereby reducing force on the brain and risk of injury.

[SAC ¶ 117.][6]  This allegation alone, which is not directed at any one specific line of

helmets, satisfies the pleading requirements of a design defect claim.  Plaintiffs include an

explanation for the way in which the design was deficient – the materials degrade over time

which provides less protection against concussions – and identify an alternative design that

---

[5] Defendants contend that no dispute exists that Plaintiffs did not meet the risk-utility test, but this is not the case.  [*Compare* Dkt. No. 90 at 7 *with* Dkt. No. 83 at 9.]

[6] Defendants take issue with several arguments in Plaintiffs' response, such as paragraphs 91-96 relating to "Modern Helmet Design," which Plaintiffs describe in their response brief as being all Riddle helmets.  [Dkt. No. 90 at 6; *see also* Dkt. No. 83 at 7.]  Further, Plaintiffs' SAC allegations of design specifications being shared by all of Riddle's helmets only related to the "Revolution" line and not all helmets manufactured at any time.  Even so, Defendants cannot ignore Plaintiffs' allegations that Riddle should have used newer materials and that alternative designs provided greater protection against concussions and that Defendants' helmets utilized an unsafely configured shock attenuating system.  These allegations suffice to plead a defective design claim, despite the lack of information as to the era of helmet at issue.

would prevent the harm – thermoplastic polyurethane which is more effective at energy absorption and without degradation which reduces the risk of injury.

Defendants maintain that Plaintiffs have contradicted their design defect claim by acknowledging that helmets certified to NOCSAE standards (such as Riddell's) "provide a substantial level of protection for serious head injuries, including concussions" and that "no helmet can prevent all concussions." [Dkt. No. 77 at 14 (citing SAC ¶ 90).] To sustain Defendants' arguments would require us to make factual determinations, which are unavailable at the motion to dismiss stage. Plaintiffs are entitled to receive the benefit of imagination: it is possible that even though NOCSAE certified helmets provide a substantial level of protection and no helmet can prevent all concussions, a design defect still existed with the Riddle helmets. Plaintiffs have not pled themselves out of court on this claim, as Defendants contend.

We agree that Plaintiffs have satisfied the minimal pleading standard to assert a products liability claim for design defect. Given the nature of Plaintiffs' claims, the amount of detail set out in the SAC, and in view of the well-established principles of law that disfavor motions to dismiss, Defendants' motion to dismiss Plaintiff's design defect claim must be DENIED.

### 2. Manufacturing Defect.

Under the WPLA, a manufacturing defect exists when "claimant's harm was proximately caused by the fact that the product was not reasonably safe in construction or not reasonably safe because it did not conform to the manufacturer's express warranty or the implied warranty." Wash. Rev. Code § 7.72.030(2). "A product is not reasonably safe

in construction if, when the product left the control of the manufacturer, the product deviated in some material way from the design specifications or performance standards of the manufacturer, or deviated in some material way from otherwise identical units of the same product line." *Id*. § 7.72.030(2)(a). Defendants contend that Plaintiffs have failed to allege that the helmets at issue here deviated from either design specifications or performance standards for other identical units. [Dkt. No. 77 at 19.] Moreover, the nature of Plaintiffs' claim, that *all* of Riddle's helmets were defective, precludes a claim for a manufacturing defect. [*Id.*]

Plaintiffs briefly respond that their manufacturing defect claim is based on the consumer expectation standard, explaining that they need not identify a manufacturing flaw, but simply allege that "'the product did not perform in keeping with the reasonable expectations of the consumer.'" [Dkt. No. 83 at 15 (quoting *Pagnotta*, 991 P.2d at 733 (quoting *Bombardi v. Pochel's Appliance & TV Co.*, 518 P.2d 202 (Wash. Ct. App. 1973))).] Neither of these cited cases supports Plaintiffs' assertion that a manufacturing defect in the product at issue as defined by the WPLA caused the alleged harm.

*Pagnotta* was a design defect case in which the plaintiff pursued a claim based on the consumer expectations test. 991 P.2d at 732. The excerpt referenced by Plaintiffs in quoting from *Pagnotta* was significantly edited in their brief. In *Pagnotta* (and *Bombardi*), the court held that where "there is no evidence, direct or circumstantial, available to prove exactly what sort of manufacturing flaw existed, or exactly how the design was deficient, the plaintiff may nonetheless be able to establish his right to recover, by proving that the product did not perform in keeping with the reasonable expectations of the user." *Id.*

26

Plaintiffs have not asserted that no evidence exists as to the precise manufacturing flaw with the helmets. Thus, *Pagnotta* is inapplicable here.

Similarly, *Bombardi* pre-dates the WPLA. It is based on a *res ipsa loquitur*-type theory. *Bombardi*, 518 P.2d 202. The *Bombardi* court was faced with defining exactly what kind of "defect" serves as a predicate for a strict liability claim in the absence of any general definition. To answer this question, the court looked to the Restatement (Second) of Torts and that definition was borrowed by Plaintiffs here. *Id.* at 204 ("According to the Restatement, a product is defective when it is 'in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him.'"). In applying this definition, the court found that "there are some accidents as to which there is common experience dictating that they do not ordinarily occur without a defect, and as to which the inference that a product is defective should be permitted." *Id.* at 204. In *Bombardi*, for example, a couple awoke to discover their television set was on fire. Three expert witnesses agreed that the television caused the fire. Even though the television was completely destroyed, the court ruled that it defective because it was apparent that the television performed in an unreasonably dangerous manner not contemplated by any user or consumer. *Id.* at 246.

Following the *Bombardi* decision, the State of Washington codified it law respecting strict liability for manufacturing defects. [*See* Wash. Rev. Code § 7.72.030(2)(a), which defines the necessary showing of proof for a manufacturing defect.] Based on the WPLA, the court in *Lovold v. Fitness Quest Inc.*, No. C11-569Z, 2012 WL 529411, at *3 (W.D. Wash. Feb. 16, 2012), rejected the *Bombardi* exception in

a non-*res ipsa loquitur* case. In *Lovold*, the court stated that "in this case, plaintiff's alleged injury of a muscle tear while using Leg Magic [is] not the sort of accident that alone can establish a product defect because a muscle tear is not a highly unusual injury during the course of exercise." *Id.*

In the case before us, according to Plaintiffs' allegations, the injuries *are* the kind that ordinarily occur and are not necessarily dependent on a helmet defect. Plaintiffs themselves specifically allege that concussions are not a "highly unusual injury" in football, but are "common" to the sport. [SAC ¶ 3, 47, 50.] Plaintiffs further concede that "repeated blows to the head are unavoidable." [*Id.*] Plaintiffs also allege that there is "no definitive scientific research to support claims that football helmets can prevent or reduce the frequency of concussions." [*Id.*] Plaintiffs are unable to reconcile these allegations with a *res ipsa loquitur*-like theory that *but for* a manufacturing defect in Defendants' helmets, Plaintiffs would not have been injured.

Plaintiffs have not alleged that the helmets at issue deviated in some material way from the design specifications or performance standards of the manufacturer, or deviated in some material way from otherwise identical units of the same product line as required by Wash. Rev. Code § 7.72.030(2)(a). The consumer expectation standard cannot act as a substitute for the requirement that Plaintiffs allege the manufacturing defect in the helmets at issue, where the injuries alleged are common and not highly unusual. Defendants' motion to dismiss Plaintiffs' manufacturing defect claim is therefore GRANTED WITHOUT PREJUDICE.

### 3.     Failure to Warn.

The WPLA recognizes a claim for a failure to warn in cases where the product was "not reasonably safe because adequate warnings or instructions were not provided."  Wash. Rev. Code § 7.72.030(1)(b).  A failure to warn claim under the WPLA requires plaintiff to show that the likelihood that the product would cause the plaintiff's harm, and the seriousness of that harm, made the manufacturer's warnings or instructions inadequate.  *Id.* (repeated by Defendants in Docket No. 77 at 16).  It also requires proof that warnings or instructions existed that the manufacturer could have provided which would have been adequate.  *Id.*  "The consumer expectation test has been established by Washington courts as an independent basis for liability for both design defect and failure to warn claims." *Neher v. II Morrow Inc.*, 145 F.3d 1339 (9th Cir. 1998).

Plaintiffs maintain that their SAC includes several allegations related to the sufficiency of Defendants' helmet warnings that suffice as a claim for failure to warn.  [Dkt. No. 83 at 11 (citing SAC ¶¶ 3, 5, 7, 118, 186(d), 191(d), 166, 179, 180).]  Defendants contend that (1) Plaintiffs have not identified the allegedly deficient warning they received from Defendant and (2) Plaintiffs' admissions that injuries in football are common, that "head impacts are unavoidable," and that Riddell warned no helmet can prevent all concussions both undermine and ultimately doom their claim that Riddle failed to adequately warn that no helmet can prevent all concussions and long-term health consequences of concussions.  [Dkt. No. 77 at 16-17; Dkt. No. 90 at 9.]

Two of Defendant's specific warnings are included in the SAC – a pre-2002 warning and a 2002 warning related to the Riddle Revolution-style helmet. [SAC ¶¶ 126-27.] Plaintiffs quote the pre-2002 warning as follows:

> "Do not use this helmet to butt, ram or spear an opposing player. This is in violation of the football rules and such use can result in severe head or neck injuries, paralysis or death to you and possible injury to your opponent. No helmet can prevent all head or neck injuries a player might receive while participating in football."

[*Id.* ¶ 126.] Plaintiffs also reference the 2002 warning that accompanied the Riddell Revolution, but do not provide the explicit text of that warning. [*See* Dkt. No. 71 at ¶ 127.] Defendants do provide the text of the 2002 warning, as follows:

> NO HELMET CAN PREVENT SERIOUS HEAD OR NECK INJURIES A PLAYER MIGHT RECEIVE WHILE PARTICIPATING IN FOOTBALL.
>
> . . .
>
> Contact in football may result in CONCUSSION-BRAIN INJURY which no helmet can prevent.

[Dkt. No. 77 at 17.][7]  Although Plaintiffs allege that the 2002 warning was an "inadequate concussion warning" [Dkt. No. 71 at ¶ 127],[8] the 2002 warning does inform of the risks of concussions.  [*See* Dkt. No. 77 at 17.]  Although Plaintiffs do not identify which warning they received (the pre-2002 or the 2002 warning), this issue can be fleshed out in discovery, similar to the issue of identifying the specific Riddle model helmet they wore.  Having alleged both warnings were deficient [SAC ¶¶ 126-27; Dkt. No. 83 at 13], Plaintiffs have satisfied the pleading standard.

Plaintiffs complain that "Defendants have known or should have known that there is no definitive scientific research to support claims that football helmets can prevent or reduce the frequency of concussions."  [SAC ¶ 150.]  The crux of Plaintiffs' failure to warn claim is that Defendants knew of the long-term consequences of head trauma and did not warn football players that their helmets would not protect against that serious harm.

---

[7] We have considered the text of the 2002 warning as presented by Defendant because that warning is alleged in the SAC, but the text was not provided.  *United States v. Wood*, 925 F.2d 1580, 1582 (7th Cir. 1991) ("[T]he district court may take into consideration documents incorporated by reference to the pleadings.");  *Manjares*, 2012 WL 5389688 (considering the text of warnings referenced, but not included in the Complaint).  We reject Plaintiffs' argument that we are foreclosed from considering this warning after Plaintiffs referenced it in the SAC *and* Plaintiffs specifically assert that it was inadequate.  [*See* Dkt. No. 83 at 12-13 (arguing that the 2002 warning was an inadequate warning of the risks and impact of head trauma).]

[8] Defendants suggest that the word "*in*adequate" in the SAC was a typographical error and that Plaintiffs intended to allege that the 2002 warning was "adequate."  [Dkt. No. 77 at 18, n.6.]  Although the sentence structure of the allegation raises doubt as to the use of the word "inadequate," based on Plaintiffs' claim that the warnings provided by Defendants failed to warn the Plaintiffs, and given the forgiving standards in favor of Plaintiffs on a motion to dismiss, we take the allegation as stated. [*See also* Dkt. No. 83 at 13 ("Plaintiffs have alleged that both the pre-2002 and the 2002 warning were inadequate.").]  Certainly, if Plaintiffs intended to allege that the 2002 warning was *adequate*, they have a Rule 11 obligation to correct their pleading.

[*See* Dkt. No. 71 at ¶ 186(d) ("The design defect includes, but is not limited to the following: . . . (d) Failing to warn Plaintiffs that their helmets would not protect against the long-term health consequences of concussive brain injury."); *id*. at ¶ 191(d) (related to manufacturing defect failure to warn); Dkt. No. 83 at 12-13 (enumerating the topics on which Defendants failed to adequately warn Plaintiffs).] For example, Plaintiffs allege that Defendants knew or should have known that collegiate football players "were unaware of the serious risk posed to the players' long-term cognitive health, caused by repeated head impacts while playing football," "including, but not limited to, memory loss, dementia, depressions, and CTE and its related symptoms." [SAC ¶¶ 141, 151.] Plaintiffs allege that at some point, Defendants did adequately warn collegiate football players of the dangers and risks associated with concussions, but that it was at some time after the Defendants knew of these risks and failed to warn football players. [*Id.* ¶ 133 ("The Defendants' belated willingness to adequately warn college football players and acknowledge the dangers and risks associated with concussions have done little to correct or even address the inadequacies of their past conduct and failure to warn and educate former college football players on concussion awareness and management.").][9] It is unclear from the SAC whether Defendants' allegedly adequate warning was the 2002 warning or a warning that came after the 2002 warning.

---

[9] We agree with Defendants that the insufficiency of Riddle helmet warnings in the *Arnold v. Riddle, Inc.*, 882 F. Supp. 979 (D. Kan. 1995) case does not *ipso facto* support all future failure to warn claims. We disagree, however, that Plaintiffs' allegation that it was public knowledge that "no helmets can prevent all concussions" necessarily results in a dismissal of Plaintiffs' claims. [*See* Dkt. No. 77 at 17.] Plaintiffs do not complain that Defendants' product failed to carry warnings against *any* concussion.

Although the 2002 warning specifically warns in capitalized letters and bold font type that "[c]ontact in football may result in CONCUSSION-BRAIN INJURY for which no helmet can prevent," it does not explain the long-term effects of repeated head trauma. It is Plaintiffs' contention that Defendants' failure to warn of the magnitude and longevity of the effects of head trauma was inadequate and accordingly made Defendants' warning deficient, particularly given the marketing campaign claiming that the Riddle Revolution helmets decreased concussions by 31%. [Dkt. No. 83 at 13.] Plaintiffs allege the Defendants had knowledge of these serious injuries, but did not include warnings to that effect on the helmets. Based on the allegations of the SAC, we conclude that Plaintiffs have sufficiently pled the inadequacy of the 2002 warning.

The same can be said of the pre-2002 warning as alleged in the SAC. That warning stated in part that "[n]o helmet can prevent all head or neck injuries a player might receive while participating in football." [SAC ¶ 126.] This warning does not use the term "concussion," but it does warn of injuries to the head or neck that could be received while participating in football. Plaintiffs contend that at the time of this warning Defendants knew a great deal more about the effects of head injuries in football and failed to warn of the enhanced risks. Based on the allegations in the SAC, we conclude that Plaintiffs have pled that the pre-2002 warning was also inadequate.

Defendants assert that because the 2002 warning explicitly warns of long-term risks of concussions, Plaintiffs' claim of this insufficiency must fail. Defendants point to two non-binding cases – *Mills v. Bristol-Myers Squibb Co.*, No. CV 11-968-PHX-FJM, 2011 WL 3566131, at *3 (D. Ariz. Aug. 12, 2011) and *Gerber v. Hoffmann-La Roche, Inc.*, 392

33

F. Supp. 2d 907, 916 (S.D. Tex. 2005). Neither of these cases persuades us that Defendants' warnings overcome Plaintiffs' defective warning claim as a matter of law.

In *Mills*, the plaintiff did not plead any facts about the warning, its content, or how it was deficient. 2011 WL 3566131, at *3. The court noted that the actual warning described the risk of bleeding, which was the specific concern raised by the plaintiff. *Id.* The court provided no other analysis.

In *Gerber*, the court considered the issue of an allegedly defective warning in the context of a motion for summary judgment. First, the plaintiff complained that the warning did not warn against possible birth defects. *Gerber*, 392 F. Supp. 2d at 916. The warning itself did not contain warnings of birth defects and thus, the court granted summary judgment for the defendant. *Id.* at 917. Second, the plaintiff contended that the warning failed to sufficiently describe necessary precautions for the drug's use. *Id.* at 918. The court considered a significant amount of evidence and applied the learned intermediary doctrine before concluding that the warning was not defective. *Id.* at 919-20.

*Gerber* highlights the factual determinations necessary in order to conclude that Riddle's warnings were or were not defective. Plaintiffs' allegations pass muster under a motion to dismiss standard, which is the current procedural posture of this case. Accordingly, we hold that Plaintiffs claim that the pre-2002 and 2002 warnings failed to provide an adequate warning to football players of the long-term consequences of repeated head trauma is sufficient to withstand Defendants' Motion to Dismiss Plaintiffs' Failure to Warn claim.

4. **Proximate Cause.**

Defendants next contend that Plaintiffs have a *de facto* deficiency in the manner in which they have alleged proximate cause due to their having failed to identify both a specific product and a specific defect. [Dkt. No. 77 at 20-21.] Plaintiffs point out in their averment "that the design and manufacturing defects and inadequate warnings caused Plaintiffs to suffer serious head injuries (SAC ¶¶ 185-93)." [Dkt. No. 83 at 16.] Thus, we should not dismiss the SAC for its failure to plead proximate cause. [*Id.*] Defendant retorts that under *Twombly* and *Iqbal*, Plaintiffs must allege more than simply that a design defect or inadequate warning caused the injury. [Dkt. No. 90 at 10-11.]

The SAC states that both the design defects and manufacturing defects of the helmets at issue were "a proximate and producing cause of the personal injuries suffered by Plaintiffs and members of the Class and subclasses." [SAC ¶¶ 189, 192.] In addition it includes a claim that the helmets designed and manufactured by Defendant did not provide a "safe means of attenuating and absorbing the foreseeable forces of impact in order to minimize and/or reduce the forces and energy directed to a player's head" and that the helmets were not equipped with "a shock attenuating system [that was] safely configured" and that Defendant did not warn Plaintiffs "that their helmets would not protect against the long-term health consequences of concussive brain injury." [*Id.* ¶¶ 191, 186.] The SAC details the dangers of repeated head impacts and concussions, helmet designs, based on reports by Defendants and other related entities. [*See generally id.*] True, the SAC could have been clearer. Plaintiffs stress, however, that they "need only allege that their injury would have been prevented or lessened if Defendants' helmets weren't defective." [Dkt.

No. 83 at 16.] Yet, the SAC contains no explicit allegation to this effect. Given that we must draw all reasonable inferences in favor of Plaintiffs in ruling on a motion to dismiss, we hold that the SAC provides Defendants fair notice of the claim and the underlying grounds in plausible fashion. *See City of Evansville*, 2011 WL 52467, at \*1.

Defendants in general have exaggerated their contentions summarizing Plaintiffs' allegations. For example, Defendants encourage us to reject Plaintiffs' claims because Plaintiffs have alleged that "no helmet can prevent all concussions," which was language contained in Defendants' warning. [Dkt. No. 77 at 20-21 (citing SAC ¶ 90).] Moreover, Defendants distort the significance of Plaintiffs' statements that football "is unquestionably a tough, aggressive, physically demanding sport" in which "[i]njuries are common" and "repeated blows to the head are unavoidable," and that there is "no definitive scientific research to support claims that football helmets can prevent or reduce the frequency of concussions." [*Id.* (citing SAC ¶¶ 3, 47, 150).] These allegations form a small portion of the overall SAC, which as a whole sufficiently alleges the defects and inadequate warnings which served as the proximate cause for their long-term brain injuries, memory loss, dementia, depression, and CTE.

Defendants urge us to find that Plaintiffs will be unable to prove that but for a defect in the helmets, "plaintiffs' concussions would have been avoidable, or that differently designed or manufactured helmet would have made a difference in the plaintiffs' specific impacts." [*Id.* at 21.] In advancing this argument, Defendants misstate Plaintiffs' claims. As we understand the SAC, Plaintiffs do not claim that the Riddle helmets should have prevented *all* concussions, rather that alternative available designs and warnings would

have decreased the amount of resulting damage from head impacts. [SAC ¶¶ 148-50.] Because Plaintiffs are entitled to "receive[] the benefit of imagination," we decline Defendant's invitation to construe the SAC so narrowly concluding that Plaintiffs have failed to plead that the alleged helmet defects and inadequate warnings proximately caused their damages.[10] Drawing all reasonable inferences in Plaintiffs' favor, a jury could conclude that, absent the design defects and/or deficient warnings, Plaintiffs' damages would not have been incurred. Defendants' Motion to Dismiss based on proximate cause is therefore DENIED.

## B. Liability of Uninvolved Entities.

Plaintiffs list seven separate entities as Defendants in their SAC: Riddell, Inc., All American Sports corporation d/b/a Riddell/All American, Riddle Sports Group, Inc., Easton-Bell Sports, Inc., Easton-Bell Sports, LLC, EB Sports Corporation, and RBG Holdings Corporation. [SAC.] Plaintiffs' allegations against Riddell, Inc., All American Sports Corporation, and Riddle Sports Group, Inc. are straightforward. [*See id.*; Dkt. No.

---

[10] Additionally, Defendant's motion would require us to make factual determinations at the motion to dismiss stage. Defendant claims that Plaintiff Harris's "return[] to play immediately after his 2007 head impact that left him lightheaded and dizzy" "preclud[es]any inference that a different warning would have made a difference." [Dkt. No. 90 at 11 (citing SAC at ¶ 16).] Defendant again misstates the allegations. Plaintiffs' SAC asserts that Mr. Harris "recalls returning to play the next time the defense took the field." SAC at ¶ 16. Defendants interpret this allegation to mean that Mr. Harris did not report his symptoms to his coach, trainer, or parents and that he did not receive medical clearance to return to the game. [*See* Dkt. No. 77 at 6 (Defendants' helmet warning).] We are not entitled to make factual determinations at this juncture, and the motion to dismiss standards operate to give *plaintiff* the benefit of all reasonable inferences, particularly when these facts are unsettled.

77 at 22 (Plaintiffs' charges against these three companies include that they designed, manufactured, sold, and distributed helmets to colleges and universities).]

With respect to Defendant Easton-Bell Sports, Inc., Plaintiffs allege that this Defendant "designs, develops, and markets branded athletic equipment and accessories, including marketing and licensing products under the Riddle brand." [SAC ¶ 21.] This allegation, although admittedly meager, is sufficient to state a claim against Easton-Bell Sports, Inc. Plaintiffs specifically allege that this defendant's design of Riddle helmets is related to the allegations against all Defendants.

With respect to Easton-Bell Sports, LLC, EB Sports Corporation, and RBG Holdings Corporation, Plaintiffs include no specific allegations of wrong-doing by them. These three entities are described as being related to the other Defendants. [*Id.* ¶ 22 ("Defendant Easton-Bell Sports, LLC is the parent corporation of Easton-Bell Sports, Inc."); *id.* ¶ 23 ("Defendant EB Sports Corporation is a wholly owned subsidiary of Easton-Bell Sports, LLC."); *id.* ¶ 24 ("RBG Holdings Corporation is a wholly owned subsidiary of EB Sports Corporation.").] No other allegations have been advanced against these three companies, including no grounds on which to pierce the corporate veil between or among the companies.[11]

---

[11] Plaintiffs half-heartedly state that "to the extent that the Complaint relies on a theory of piercing the corporate veil, that inquiry is fact-intensive and not appropriately resolved on a motion to dismiss." [Dkt. No. 83 at 17.] The SAC contains no piercing allegations and even Plaintiffs do not contend that their SAC intends to assert such a claim.

Plaintiffs maintain that by simply naming all of the entities as "Defendants," their SAC is sufficient under the Federal Rules of Civil Procedure and *Iqbal* and *Twombly*. This is incorrect. *See Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008) (citations omitted) ("Given the complaint's use of either the collective term 'Defendants' or a list of the defendants named individually but with no distinction as to what acts are attributable to whom, it is impossible for any of these individuals to ascertain what particular unconstitutional acts they are alleged to have committed."). Plaintiffs' SAC lacks sufficient allegations of fact to state a claim for relief that is plausible on its face as to Defendants Easton-Bell Sports, LLC, EB Sports Corporation, and RBG Holdings Corporation. Their Motion to Dismiss is therefore GRANTED WITHOUT PREJUDICE.

## C. Time-bar.

### 1. Statute of Limitations.

Dismissals under Rule 12(b)(6) based on the statute of limitations are rare because to establish an entitlement to such the complaint itself must "admit[] all of the ingredients of an impenetrable defense." *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004). This is not to say that motions to dismiss based on a statute of limitations are necessarily doomed to fail, but the "allegations of the complaint itself [need to] set forth everything necessary to satisfy the affirmative defense." Dismissal is appropriate, therefore, only in circumstances "when a complaint plainly reveals that an action is untimely." *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005).

The parties agree that Indiana's statute of limitations applies to Plaintiffs' claims. [Dkt. No. 77 at 24; Dkt. No. 83 at 17.] Indiana's statutes of limitations are deemed

procedural in nature, and therefore, under Indiana's choice of law rules, the law of the forum state, here Indiana, governs issues arising under the statute of limitations. *Trinity Indus. Leasing Co. v. Midwest Gas Storage, Inc.*, 33 F. Supp. 3d 947, 974 (N.D. Ill. 2014) (citation and internal quotation marks omitted); *Autocephalous Greek–Orthodox Church of Cyprus v. Goldberg & Feldman Fine Arts, Inc.*, 717 F. Supp. 1374, 1385 (S.D. Ind. 1989) (citations omitted), *aff'd*, 917 F.2d 278 (7th Cir. 1990)).  Indiana statutes require that "any product liability action in which the theory of liability is negligence or strict liability in tort" must be commenced "within two (2) years after the cause of action accrues."  Ind. Code § 34-20-3-1 (West 2014); *see also Dague v. Piper Aircraft Corp.*, 418 N.E.2d 207, 210 (Ind. 1981) (acknowledging that a products liability action "must be brought within two years after it accrues").  Indiana's personal injury statute of limitations is also two years.  *See* Ind. Code § 34-11-2-4(a).

Both sides agree that the statute of limitations starts to run based on Indiana's discovery rule.  Indiana's discovery rule is two-pronged:  "the Indiana statute of limitations begins to run from the date that the plaintiff knew or should have discovered (1) that the plaintiff suffered an injury or impingement, and (2) that the injury or impingement was caused by the product or act of another."  *Everson v. Osmose Wood Preserving Co. of Am, Inc.*, 899 F.2d 701, 703 (7th Cir. 1990); *Wehling v. Citizens Nat'l Bank*, 586 N.E.2d 840, 843 (Ind. 1992).  Indiana's "discovery rule has both an injury and a causation prong."  *Everson*, 899 F.2d at 703.  The Seventh Circuit has acknowledged that "it is futile to try to draw firm lines in the context of the discovery rule."  *Id.* at 705.  The causation prong of Indiana's discovery rule is defined as:  "a person knows or should have discovered the cause

of his injury when he has or should have discovered some evidence that there was a reasonable possibility that his injury was caused by the act or product of another," which requires "more than mere suspicion." *Id.*[12]

*Morgan v. Columbus McKinnon Corp.*, 837 N.E.2d 546, 549 (Ind. Ct. App. 2005), cited by Defendant, succinctly summarizes Indiana's discovery rule. "[T]he question is whether [plaintiff] experienced symptoms that would cause a person of reasonable diligence to take action that would lead to the discovery of his cause of action." *Id.* The *Morgan* case noted that events short of a diagnosis can provide plaintiff with enough evidence to suffice as notice and require that he take action, such as a doctor informing plaintiff of a reasonable possibility that the injury was caused by an act or product. *Id.* In *Morgan*, the plaintiff knew the day after his accident that his nervous feelings were related to his injury (electrical shock). Only later, when he was diagnosed with anxiety disorder, did plaintiff apparently attribute the injury to the defendant. *Id.* The court held that plaintiff's later-diagnosed anxiety disorder diagnosis was not the trigger for the statute of limitations, but that the initial symptoms that would cause a person of reasonable diligence to take action – i.e., those that occurred the day after the accident. The court affirmed summary judgment for defendant based on the expiration of the statute of limitations.

---

[12] The Defendants accurately observe that the court in *Everson* noted an "unusual factor" in that the plaintiff acted with diligent efforts but did not have a suspicion about the cause of his injuries because his suspicions were rebuffed by his doctors upon whom he relied. *Evenson*, 899 F.2d at 705. This distinguishing factor is irrelevant here where the SAC does not indicate *when* the Plaintiffs knew or should have known that their alleged injuries were caused by Defendants (or another).

The parties focus here on two different time periods as triggers for the statute of limitations. Defendants focus on the date of the first concussion alleged in the SAC. [*See* Dkt. No. 77 at 26.] In citing to several Indiana and Seventh Circuit cases, Defendants argue that the concussions suffered by Plaintiffs during college were the injuries that triggered the running of the statute of limitations. [*See id.* at 25 (citing *Rieth-Riley Const. Co. v. Gibson*, 923 N.E.2d 472, 476–77 (Ind. Ct. App. 2010) (plaintiff knew an injury caused by another occurred, but did not know the identity of the alleged tortfeasor); *Richards-Wilcox, Inc. v. Cummins*, 700 N.E.2d 496, 498 (Ind. Ct. App. 1998) (same); *Custom Radio Corp. v. Actuaries & Benefit Consultants, Inc.*, 998 N.E.2d 263, 268 (Ind. Ct. App. 2013) (quoting *Shideler v. Dwyer*, 417 N.E.2d 281, 289 (Ind. 1981)) (focusing on when the damage occurred from a breach of consulting services contract when the tortfeasor was known); *Frey v. Bank One*, 91 F.3d 45, 47 (7th Cir. 1996) (holding that "Indiana does not require that a plaintiff uncover the legal theory for holding a defendant liable for the action to accrue. Rather, the plaintiff must only be aware that the defendant caused him injury.")).] Defendants argue that:

> Here, DuRocher and Harris allege that they experienced traumatic head impacts while playing college football, including specific impacts during their college football careers that purportedly rendered them lightheaded and dizzy and resulted in doctors diagnosing them with concussions. (SAC ¶¶ 13, 16.) Their college football careers ended in 2006 and 2008, respectively. (*Id.* ¶¶ 13, 15.) Yet despite their admitted knowledge of concussive injuries experienced during college, they did not file their claims until October 2013, well outside the two-year statute of limitations. (Class Action Compl. (ECF No. 1), filed Oct. 1, 2013.) Their claims are therefore time-barred, and the Court should dismiss them entirely and with prejudice. *See Lewis*, 411 F.3d at 842.

[*Id.* at 26.] Defendants ignore that the SAC did not allege when Plaintiffs knew or should have known that their injuries were caused by another.

Plaintiffs characterize their injuries as latent and thus do not focus on Plaintiffs' concussions as the injuries that would trigger the statute of limitations period. Instead, they argue that "nothing in the Complaint alleges that either Mr. DuRocher or Mr. Harris knew more than two years before filing suit of a reasonable possibility that their exposures to head impacts resulted in latent brain injuries requiring ongoing medical monitoring – much less that they received any such indication from a doctor." [Dkt. No. 83 at 22.]

Defendants are correct that "it is not necessary that the full extent of the damage be known" for the statute of limitations to be triggered. Nor does the fact that Plaintiffs seek compensation for damages they characterize as "latent" extend the statute of limitations. Defendants argue that the trigger with respect to damages is when "some ascertainable damage has occurred." [Dkt. No. 90 at 16 (citing *Kazmer v. Bayer Healthcare Pharm., Inc.*, No. 2:07-cv-112-TS, 2007 WL 4148003, at *2 (N.D. Ind. Nov. 19, 2007)).]

In response to Defendants' argument that Plaintiffs need not know or even appreciate the full range of symptoms suffered before the statute of limitations begins to run, Plaintiffs equate their claims and injuries to chemical exposure cases where a plaintiff's injury did not manifest itself until years later. [*See* Dkt. No. 83 at 19-23.] For example, in *Everson*, the plaintiff was exposed to carcinogenic chromated cooper arsenate ("CCA"). 899 F.2d at 701. After three years, plaintiff developed respiratory problems and after five years he grew concerned that the CCA was causing his respiratory problems. *Id.* The testing performed by his doctors did not confirm that plaintiff's respiratory problems

43

were related to his CCA exposure (the "unusual factor" in this case, discussed above). *Id.* Only after he spoke with an attorney more than two years after he first became concerned that the CCA was causing respiratory problems did plaintiff file suit. *Id.* The Seventh Circuit found that "[a] reasonable possibility, while less than a probability, requires *more than the mere suspicion* possessed by [the plaintiff], a layperson without technical or medical knowledge." This is a fact-specific inquiry not appropriate for summary judgment. *Id.* at 705.[13]

It is unclear whether *Everson* is applicable here or not. The circumstances of the named Plaintiffs' injuries, medical treatment, and our knowledge of the facts underlying their claims as alleged in the SAC are extremely limited. Because a motion to dismiss is limited to the allegations of the SAC, we are unable to determine "the date that the plaintiff knew or should have discovered (1) that the plaintiff suffered an injury or impingement and (2) that the injury or impingement was caused by the product or act of another." *Everson*, 899 F.2d at 703. Here's what we do know, based on the SAC: (1) Plaintiffs

---

[13] Plaintiffs cite *Dorman v. Osmose, Inc.*, 782 N.E.2d 463, 464 (Ind. Ct. App. 2003). [Dkt. No. 83 at 19-20.] In that CCA exposure case, plaintiff knew at the time of his exposure that there was "some nasty stuff in that [treated lumber]," but it was not until an attorney recommended CCA testing (four years after the injury) that plaintiff discovered his cause of action. *Dorman*, 782 N.E.2d at 465. Similarly, *Degussa Corp. v. Mullens*, 744 N.E.2d 407, 409 (Ind. 2001) focused on the time at which plaintiff knew that a "reasonable possibility" existed that her ailments were caused by her chemical exposure (which was more than two years from exposure). These and other cases cited by Plaintiffs were decided at the summary judgment stage of the proceedings. *See also Allied Resin Corp. v. Waltz*, 574 N.E.2d 913 (Ind. 1991); *Detrex Chem. Indus., Inc. v. Skelton*, 789 N.E.2d 75 (Ind. Ct. App. 2003). Here, the parties are limited to the allegations of the SAC, which makes it even more difficult for Defendants to show that Plaintiffs knew or had reason to know that a reasonable possibility existed that the negative effects of their concussions incurred during college were the result of a defect in Defendants' helmets when the first head injury occurred.

played college football between 2003 and 2008, inclusive; (2) Plaintiffs suffered repeated

traumatic head impacts during their respective collegiate football careers and received

concussion diagnoses; (3) Plaintiffs believe they wore helmets manufactured and sold by

Defendants when their traumatic head impacts occurred; (4) after their respective

graduations from college (or completion of their participation in collegiate football)

Plaintiffs experienced frequent severe headaches;[14] and (5) Plaintiffs seek an order

providing them with medical monitoring for the residual effects of their traumatic head

impacts. [SAC ¶¶ 13-17.] Although Plaintiffs' SAC includes a myriad of allegations

relating to the medical explanations for concussions, the evolution of football helmets,

information disseminated by Defendants relating to the safety and quality of their helmets,

and the state of Defendants' knowledge at a given time, there are no allegations that these

things were known by the Plaintiffs. Defendants' motion to dismiss based on the statute

of limitations therefore fails.

Defendants do not demonstrate that the SAC contains any indication when Plaintiffs

knew or reasonably should have known that their injuries (even if they occurred prior to

2008) were "caused by the act or product of another." As a result, Defendants cannot show

---

[14] Defendants claim that Plaintiffs "began experiencing other purportedly related conditions in the mid to late 2000s. ([SAC] ¶¶ 13, 16)." [Dkt. No. 90 at 15.] This is an inaccurate recap of the allegations. The SAC alleges only that "[a]fter graduation, Mr. DuRocher has experienced frequent severe headaches" and that "[a]fter graduation, Mr. Harris has experienced frequent severe headaches, memory loss, an inability to concentrate or focus, anxiety, and depression." [SAC at ¶¶ 13, 16.]

at this time that the statute of limitations bars Plaintiffs' claims.[15]  The SAC falls short of plainly revealing that this litigation was untimely; no indication that the statute of limitations bars the claims set out in the SAC.  Defendants' Motion to Dismiss based on the statute of limitations is thus DENIED.

### 2. Fraudulent Concealment.

Defendants have not shown based on the allegations of the SAC, that the statute of limitations expired prior to Plaintiffs' filing their complaint.  Therefore, we need not reach the claim of fraudulent concealment.

## V. Conclusion.

For the foregoing reasons, Defendants' Motion to Dismiss [Dkt. No. 76] is GRANTED IN PART AND DENIED IN PART.  The Court rules as follows:

Defendants' Motion to Dismiss Plaintiffs' Claim for Medical Monitoring is GRANTED WITH PREJUDICE.

Defendants' Motion to Dismiss Plaintiffs' Common-Law Negligence Claim is GRANTED WITH PREJUDICE.

Defendants' Motion to Dismiss Plaintiffs' Products Liability Claim related to an alleged design defect is DENIED.

Defendants' Motion to Dismiss Plaintiffs' Products Liability Claim related to an alleged manufacturing defect is GRANTED WITHOUT PREJUDICE.

Defendants' Motion to Dismiss Plaintiffs' Products Liability Claim related to an alleged failure to warn is DENIED.

---

[15] Defendant is correct that a medical diagnosis is not necessarily required to trigger the running of the statute of limitations.  [Dkt. No. 90 at 15 (citing *Evenson*, 899 F.2d at 704-05).]  Here, however, we have neither a medical diagnosis nor any allegations pointing to a time when Plaintiffs knew or had reason to know that their injuries were caused by the act or product of another.

Defendants' Motion to Dismiss Plaintiffs' Products Liability Claim based on proximate cause is DENIED.

Defendants' Motion to dismiss Easton-Bell Sports, Inc. is DENIED.

Defendants' Motion to Dismiss Easton-Bell Sports, LLC; EB Sports Corp.; and RBG Holdings Corp. is GRANTED WITHOUT PREJUDICE.

Defendants' Motion to Dismiss Plaintiffs' SAC based on the statute of limitations is DENIED.

Date: 3/31/2015

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Don Barrett
BARRETT LAW OFFICE PA
dbarrett@barrettlawgroup.com

Paul Cereghini
BOWMAN & BROKE LLP
paul.cereghini@bowmanandbrooke.com

Cary A. Slobin
BOWMAN & BROOKE, LLP
cary.slobin@bowmanandbrooke.com

Robert Latane Wise
BOWMAN AND BROOKE LLP
rob.wise@bowmanandbrooke.com

Irwin B. Levin
COHEN & MALAD LLP
ilevin@cohenandmalad.com

Lynn A. Toops
COHEN & MALAD LLP
ltoops@cohenandmalad.com

Richard E. Shevitz
COHEN & MALAD LLP
rshevitz@cohenandmalad.com

Scott D. Gilchrist
COHEN & MALAD LLP
sgilchrist@cohenandmalad.com

Vess Allen Miller
COHEN & MALAD LLP
vmiller@cohenandmalad.com

Randall R. Riggs
FROST BROWN TODD LLC
rriggs@fbtlaw.com

Mark S. Mester
LATHAM & WATKINS LLP
mark.mester@lw.com

Elizabeth J. Cabraser
LIEFF CABRASER HEIMANN & BERNSTEIN
ecabraser@lchb.com

Wendy Ruth Fleishman
LIEFF CABRASHER HEIMANN & BERNSTEIN LLP
wfleishman@lchb.com

Daniel J. Kain
LITTLETON JOYCE UGHETTA PARK & KELLY LLP
daniel.kain@littletonjoyce.com

Scott  Toomey
Littleton Joyce Ughetta Park & Kelly, LLP
scott.toomey@littletonjoyce.com

David B. Franco
THE DUGAN LAW FIRM, APLC
dfranco@dugan-lawfirm.com

James  Dugan
THE DUGAN LAW FIRM, APLC

jdugan@dugan-lawfirm.com